UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

                    v.

ANDREY KOSTIN,
  a/k/a "Andrei Kostin,"

VADIM WOLFSON,
  a/k/a "Vadim Belyaev," and

GANNON BOND,

               Defendants.

S2 24 Cr. 91 (GHW)

# THE GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS, STRIKE, FOR A BILL OF PARTICULARS, AND FOR PRODUCTION OF GRAND JURY MATERIALS

EDWARD Y. KIM
Acting United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10007

Emily Deininger
David R. Felton
Assistant United States Attorneys
   *Of Counsel*

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 4

DISCUSSION ................................................................................................................... 6

A.    Wolfson's Motion to Suppress the Law Firm Records Should Be Denied ........... 6

1.    Materials Produced by the Cyprus-based Law Firm ....................................... 7

2.    Applicable Law ................................................................................................ 10

a.    Attorney-Client Privilege ..................................................... 10

b.    Crime-Fraud Exception ....................................................... 12

3.    Argument ......................................................................................................... 13

a.    Wolfson's Motion is Untimely ............................................. 13

b.    Wolfson Has Failed to Establish an Applicable Attorney-Client Privilege ........................................................................... 13

c.    The Law Firm Records Do Not Pertain to Legal Advice ............. 17

d.    The Crime Fraud Exception Applies ...................................... 19

e.    The Remedy Wolfson Seeks Is Overly Broad and Lacks Any Legal Basis ...................................................................... 21

B.    Wolfson's Motion to Suppress Data From His iPhone and iPad Should Be Denied ........................................................................................................... 22

1.    Suppressing Data From the iPhone and iPad (As Opposed to the Passcode) Is Not a Remedy for the Conceded *Miranda* Violation ................................... 23

a.    Digital Fruits Should Not Be Suppressed .................................. 24

b.    The Passcode Statements Were Not Given Involuntarily ............. 27

2.    Data From the iPhone Should Not Be Suppressed Because the Government Would Inevitably Have Obtained the Data Even Absent Wolfson's Statements 35

a.    Applicable Law ................................................................... 35

b.    Argument ......................................................................... 36

C.    Defendants' Motions to Suppress the Fruits of Searches Executed Pursuant to Search Warrants for Their Email Accounts, iCloud Accounts, and Cellphones Should Be Denied .................................................................................... 39

1.    The Challenged Search Warrants ................................................................... 39

2.    Applicable Law ............................................................................................... 40

a.    Review of a Magistrate Judge's Probable Cause Determination.. 40

|   |   | b. | The *Franks* Doctrine ................................................................. 41 |
|   |   | c. | Misstatements or Omissions in a Search Warrant Affidavit......... 42 |
|   | 3. | | Argument ................................................................................... 45 |
|   |   | a. | The Affidavit Supporting the Email Warrant Is Not Facially Defective ..................................................................................... 45 |
|   |   | b. | The Affidavit Supporting the Email Warrant Does Not Contain Materially False Statements Nor Does It Omit Material Facts..... 47 |
|   |   | c. | The Affidavit Supporting the iCloud Warrant Does Not Contain Materially False Statements Nor Does It Omit Material Facts..... 52 |
|   |   | d. | There Is No Basis to Suppress Evidence Obtained from Bond's Cellphone .................................................................................... 58 |
|   |   | e. | The Affidavit Supporting the Wolfson Device Warrant Does Not Contain Materially False Statements Nor Does It Omit Material Facts ........................................................................................... 58 |
|   |   | f. | The Affidavit Supporting the Cellphone Location Warrant Does Not Contain Materially False Statements Nor Does It Omit Material Facts .............................................................................. 60 |
| D. | | | Defendants' Motion for a Bill of Particulars Should Be Denied ........................ 61 |
|   | 1. | | Applicable Law............................................................................. 62 |
|   | 2. | | Argument ..................................................................................... 65 |
| E. | | | Defendants' Motion for Grand Jury Materials Should Be Denied ...................... 72 |
|   | 1. | | Applicable Law............................................................................. 72 |
|   | 2. | | Argument ..................................................................................... 76 |
| F. | | | Defendants' Motion to Strike Allegations From the Indictment Should Be Denied ........................................................................................................ 78 |
|   | 1. | | Applicable Law............................................................................. 78 |
|   | 2. | | Argument ..................................................................................... 80 |
| **CONCLUSION** ........................................................................................................ **84** | | | |

The Government respectfully submits this memorandum of law in opposition to the motions of defendants Vadim Wolfson and Gannon Bond.  Defendants have filed motions seeking: (1) to suppress materials obtained from a Cyprus-based law firm (Dkt. 76);[1] (2) to suppress data obtained from their Yahoo and Gmail accounts pursuant to a search warrant, or for a *Franks* hearing (Dkt. 87); (3) to suppress data obtained from their Apple iCloud accounts pursuant to a search warrant, or for a *Franks* hearing (Dkt. 87); (4) to strike purported surplusage from the Indictment (Dkt. 87); (5) for a bill of particulars (Dkt. 83); and (6) for production of, or *in camera review of*, grand jury materials (Dkt. 83).  Wolfson alone also moves to (1) suppress his device passcode and data from his iPhone and iPad because of an alleged Fifth Amendment violation (Dkt. 79); (2) suppress cellphone location information obtained from AT&T pursuant to a search warrant (Dkt. 83); and (3) suppress data obtained from his iPhone and iPad because of alleged issues with allegations contained in an affidavit submitted in support of the search warrant for those devices (Dkt. 83).  Additionally, Bond alone moves to suppress the data obtained from the search of his cellphone pursuant to a search warrant (Dkt. 87).

---

[1] "Dkt." refers to docket entries in this case; "Indictment" or "Ind." refers to the superseding indictment listing the three defendants in this case (Dkt. No. 13); "Bond Motion" or "Bond Mot." refers to the memorandum of law filed in support of Bond's motions (Dkt. No. 87); "Privilege Motion" or "Priv. Mot." refers to the memorandum of law filed in support of Wolfson's motion to suppress materials obtained from a Cyprus-based law firm (the "Law Firm") (Dkt. 76), and "Privilege Decl." refers to the declaration filed by David C. Rybicki in support of Wolfson's motion to suppress materials obtained from the Law Firm (Dkt. 75); "Device Motion" or "Device Mot." refers to the memorandum of law filed in support of Wolfson's motion to suppress his device passcode and the data from his iPhone and iPad (Dkt. 79), and "Device Decl." refers to the declaration filed by David C. Rybicki in support of that motion (Dkt. 78); "Wolfson Motion" or "Wolfson Mot." refers to the memorandum of law filed in support of Wolfson's motion for a bill of particulars, for suppression of the fruits of certain searches, and to require production of grand jury materials (Dkt. 83), and "Rybicki Decl." refers to the declaration filed by David C. Rybicki in support of that motion (Dkt. 82).

Apart from Wolfson's motion to suppress his post-arrest statement in which he provided his device passcode, which the Government does not oppose in part as is described further below,[2] these motions are meritless and should be denied.

## BACKGROUND

The Indictment charges that Wolfson and Bond, along with co-defendant Andrey Kostin, and others not charged in the Indictment, participated in a scheme to violate the International Emergency Economic Powers Act ("IEEPA") through the provision of funds, goods, and services, including U.S. financial services and U.S. dollar transactions, to and for the benefit of Kostin, a Russian oligarch who was sanctioned by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC")  (Ind. ¶ 1).  Kostin, who was sanctioned by OFAC on April 6, 2018 (*id.*), beneficially owned and controlled his assets, including a luxury home in Aspen, Colorado ("the Aspen Home"), through shell companies, nominal owners, and trusted associates (*id.* ¶¶ 2, 6-10).

Kostin bought the Aspen Home in 2010 for approximately $13.5 million with the assistance of trusted associates including an individual referred to in the Indictment as co-conspirator 1 ("CC-1").  (*Id.* ¶¶ 8, 34).  Consistent with how he owned nearly all of his assets, the Aspen Home was "owned" on paper by a company, specifically 40 North Star LLC ("40 North Star"), which was a company that Kostin himself described in 2011 as "an entity that I control."  (*Id.* ¶¶ 34-36). Between approximately 2010 and 2017, Kostin, accompanied by members of his family and/or his house staff, came to the United States to use the Aspen Home for approximately two weeks every

---

[2] For clarity, the Government opposes the portion of this motion that seeks to suppress the data obtained after the Government accessed Wolfson's iPhone and iPad, pursuant to a search warrant, using the device passcode.  It consents only to the suppression of Wolfson's statement in which he provided the passcode.

year.  In contemporaneous correspondence between the individuals responsible for the operation of the Aspen Home and others, Kostin was referred to as the "owner" or "boss."  (*Id*. ¶ 38).  When others, including Bond and Wolfson, used the Aspen Home between 2010 and 2017, they were described by Kostin's representatives as Kostin's guests, with Kostin funding their visits.  (*Id*. ¶ 39).

Also consistent with how Kostin owned nearly all of his assets, the nominal ownership or shell entities that on paper purported to "own" 40 North Star changed several times between 2010 and September 2019.  (*Id*. ¶¶ 35, 42-43).  One such example was a May 2014 transfer of 40 North Star's nominal ownership from a shell entity named Ledridge to a British Virgin Islands shell entity named Altamonte.  (*Id*. ¶ 42).  Altamonte, created one month before becoming the nominal owner, purchased 40 North Star using money it obtained from an approximately $10 million loan that it received from another shell entity, named Capital Business Finance, that was controlled by Kostin.  (*Id*. ¶ 42-43).  Capital Business Finance was "owned" on paper by other shell companies that listed CC-1 and another of Kostin's trusted associates, referred to in the Indictment as co-conspirator 3 ("CC-3"), as nominal owners.  (*Id*. ¶¶ 10, 44).  Between in or about 2014 through at least in or about 2017, Capital Business Finance funded the maintenance and operations of the Aspen Home by regularly funding the bank account used by Altamonte in advance of Altamonte's payments to 40 North Star.  (*Id*. ¶ 45).

On or about April 6, 2018, OFAC designated Kostin as a Specially Designated National ("SDN"), thereby blocking all property that Kostin owned and prohibiting U.S. persons from contributing or providing any funds, goods, or services to Kostin, or for his benefit.  (Ind. ¶¶ 15, 16, 21).  Shortly before that designation, in January 2018, CC-1's assistant notified 40 North Star that Bond would now be authorized to provide instructions and approvals related to the Aspen

Home.  (*Id*. ¶ 47).  The Aspen Home was thereafter used primarily by Wolfson and his family, who were frequently accompanied by Bond.  (*Id*.).

In 2019, Wolfson, Bond, and CC-3 worked with others to finalize contracts and agreements effectuating the sale of the Aspen Home from Kostin to Wolfson.  (*Id*. ¶ 48).  On or about September 25, 2019, Wolfson finalized the purchase of 40 North Star by transferring a total of approximately $12 million (the "September 2019 Transaction") to CapitalInvest Limited ("CapitalInvest"), a wholly owned subsidiary of Capital Business Finance that was nominally owned and controlled by CC-1 and CC-3, on Kostin's behalf.  (*Id*.).  Approximately $11.8 million was transferred from a bank account held in Wolfson's name, while approximately $200,000 was transferred from a bank account held by Altamonte.  (*Id*.)

In sum, after Kostin was sanctioned on April 6, 2018, Defendants (1) continued to deal in blocked property, which was the Aspen Home, until at least September 2019; (2) continued to provide funds, goods, and services for Kostin's benefit and/or to the benefit of the companies Kostin owned or controlled, by operating and maintaining the Aspen Home until at least September 2019; and (3) in September 2019, caused approximately $12 million to be transferred to a shell entity that Kostin controlled, for Kostin's benefit, all of which they did without the requisite license from OFAC and all of which is in violation of IEEPA.  (*Id*. ¶¶ 54-60).

## DISCUSSION

### A. Wolfson's Motion to Suppress the Law Firm Records Should Be Denied

According to Wolfson, materials that were produced to the Government by a Cyprus-based Law Firm (the "Law Firm Records") contain privileged attorney-client communications between himself, or his agents, and the Law Firm.[3]  Wolfson's motion, however, fails on multiple grounds:

---

[3] Wolfson asserts in passing that "the prosecution team . . . may have been tainted by privileged materials," but does not seek recusal of the any of the prosecution team or make any other argument

it is untimely; he has not identified any materials to which he would have a valid claim of privilege; the Law Firm Records primarily pertain to business, not legal, dealings; and, to the extent the Law Firm Records might contain materials relating to Wolfson's personal engagement with the Law Firm that would otherwise be privileged, the crime fraud exception would apply.[4]

### 1. Materials Produced by the Cyprus-based Law Firm

On April 12, 2023, ███████████████████ ("Lawyer-1")[5] was designated as an SDN by OFAC for having being, among other things, "a prolific enabler[] of a number of Russian oligarchs."[6]  A Cyprus-based law firm owned and controlled by Lawyer-1 (the "Law Firm"), Lawyer-1's adult daughter, who was a partner at the Law Firm ("Lawyer-2"); another senior lawyer employed by the Law Firm ("Lawyer-3"); and Lawyer-1's adult son were also designated as SDNs by OFAC at the same time. ████████████████████████████

████████████████████████████

---

on these grounds.  (Priv. Mot. 12).  For the reasons discussed below, the Law Firm Records are not privileged, and, therefore, there was no taint.

[4] Bond states that he joins in this motion.  (Bond Mot. 1).  Bond does not, however, claim or present any evidence that he had an attorney-client relationship with the Law Firm.  There is thus no reason to believe that he is a privilege holder regarding any of the Law Firm Records.  Accordingly, he lacks standing to join in this motion and for this additional reason the motion should be denied as to Bond.  *Application of Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997) (movant "does not have standing to assert an attorney-client privilege belonging to [a third party]"); *United States v. Renzi*, No. 08 Cr. 212, 2010 WL 1962644, *1 (D. Ariz. May 14, 2010) (defendant lacked standing to join motion to suppress "because he has no privacy interest in [co-defendant's] attorney-client privilege").

[5] The Government has designated proposed redactions in the motion papers and accompanying exhibits to protect the identities of witnesses, some of whom are subject to retaliation, and their personally identifiable information, as well as materials over which Wolfson is claiming privilege, consistent with the redactions in Wolfson's and Bond's motions.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006).

[6] Further Curbing Russia's Efforts to Evade Sanctions and Perpetuate its War against Ukraine, Fact Sheet, U.S. Department of State, April 12, 2023, *available at* https://www.state.gov/further-curbing-russias-efforts-to-evade-sanctions-and-perpetuate-its-war-against-ukraine-2/.

Lawyer-1 and Lawyer-2 subsequently participated in voluntary interviews in connection with this investigation, which were attended by an Assistant United States Attorney ("AUSA") from the Southern District of New York and two FBI Special Agents.  Lawyer-1 was interviewed

in Athens, Greece, on July 26 and 28, 2023,[7] and Lawyer-2 was interviewed on July 27, 2023. Lawyer-1 and Lawyer-2 were represented by both Cypriot and U.S.-based counsel during those interviews.  At the outset of the interviews, the AUSA advised Lawyer-1 and Lawyer-2 that the Government did not intend to ask about matters that would be protected by attorney-client privilege, and that the witnesses should not answer any questions that implicated such communications or information.  The interviews with Lawyer-1 focused on Lawyer-1's knowledge of, and relationship with Kostin, and the role of certain individuals, including CC-1 and CC-3, as Kostin's agents and nominees.  The interview with Lawyer-2 focused primarily on the corporate entities and structures used to hold certain Kostin assets, as reflected in corporate business records, such as company formation records and declarations of trust, that were maintained by the Law Firm.

During the interviews, Lawyer-1 informed the Government, among other things, that "[a]ll instructions for Kostin-related matters came from [CC-1] or [CC-3], or from people working for [CC-1] or [CC-3]," Privilege Decl., Ex. C at 4; *id.*, Ex. E at 2, and that CC-1 and CC-3 served as nominee owners—"only on paper"—for Kostin assets and companies.  *Id.*, Ex. C, at 4, 6, 7.

Following the interviews, between in or about September 2023 and December 2023, Lawyer-1, through his U.S. counsel, voluntarily made several productions to the Government of records relating to companies that had been used to hold Kostin assets and for which the Law Firm

---

[7] Lawyer-1 demonstrated no significant signs of cognitive impairment or diminished capacity during his interview, and the Government has no information regarding Lawyer-1's purported Alzheimer's diagnosis beyond the assertions made in Wolfson's motion. (*See* Wolfson Mot. 8).  Regardless, even assuming that Lawyer-1 has Alzheimer's disease, that would not mean either that he was incompetent at the time of the interview or that he could not be a competent witness.  *See United States v. Blevins*, No. 18 Cr. 22 (TAV) (HBG), 2019 WL 5866142, at *9 n. 4 (E.D. Tenn. July 30, 2019) (witness with Alzheimer's not barred from testifying; diagnosis is a merely a consideration for weight and credibility of testimony).

had provided incorporation and other related business services (*i.e.*, the Law Firm Records). The Law Firm Records, which primarily relate to business services provided by the Law Firm and contain numerous business and corporate records, were produced to Wolfson and Bond as part of Rule 16 discovery on March 27, 2024.[8]  Wolfson raised no issues regarding attorney-client privilege pertaining to the Law Firm Records until the filing of the instant motion.[9]

### 2. Applicable Law

#### a. Attorney-Client Privilege

"A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). "The law is clear in this circuit that a person claiming the attorney-client privilege has the burden of establishing all the essential elements thereof." *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987). That "'burden [is] not discharged by mere conclusory or ipse dixit assertions.'" *United States v. Ghavami*, 882 F. Supp. 2d 532, 536 (S.D.N.Y. 2012) (*quoting In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 225 (2d Cir. 1984)). And "[t]he party invoking the privilege also has the burden to show that the privilege has not been waived." *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 391 (S.D.N.Y. 2015).

A lawyer's involvement is not the hallmark of privilege. Rice, *Attorney-Client Privilege in the U.S.* § 7:1 ("The fact that a person consults with an attorney does not render everything he

---

[8] The Law Firm Records contain 3,596 documents that were produced at US_0000027222 to US_0000037645, and US_0000441193 to US_0000447489. Of those more than 3,500 documents, Wolfson has identified only 11 that he claims are purportedly privileged. (*See* Priv. Decl., Exs. G to Q).

[9] Wolfson, for example, did not indicate that he would be filing any motions relating to attorney-client privilege when asked what motions he intended to file during the pretrial conference held on September 26, 2024.

says to the attorney privileged"). "[T]he attorney-client privilege protects only legal advice, not economic, business, or policy advice." *Fox News Network, LLC v. U.S. Dep't of The Treasury*, 739 F. Supp. 2d 515, 560 (S.D.N.Y. 2010); *see also In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1037 (2d Cir. 1984) ("[T]he privilege is triggered only by a client's request for legal, as contrasted with business, advice."). Thus, "the key inquiry is whether the predominant purpose of the communication is to solicit or provide legal advice." *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT) (SN), 2022 WL 2705396, at *2 (S.D.N.Y. July 12, 2022), *objections overruled*, 2022 WL 4584111 (S.D.N.Y. Sept. 29, 2022) (internal quotation marks omitted).

"Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct . . . . It requires a lawyer to rely on legal education and experience to inform judgment." *Cnty. of Erie*, 473 F.3d at 419 (internal quotation marks and citations omitted); *see also Oil Chem. & Atomic Workers Int'l Union (OCAWIU) v. Am. Home Prod.*, 790 F. Supp. 39, 41 (D.P.R. 1992) (noting that one "factor" in considering whether privilege should apply "is whether the function that the attorney is performing is a lawyer-related task such as: applying law to a set of facts; reviewing client conduct based upon the effective laws or regulations; or advising the client about status or trends in the law"). "Where an attorney and his client are engaged in business dealings . . . the attorney-client rule does not apply." *Lowy v. Comm'r*, 262 F.2d 809, 812 (2d Cir. 1959); *see also Shih v. Petal Card, Inc.*, 565 F. Supp. 3d 557, 566 (S.D.N.Y. 2021) ("'Needless to say, the attorney-client privilege attaches only to legal, as opposed to business, services.'" (*quoting U.S. Postal Serv. v. Phelps Dodge Ref. Corp.,* 852 F. Supp. 156, 160 (E.D.N.Y. 1994)).

Finally, and relatedly, "[b]lanket claims asserting attorney client privileges are improper"

because "[t]he privilege must be determined on a case-by-case analysis of the relevant factors." *Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.)*, 139 F.R.D. 295, 300 (S.D.N.Y. 1991). "That is especially so because "the privilege" is "construe[d] . . . narrowly because it renders relevant information undiscoverable." *Cnty. of Erie*, 473 F.3d at 418; *In re Grand Jury Investigation*, 399 F.3d 527, 531 (2d Cir. 2005) ("[T]he attorney-client privilege, in particular, 'applies only where necessary to achieve its purpose.'" (*quoting Fisher v. United States*, 425 U.S. 391,403 (1976)).

b.  Crime-Fraud Exception

Privilege does not extend to "communications made for the purpose of getting advice for the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563, (1989) (internal quotation marks omitted). "Although there is a societal interest in enabling clients to get sound legal advice, there is no such interest when the communications or advice are intended to further the commission of a crime or fraud." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). "A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law." *Clark v. United States*, 289 U.S. 1, 15 (1933).

"The crime-fraud exception applies only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal activity." *United States v. Tucker*, 254 F. Supp. 3d 620, 622 (S.D.N.Y. 2017) (internal quotation marks and modifications omitted). The burden in proving that lies with the party seeking to invoke it. *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984). The "probable cause" standard has been "rephrased as requiring that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) (internal quotation marks omitted). "Obviously, there need not be a definitive showing

of the fraudulent nature of the client's objective; rather, there need only be presented a reasonable basis for believing that objective was fraudulent." *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013) (internal quotation marks and modifications omitted).

### 3. Argument

#### a. Wolfson's Motion is Untimely

Initially, Wolfson's privilege claim is untimely and should be rejected on this basis alone. Wolfson has been on notice since at least March 27, 2024—when the Law Firm records were produced as part of the discovery process, and plainly identified in the production cover letter as "[Lawyer-1] Records"—as to any potential privilege claim and did not raise it at any point prior to filing the instant motion at the end of November 2024.  There is no reason that the claim could not have been raised earlier, including by making a timely request for the Government to segregate or limit the prosecution team's access to any potentially privileged materials.  *See Hurst v. F.W. Woolworth Co.,* 1997 WL 61051, at *6 (S.D.N.Y. Feb. 11, 1997) (finding waiver after dilatory assertion of attorney-client privilege); *Apex Mun Fund v. N-Group Securities*, 841 F. Supp. 1423, 1433 (S.D. Tex. 1993) (finding privilege waived as to documents disclosed by third-party; "a one-year delay in taking any action to attempt to preserve the privilege exemplifies carelessness"); *see also* Barnett, et al., 2 Attorney-Client Privilege in the U.S. § 9:33, Failure to Properly Object to Disclosure of Confidential Communications ("[W]hen . . . the client fails to timely and properly voice any objection to the disclosure, he impliedly waives the privilege protection that otherwise could have been asserted.").  This is particularly true given that Wolfson previously filed a motion, on April 16, 2024, seeking to protect other records that were purportedly privileged, including materials that had been produced in discovery on April 5, 2024, *after* production of the Law Firm Records.

#### b. Wolfson Has Failed to Establish an Applicable Attorney-Client Privilege

Wolfson also lacks standing to move to suppress many, if not most, of the Law Firm Records. Those records relate not to services provided by the Law Firm to Wolfson—which, as set forth in the engagement agreement, was limited to services provided for Altamonte and another entity, Spencer Investments Limited ("Spencer") (Privilege Decl., Ex. A, Schedule 1)—but rather to other entities and trusts for which the Law Firm provided incorporation and business services on behalf of Kostin, CC-1, or CC-3. Wolfson has no standing to assert an attorney-client privilege over these records, which is his only basis for suppression.[10]  (Priv. Mot. 9-10); *see, e.g.*, *Application of Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997) (movant "does not have standing to assert an attorney-client privilege belonging to [a third party]"); *United States v. Renzi*, No. 08 Cr. 212, 2010 WL 1962644, *1 (D. Ariz. May 14, 2010) (defendant lacked standing to join motion to suppress "because he has no privacy interest in [co-defendant's] attorney-client privilege"); *In re von Bulow*, 828 F.2d at 100 ("privilege belongs solely to the client").

Wolfson, moreover, has failed to submit competent evidence that any attorney-client relationship existed between Wolfson in his personal capacity and the Law Firm prior to December 13, 2018 (*see* Privilege Decl., Ex. A (Engagement Agreement, dated Dec. 13, 2018)), and the Government is aware of no such relationship between the Law Firm and Wolfson in his personal capacity prior to December 17, 2016 (*see* Engagement Agreement, dated Dec. 27, 2016, attached hereto as Exhibit A). All of the purportedly privileged communications and attorney notes Wolfson has identified precede that December 2016 Engagement Agreement between Wolfson

---

[10] Wolfson claims that Lawyer-1 and Lawyer-2 breached their ethical obligations by producing privileged and/or confidential communications among the Law Firm Records. (Priv. Mot. 11). He does not, however, identify any case or other authority suggesting that the Government did anything improper in seeking or accepting a voluntary production of records, or that, even assuming there was a breach of Lawyer-1 or Lawyer-2's ethical obligations, that would be a valid basis for suppression of evidence in a criminal case.

and the Law Firm.  (*See* Privilege Decl., Exs. G-M).[11]

Any attorney-client relationship that existed prior to December 27, 2016, at least as relevant to the email communications Wolfson challenges, was between the Law Firm and Otkritie Financial Corporation, a Russian financial institution where Wolfson formerly served as the Chief Executive Officer.  *See, e.g.*, Privilege Decl., Ex. J (correspondence between Law Firm and individual identified in email signature as Deputy Head of Otkritie's Corporate Legal Department, using email address with Otkritie's "open.ru" domain); *id.*, Ex. J (correspondence between Law Firm and individual using email address with Otkritie's open.ru domain); *id.*, Ex. H (same); *id.*, Ex. G (same); *id.*, Ex. E at 3 (Lawyer-1 explaining that Otkritie was a client of the Law Firm prior to Wolfson becoming a personal client).  And Wolfson, as a former employee, is not the privilege holder regarding those communications and has no standing to assert privilege on behalf of Otkritie.  *See, e.g.*, *United States v. Int'l Bd. of Teamsters*, 119 F.3d 210, 215 (2d Cir. 1997) (courts have held that any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee) (gathering cases); *In re Grand Jury Subpoenas*, 114 F.3d 653, 658 (10th Cir. 1998) (recognizing that because "[a]ny privilege resulting from communications between corporate

---

[11] Similarly, only one of the four "charts" describing the various phases of ownership of the Aspen Home relates to a time period encompassed by Wolfson's Engagement Agreements with the Law Firm.  *See* Privilege Decl., Ex. Q.  The Government's understanding is that those charts were created internally by the Law Firm after any relevant representation ended.  They do not contain any communications soliciting or pertaining to legal advice, and therefore would potentially be protected only as attorney-work product.  (*See* Privilege Mot. describing charts as containing "counsel's legal impressions" and "counsel's legal conclusions").  To the extent any such work-product protection was applicable, it was waived by the Law Firm and Lawyer-1 when they chose to voluntarily produce the records.  *See, e.g.*, *Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, Inc.*, 130 F.R.D. 28, 32 (S.D.N.Y. 1990) ("it seems clear that the attorney may waive the benefits of the [attorney work-product] privilege, because it is the attorney's material, not the client's receiving protection"); *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, No. 10 Civ. 9193, 2023 WL 315027, at *15 (S.D.N.Y. Jan. 19, 2023) (same).

officers and corporate attorneys . . . belongs to the corporation and not to the officer, [an individual]

has no power to assert the attorney-client privilege except as to confidential communications with

[those attorneys] in his individual capacity"); *United States v. Planche*, 913 F. 2d 1375, 1381 (9th

Cir. 1990) (former officer of corporation could not assert corporation's attorney-client privilege).

Moreover, the Government understands, based on its communications with Lawyer-1 and

his counsel and review of other evidence, that the attorney notes over which Wolfson has claimed

privilege (Privilege Decl., Exs. K-M) pertain to meetings between Lawyer-3 and CC-3 regarding

services provided by the Law Firm to CC-3 and Kostin, not services provided to Wolfson. This is

apparent from the notes, which indicate that they relate to meetings with ██████—*i.e.*, the initials of

████████████, CC-3—or otherwise refer to entities outside the scope of Wolfson's

engagement of the Law Firm, which was limited to issues pertaining to Altamonte and Spencer.

*See id.*, Ex. K (notes re Sept. 15, 2016 meeting with ████ (*i.e.*, CC-3) regarding various entities

and foundations, including "Spenmil," and "office for ████" (*i.e.*, the initials of ████████, CC-

1)); Ex. L (June 25, 2015 notes mentioning "no foundations for ████" (*i.e.*, Kostin's long-term

girlfriend), "2nd shareholders contribution – ████" (*i.e.*, CC-1), and various entities, including

"Detnor" and "Ledridge"); Ex. M (Feb. 10, 2015 notes re meeting with "████" (*i.e.*, CC-3) re various

entities, including "Ledridge").[12]

Wolfson has accordingly failed to submit evidentiary support for a claim of privilege that

---

[12] *See also* Declaration of Trust, dated May 20, 2011 (attached hereto as Exhibit B) (showing that shares of Detnor Holdings Limited were held in trust for ████████████); Winch Design Meeting Minutes re Moscow Residence, dated Oct. 18, 2018 (attached hereto as Exhibit C) (regarding discussions with Kostin, ████████████, and CC-2 for new "family home" for Kostin, ████████████, and their children); Declaration of Trust, dated Aug. 21, 2013 (attached hereto as Exhibit D) (showing that shares of Ledridge Investments Limited were held in trust for Kostin); Email dated July 3, 2008 (attached hereto as Exhibit E) (email from Lawyer-3 stating that CC-1 had ordered creation of Spenmil Management Limited).

would encompass the records he has identified as purportedly privileged. *See, e.g.*, *Kennedy v. Basil*, No. 18 Civ. 2501, 2018 WL 4538898, at *5 (S.D.N.Y. Sept. 20, 2018); *United States v. Bergstein*, 302 F. Supp. 3d 580, 584 (S.D.N.Y. 2018).

In seeking wholesale suppression of the records produced by the Law Firm, without limitation to whether they pertain to Wolfson's engagement of the Law Firm or even relate to a time period in which there was such an engagement, Wolfson asserts an improper blanket claim of privilege. *See Dep't of Econ. Dev.*, 139 F.R.D. at 300. In doing so, he appears to be seeking to prevent the Government from having access to highly relevant, non-privileged corporate and financial records that represent incriminating evidence showing the nominee structures that Kostin used to hold and manage his assets and how CC-1 and CC-3 regularly acted as Kostin's agents with respect to those entities and assets.[13] His motion to suppress these materials for which he has no viable claim of privilege should be denied.

### c. The Law Firm Records Do Not Pertain to Legal Advice

Even if the Court were to look past the above-discussed glaring deficiencies, it should reject the defendant's privilege claim because the records do not relate to dealings in which the Law Firm was "providing legal advice." *Cnty. of Erie*, 473 F.3d at 419. The limited number of purportedly privileged communications identified by Wolfson all predate his Engagement Letters with the Law Firm and show employees of Otkritie communicating with the Law Firm regarding

---

[13] *See, e.g.*, Regulations of Lexus Foundation, dated Oct. 28, 2015, attached hereto as Exhibit F (identifying CC-3 as a "protector," or administrator, of a trust established for management of Kostin's assets, identifying Kostin, his wife, and children as the beneficiaries); Regulations of Lexus Foundation, dated Dec. 4, 2003, attached hereto as Exhibit G) (similar; identifying CC-1 as "protector" of the same trust); Agreement for the Provision of Services, dated Dec. 10, 2014, at 2-3, attached hereto as Exhibit H (giving Ledridge, a Kostin-controlled company, the authority to "take such actions as it may from time in its absolute discretion consider necessary" to collect invoices, make payments, and otherwise take care of the "[Aspen Home] maintenance and management").

the incorporation of a new company (Privilege Decl., Ex. J); ordering payment of outstanding debts (*id.*, Ex. K); and notifying the Law Firm of a debt restructuring (*id.*, Ex. L).  The purpose of these communications is primarily, if not entirely, to serve a business function.  Indeed, in only one of these communications is there even any arguable mention of a request for legal advice. *Compare id.*, Ex. J (Otkritie employee mentions request for "review and comment" of documents)[14] *with id.*, Ex. G (introductory email; no discussion of legal issues or advice); *id.*, Ex. H (Otkritie employee notifies the Law Firm of transaction structure for proposed restructuring, but does not ask for review or comment); *id.*, Ex. I (ordering invoice payment).  This is consistent with Wolfson's subsequent Engagement Agreements, which specify that the services the Law Firm will provide regarding Altamonte and Spencer include the quintessential business—not legal—services of (a) "provi[ding] "administration and/or management services to the Companies"; (b) "provi[ding] Nominee Directors, Nominee Shareholders, Company Secretary, [and] Bank Account Signatory/ies"; and (c) "The provision of a Registered Office Address."  Privilege Decl., Ex. A at 1-2.

As noted above, it is black letter law that "where an attorney and his client are engaged in business dealings . . . the attorney-client rule does not apply." *Shih*, 565 F. Supp. 3d at 566.  The use of a lawyer to provide corporate administration and management services, nominee shareholders, nominee directors, and conduct financial transactions, are squarely non-privileged business services that the Law Firm provided to Wolfson and its other clients. *See, e.g.*, *Shih*, 565 F. Supp. 3d at 569 (attorney-client privilege "simply does not apply" to "generic corporate documents" that do not contain client confidences); *United States v. Rosenstein*, 474 F.2d 705 (2d

---

[14] For the reasons discussed above, to the extent this correspondence contains any potentially privileged communications, Wolfson is not the holder of that privilege and has no standing to assert it.

Cir. 1973) (rejecting privilege claims where two attorneys were used to operate a shell company to evade taxes; they were engaged in "business dealings," which included performing "ministerial tasks" like "amending corporate records" and "being directed by [defendants] to sign contracts, forward checks to [a bank], order business cards, and to arrange for letters of credit"); *Itoba Ltd. v. LEP Group PLC*, 930 F. Supp. 36, (D. Conn. 1996) (privilege not applicable to memo prepared by attorney retained to "manage the affairs" of a business); *United States  v. Hershkowitz*, Misc. No. 25, 26, 1974 WL 759, at *2 (N.D.N.Y. Dec. 19, 1974) (noting that it was "difficult . . . to see . . . how real estate transactions and transfers of funds could be subsumed within the attorney-client privilege").[15]

The defendant has, at bottom, made no showing—as is his burden—that any services the Law Firm provided for him "involve[d] the interpretation and application of legal principles to guide future conduct or to assess past conduct." *Cnty. of Erie*, 473 F.3d at 419 (internal quotation marks and citations omitted).  Accordingly, the attorney-client privilege does not apply.

    d.  <u>The Crime Fraud Exception Applies</u>

As set forth above, the documents at issue are not privileged.  But, "[e]ven if we make the assumption that" the materials produced by the Law Firm regarding Altamonte and/or Spencer are "privileged" and do not relate to "a routine business arrangement," the crime-fraud exception would still apply.  *Rosenstein*, 474 F.2d at 715.  For the crime fraud exception to apply, "a party seeking  to invoke the crime-fraud exception must  at  least  demonstrate  that  [1]  there  is

---

[15] *See also In re In re Grand Jury Subpoenas*, 803 F.2d 493, 499 (9th Cir. 1986) (no attorney-client privilege when "lawyer [acts] as a mere conduit for the payment of money" (citing *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 247 (2d Cir. 1986) (en banc)); *United States v. Horvath*, 731 F.2d 557, 561 (8th Cir. 1984) ("To the extent [lawyer's] services to the [defendants] took the form of transferring funds and facilitating transactions, they were not privileged."); *United States v. Krug*, 379 F. App'x 473, 478 (6th Cir. 2010) (no attorney-client relationship where "[d]efendant was merely using his attorney to help with financial management")

probable cause to believe that a crime or fraud has been attempted or committed and [2] that the communications were in furtherance thereof." *In re Richard Roe*, 68 F.3d at 40.

This test is met here. To start, that the grand jury "issued [an] Indictment, including allegations concerning [Kostin's]" use of shell entities and nominee owners to hide his ownership of the Aspen Home, Wolfson's management of the Aspen Home on Kostin's behalf after Kostin was subject to U.S. sanctions beginning in or about April 2018, and Wolfson's transfer, in 2019, of approximately $12 million to a shell entity for Kostin's benefit in exchange for the Aspen Home, all of which "supports a finding of probable cause that a crime was committed." *Tucker*, 254 F. Supp. 3d at 624; *United States v. Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579, at *4 (S.D.N.Y. Oct. 5, 2015) ("The Grand Jury has returned an Indictment, finding probable cause to charge the defendants with mail and wire fraud . . . .The Government has thus satisfied the first prong of the crime-fraud exception."); *United States v. Gasparik*, 141 F. Supp. 2d 361, 372 (S.D.N.Y. 2001) ("Probable cause to believe that the fraud occurred has already been found by reason of the indictment.").

Wolfson's communications with the Law Firm also "were in furtherance" of this scheme. Among other things, Wolfson used the Law Firm, after Kostin was sanctioned, to transfer funds to pay property management services and expenses for the Aspen Home (*see* Payment Order, attached hereto as Exhibit I), to complete the September 2019 Transaction (the approximately $12 million in funds transferred to the Kostin entity, CapitalInvest) (*see* Payment Order, attached hereto as Exhibit J), and to serve as a liaison between corporate entities allowing Kostin to exercise control over the Aspen Home, despite Altamonte's nominal ownership (*see* Exhibit H (agreement for provisions of services giving Ledridge, a Kostin-controlled entity, the authority to "take such actions as it may from time in its absolute discretion consider necessary" to collect invoices, make

payments, and otherwise take care of the "[Aspen Home] maintenance and management")).  These records and communications were thus "in furtherance of the crime charged in the indictment" because they facilitated the prohibited September 2019 Transaction and provided Kostin a benefit, through Wolfson's maintenance of operation of the Aspen Home after Kostin was sanctioned.  *See Cendant Corp. v. Shelton*, 246 F.R.D. 401, 406 (D. Conn. 2007) (crime fraud applicable where attorneys were used to form trust which was used "as a vehicle to shield[] assets from creditors who were making claims . . .while [defendant] maintain[ed] his control over those assets" in the trust); *Gasparik*, 141 F. Supp. 2d at 370 (crime fraud applicable where testimony went directly "to the issue of who controlled the . . .Trust" at issue).  Thus, the crime-fraud exception squarely applies.[16]

e.  The Remedy Wolfson Seeks Is Overly Broad and Lacks Any Legal Basis

Finally, even assuming *arguendo* that Wolfson's motion has any merit, the remedies that he seeks from the purported violation are overbroad and contrary to settled law.  In particular, despite acknowledging that "the general remedy for violation for the attorney-client privilege is to suppress introduction of the privileged information at trial, not to order wholesale suppression" (Priv. Mot. 10, quoting *United States v. Schulte*, No. 17 Cr. 548, 2019 WL 5287994, *2 (S.D.N.Y. Oct. 18, 2019)), Wolfson seeks exactly that—the wholesale suppression of *all* of the Law Firm Records, the vast majority of which are quintessential business records and/or do not pertain to any attorney-client relationship Wolfson had with the Law Firm.  Wolfson provides no legal support for his proposed remedy of wholesale suppression, and the Government is aware of none.[17]

---

[16] Additionally, if Wolfson intends to argue that he relied on the Law Firm's advice, or that the Law Firm's involvement is any way indicative of good faith on his part, any privilege that may potentially exist would be waived.  *Sec.& Exch. Comm'n v. Honig*, No. 18 Civ. 8175 (ER), 2021 WL 5630804, at *11 (S.D.N.Y. Nov. 30, 2021).

[17] Wolfson's proposed remedies also raise various other issues.  Wolfson proposes that the Law

Even assuming for the sake of argument that there are some limited number of communications in the Law Firm records to which Wolfson would have a valid claim of privilege and that are not subject to the crime-fraud exception—and the Government is aware of none—the appropriate remedy would be to have Wolfson identify those specific documents so that the Government can have its filter team review them and segregate them so that the prosecution team no longer has access, as appropriate.

**B. Wolfson's Motion to Suppress Data From His iPhone and iPad Should Be Denied**

Wolfson moves to suppress his non-*Mirandized* statement to the FBI during his arrest disclosing his iPhone and iPad passcode and the fruits of the searches of those devices.[18]  The Government concedes that the agents should have provided Wolfson (but did not so provide) a full *Miranda* warning before asking for the passcode to his iPhone or iPad.  However, as the Supreme Court and courts in this Circuit have repeatedly recognized, suppressing the fruits of a non-*Mirandized* statement, here, data seized from the iPhone or iPad, would not be a legally appropriate

---

Firm materials be returned to the Law Firm (Priv. Mot. 10), but, as he is well aware, the Law Firm no longer exists (*id.* 2).  Nor would the Law Firm, an offshore entity that was located and operated outside of the U.S., be obliged to comply with a subpoena, which Wolfson proposes that the Government should issue.  (*Id.* 10).  Wolfson alternatively proposes that all of the materials should be submitted for filter review, which is typically conducted to avoid potentially privileged materials being accessed by a case team, but that would serve little purpose here, where the prosecution team has already had access to the records for approximately a year.  And regardless, Wolfson is wrong that the Law Firm Records would likely have gone through filter team review if they had been produced in response to a subpoena instead of being voluntarily produced.  The Government generally does not conduct filter review for materials received through voluntary or subpoenaed productions, particularly those produced by represented parties who have the ability to withhold privileged materials and/or provide a privilege log as appropriate.  And the Justice Manual provision Wolfson cites has no bearing here, as it pertains to the use of filter review for materials obtained pursuant to a *search warrant* for attorney premises, where neither the attorney or any third-party counsel would have such an ability to withhold privileged materials, not subpoenaed or voluntary productions.  *See* Justice Manual § 9-13.420.

[18] Bond states that he is joining in the motion to suppress fruits of searches.  (Bond Mot. at 1).  But the "privilege against self-incrimination is personal," and Bond therefore lacks standing to join his co-defendant's motion.  *See United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir. 1988).

remedy for that admitted error; in these types of circumstances, suppression would not serve to deter a constitutional violation.  Rather, the proper remedy is barring the Government from introducing Wolfson's statement disclosing the passcode in its case in chief, which statement, in any event, the Government does not intend to rely on.

Even if the Court disagrees and concludes that a Fifth Amendment violation occurred, all the data on the iPhone except for emails, recently visited locations, and iOS Health application data should not be suppressed because this data would have been inevitably discovered, even if Wolfson had not provided his passcode.[19]

In support of his suppression motion, Wolfson submits an attorney declaration, but not a declaration from the defendant or any of the underlying three videos summarized in the attorney declaration.  The Government is submitting the three videos, and an additional fourth video, as part of its opposition.  (*See* Exhibits L, M, N, and O).[20]  As Judge Nathan has explained, such a factual presentation is generally a sufficient basis, on its own, for the Court to deny the suppression motion, without the necessity of a hearing.  *See United States v. Greenberg*, No. 21 Cr. 92 (AJN), 2022 WL 827304, at *25 (S.D.N.Y. Mar. 9, 2022).

For these reasons, and the reasons set forth below, Wolfson's motion should be denied.[21]

1.  **Suppressing Data From the iPhone and iPad (As Opposed to the Passcode) Is Not a Remedy for the Conceded *Miranda* Violation**

---

[19] The Government concedes that, based on law enforcement's current technical capabilities as of December 23, 2024, the data on the iPad (unlike the data on the iPhone) would *not* inevitably have been discovered.

[20] The Government is intentionally omitting Exhibit K, skipping directly from Exhibit J to Exhibit L.

[21] As of December 23, 2024, the Government has not determined whether it intends to use any evidence from the iPhone or iPad at trial.  If the Government makes such a determination before the motion is resolved such that the motion would be mooted, it will promptly inform defense counsel and the Court.

To begin, the Supreme Court has long recognized a distinction between *Miranda* violations—which concededly occurred here—and violations of the Fifth Amendment, which did not. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." This right "bars the introduction against a criminal defendant of out-of-court statements obtained by compulsion." *Vega v. Tekoh*, 597 U.S. 134, 141 (2022). "*Miranda* imposed a set of prophylactic rules" designed to protect defendants' Fifth Amendment rights. *Id.* at 141-42. But the Supreme Court has consistently held "a violation of *Miranda*" is not a *per se* "violation of the Fifth Amendment right against compelled self-incrimination" because a non-*Mirandized* statement is not necessarily a compelled statement. *See id.* at 141-45; *see also Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985) (explaining that *Miranda* "sweeps more broadly than the Fifth Amendment" and excludes even "*voluntary* statements"); *United States v. Patane*, 542 U.S. 630, 634 (2004) (analyzing "unwarned but voluntary statement").

Wolfson argues that his Fifth Amendment rights were violated and data from the iPhone and iPad should be suppressed. (Device Mot. 9-12). This argument fails at multiple levels, even with the Government's concession that a *Miranda* violation occurred: First, a *Miranda* violation cannot justify suppressing data from Wolfson's iPhone or iPad, the physical fruits of Wolfson's non-*Mirandized* statement. And second, the fact of a *Miranda* violation does not mean there was a violation of the Fifth Amendment because, under the demanding legal test to determine involuntariness, Wolfson was not compelled to divulge his passcode; the statement was voluntary.

     a.  <u>Digital Fruits Should Not Be Suppressed</u>

The Supreme Court and Second Circuit have repeatedly rejected the argument that "fruits" of *Miranda* violations should be suppressed. In *Michigan v. Tucker*, the Supreme Court "held that the 'fruits' of an un-*Mirandized* statement can be admitted" in evidence. *Vega*, 597 U.S. at 145 (quoting *Michigan v. Tucker*, 417 U.S. 433, 450-52 n.26 (1974)). The Supreme Court reaffirmed

that decision in *United States v. Patane*, rejecting the argument that "a failure to give a suspect" *Miranda* warnings "requires suppression of the physical fruits of the suspect's unwarned but voluntary statements." 542 U.S. at 633-34. Three Justices reached that conclusion by reasoning that "failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights," and that potential constitutional "violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." *Id.* at 641-42. "Thus, . . . with respect to mere failures to warn," there is "nothing to deter" and "no reason to apply the 'fruit of the poisonous tree doctrine.'" *Id.* at 642. Two other Justices applied a balancing test, reasoning that physical evidence has "important probative value" and that introducing that evidence carries a low risk of using the accused's "incriminating statements against him." *Id.* at 644. But all five Justices reached the same conclusion that fruits of a *Miranda* violation should not be suppressed. *See Vega*, 597 U.S. at 146 n.3.

The Second Circuit, and courts in this District, have followed the holding of *Patane*, and consistently decided that "failure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements." *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010); *accord United States v. Haygood*, 157 F. App'x 448, 449 (2d Cir. 2005); *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *8 (S.D.N.Y. Aug. 13, 2019); *United States v. Fiseku*, 2015 WL 7871038, at *16 (S.D.N.Y. Dec. 3, 2015); *United States v. Wilson*, 914 F. Supp. 2d 550, 562 (S.D.N.Y. 2012); *United States v. Grant*, No. 07 Cr. 1119 (CM), 2008 WL 2971781, at *6-*7 (S.D.N.Y. Aug. 1, 2008); *United States v. Fritzinger*, 2024 WL 2868987, at *4 (E.D.N.C. June 6, 2024) ("[P]ursuant to *Patane*, . . . to the extent that unlocking a cellphone in response to an officer's request was communicative in nature, 'the fruit of that voluntary communication, even though made without a *Miranda* warning, would

nonetheless be admissible into evidence.'" (quoting *United States v. Oloyede*, 933 F.3d 302, 30910 (4th Cir. 2019))).

As to this issue, following Supreme Court and Second Circuit precedent leads to a straightforward result: the agents' conceded failure to read Wolfson a *Miranda* warning should result in the suppression of any statements Wolfson made (*i.e.*, Wolfson's statement about the numbers that constitute his passcode), but not "fruits" of his non-*Mirandized* statements— including data from the iPhone or iPad. Without more, the conceded failure to give a *Miranda* warning was not a violation of Wolfson's constitutional rights and introducing the contents of the iPhone or iPad at trial runs no risk of introducing Wolfson's non-*Mirandized* statements against him. There is, accordingly, no basis to apply the harsh remedy of suppressing probative evidence from the iPhone or iPad.

In arguing to the contrary, Wolfson attempts to draw a distinction between physical and digital fruits, relying solely on an outlier case from the Eastern District of New York, *United States v. Djibo*, and a law review article that does not appear to have ever been cited by a court. (Device Mot. 10). Nothing in those authorities warrants a different result, as *Djibo* arose out of materially different circumstances. There, officers conducting a narcotics investigation stopped a suspect at the border, obtained his phone passcode, and conducted a warrantless search of the suspect's phone. 151 F. Supp. 3d 297, 299-305 (E.D.N.Y. 2015). The suspect moved to suppress the result of that search and the result of a second search of the phone conducted pursuant to a subsequently obtained search warrant. *Id.* The Court found that the suspect was in "custody" when he provided the passcode, and the Government voluntarily suppressed evidence gathered from the pre-warrant search of the phone. *Id.* at 305-06. The Court held that the data obtained after the Government obtained a search warrant should be suppressed as a fruit of the poisonous tree, relying heavily on

the warrantless search of the suspect's phone and the connection between that initial, warrantless search and the subsequent warrant. *Id.* at 308-09.

*Djibo* and Wolfson's case are fundamentally different because, here, there was never a warrantless search of the iPhone or iPad. The FBI had a warrant to search Wolfson's electronic devices before they ever set foot in his home or looked at any data on the iPhone or iPad. Thus, the key concern about the need to protect cellphones from unreasonable warrantless searches that animated *Djibo* is not present here. A judge authorized the search here *before* agents accessed Wolfson's iPhone or iPad. At bottom, *Patane*'s conclusion that "a failure to give a suspect" *Miranda* warnings does not "require[] suppression of the physical fruits of the suspect's unwarned but voluntary statements" applies. 542 U.S. at 633-34.

As set forth above, the Supreme Court has been clear: the physical fruits of a *Miranda* violation should not be suppressed. Relying on *Djibo*, Wolfson argues that this rule is simply inapplicable when those fruits consist of the contents of a cellphone. This is wrong. As explained above, the rule against suppression arises from *Miranda*'s purpose, not the type of physical evidence at issue. Failure to give a *Miranda* warning is not, by itself, a constitutional violation and admitting physical evidence at trial does not risk introducing a defendant's statements against him, so there is no constitutional interest that warrants suppression. Any concerns unique to the importance of cellphones in modern life, sounding in the Fourth Amendment case of *Riley v. California*, 573 U.S. 373 (2014), cited in the portion of *Djibo* block quoted by Wolfson, (Device Mot. 10), is appropriately handled by requiring that cellphones are searched only pursuant to judicially authorized warrants, as was the case here, not by ad hoc extensions of *Miranda*.

b.  The Passcode Statements Were Not Given Involuntarily

Thus, for the Court to suppress the physical fruits here, the Court would need to make a finding of constitutional involuntariness. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *accord*

*Elstad*, 470 U.S. at 305. Wolfson's involuntariness argument—that the agents' conduct violated Wolfson's Fifth Amendment rights—falls far short of the high bar needed to show Fifth Amendment involuntariness. (Device Mot. 10-11). As noted above, while the Government concedes that the agents should have given a *Miranda* warning before asking for the passcode, that does not mean there was a violation of the Fifth Amendment. Rather, "the Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony," and "[v]oluntary statements remain a proper element in law enforcement." *Elstad*, 470 U.S. at 304-07. While "all custodial interrogations inherently involve pressure," *Parsad v. Greiner*, 337 F.3d 175, 185 (2d Cir. 2003), more is needed for the statements to be deemed legally involuntary. Indeed, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *accord Elstad*, 470 U.S. at 305 (noting that the Fifth Amendment is "not concerned . . . with moral and psychological pressures to confess emanating from sources other than official coercion"); *United States v. Velasquez*, 885 F.2d 1076, 1088 (3d Cir. 1989) (noting that even "lies told by the police do not necessarily make a confession involuntary").

A confession is involuntary only when it results from police misconduct. *Connelly*, 479 U.S. at 167-69; *United States v. Rico*, No. 18 Cr. 661 (PGG), 2019 WL 4014826, at *24 (S.D.N.Y. Aug. 26, 2019) (noting that being "afraid and nervous . . . does not compel a finding of involuntariness"); *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("[S]tatements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive."); *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) (agents did not engage in impermissible trickery by "emphasiz[ing] cooperation"); *United States v. Turner*, 674 F.3d 420, 433 (5th Cir. 2012) (finding statement voluntary despite officers' suggestion that if defendant cooperated, defendant

could be released from prison in time to see his daughter's first day of school); *United States v. Draconis*, No. 11 Cr. 1003 (DAB), 2012 WL 1267838, at *2 (S.D.N.Y. Apr. 11, 2012) (concluding that a defendant "in the midst of a panic attack and suffering from chronic mental problems" and "in intense physical pain from having her hands handcuffed tightly behind her back" did not evince "the kind of significant confusion or disorientation . . . that would warrant a finding" of involuntariness, and observing that courts in this Circuit "have found [voluntariness] in circumstances indicating far more physical pain and mental confusion" (collecting cases)). In conducting this voluntariness inquiry, courts look to whether the defendant's will was "overborne" by unconstitutionally coercive conduct. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963).

Whether a statement is unconstitutionally coerced is "determined by the totality of the circumstances," *Charlotte E. v. Safir*, 156 F.3d 340, 346-47 (2d Cir. 1998), including the repeated and prolonged nature of the questioning, the deprivation of food or sleep, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), and "the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, and any use of physical punishment," *United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012) (quoting *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989)). The Government bears the burden of demonstrating voluntariness. *Id.*

Here, even in the instant, unwelcome circumstances of an arrest, the record cannot satisfy the demanding Fifth Amendment involuntariness requirement. The circumstances surrounding Wolfson's brief questioning at issue "contain[ed] no traces of the brutality, psychological duress, threats, or unduly prolonged interrogation that courts have previously found when they have concluded that statements were involuntarily made." *United States v. Verdugo*, 617 F.3d 565, 575-76 (1st Cir. 2010) (collecting cases). Wolfson cannot credibly suggest that FBI agents used

"brutality," "psychological duress" or "threats" to compel him to give up his passcode. The video evidence[22]—submitted by the Government with its motion papers but not included by Wolfson— shows that, as part of an arrest and execution of a judicially authorized premises search warrant, Wolfson made the statements at issue after agents truthfully told him that they had a warrant and, albeit before properly *Mirandizing* him,[23] asked Wolfson a handful of straightforward questions without raising their voice and in a conversational tone. *See United States v. Crespo*, 834 F.2d 267, 271-72 (2d Cir. 1987) ("That Crespo was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion. Nor . . . does the Government have an affirmative duty to advise a suspect that he may refuse his consent to an apartment search"). The FBI agents did so while Wolfson was clothed, in handcuffs, in a stationary police car, outside of his home, with the car doors open at various times. (*See* Exhibits M at 26:30-30:00; N (immediate continuation of Exhibit M) at 00:00-04:34).

---

[22] In support of his motion, Wolfson observes that, on November 6, 2024, the Government produced certain videos and reports relating to the suppression motion. (Device Mot. 6, 12). The Government produced the materials as soon as it learned about and obtained them. On October 29, 2024, Wolfson's counsel for the first time inquired how information was obtained from the iPhone and iPad and asked for a proffer on the issue. It was then, after consulting with the FBI agents, that the Government first learned about the records and promptly produced them upon receipt, within one week of the call with Wolfson's counsel.

[23] The FBI agent who engaged in the non-*Mirandized* colloquy with Wolfson was not proceeding in bad faith. He simply—and regrettably—was operating under a wholly mistaken subjective belief that asking Wolfson about his phone passcode was a permissible, "non-substantive" question that did not require *Mirandizing* Wolfson, akin to asking about a defendant's pedigree information, such as his name or date of birth. The agent's lack of bad faith is illustrated by the fact that, aside from the brief, limited passcode discussion, he did not ask Wolfson any substantive questions about the charges against him nor about the investigation under which he was being arrested. This reflects, again, the agent's sincerely held but, as he now knows, utterly mistaken belief at the time that asking about Wolfson's phone passcode was a permissible, non-substantive area of inquiry that did not require *Mirandizing* a defendant. As the agent explained, at the time of Wolfson's arrest, he did not understand that one sentence in the 25-page agent affidavit in support of the search warrant, of which he was not the affiant, stated "This authority is not to compel WOLFSON to provide a numeric passcode." The search warrant itself, as opposed to the agent affidavit, did not contain that single sentence. (*See* Exhibit P (declaration of Roland E. Chattaway), at ¶¶ 4-7).

Moreover, the brevity of the interaction is indicative of the fact that Wolfson's statements were not coerced. The entirety of any discussion regarding Wolfson's passcode is about six-and-a-half minutes long, (*see* Exhibits M at 28:10-30:00; N (immediate continuation of Exhibit M) at 00:00-04:34), and the whole sequence from the time of Wolfson's arrest to when Wolfson concluded providing his device passcode lasted less than approximately 27 minutes (*see* Exhibits M at 7:50-30:00; N (immediate continuation of Exhibit M) at 00:00-04:34). *See United States v. Mendonca*, 88 F.4th 144, 157-58, 168 & n.21 (2d Cir. 2023) (four-hour interrogation at police precinct does not support finding of involuntariness); *United States v. Greenberg*, No. 21 Cr. 92 (AJN), 2022 WL 827304, at *25 (S.D.N.Y. Mar. 9, 2022) (reasoning that interview that was over two hours long "was not so long as to be coercive"); *United States v. Egipciaco*, 389 F. Supp. 2d 520, 525 (S.D.N.Y. 2005) (questioning for two hours "was not excessively long").

Furthermore, Wolfson never indicated an unwillingness or reluctance to make the statements at issue. There is no reasonable argument that Wolfson was not lucid or able to engage the agents in coherent conversation. *See United States v. Gomez*, No. 17 Cr. 602 (JMF), 2018 WL 501607, at *2 (S.D.N.Y. Jan. 19, 2018) (finding that in a recorded confession, the defendant's "demeanor, tone of voice, and coherent answers to the agents' questions" all supported voluntariness). And Wolfson, who was 57 years old at the time of his arrest, is a well-educated, highly accomplished professional who founded and was previously the chief executive officer of what was one of the largest privately held banks in Russia. *See Siddiqui*, 699 F.3d at 707.

Nor do the circumstances prior to Wolfson's entering the car militate in favor of constitutional involuntariness. During the approximately 13-minute period while the FBI agents followed standard procedure in clearing and securing the large, approximately 6,000 square foot house with five bedrooms, which Wolfson had disclosed contained multiple firearms, Wolfson

waited outside the home in his underwear, the clothes he was wearing when he responded to the arresting agents.  (*See* Exhibits M at 9:55-22:50; O at 12:00-23:00).  The low temperature in Austin, Texas on February 22, 2024, the date of the arrest, was a relatively mild approximately 65 degrees.[24]  The video evidence shows the process the agents followed in clearing and securing the home.  Once the FBI cleared and secured the home, they brought Wolfson clothes before he entered the car and made the statements at issue.  (*See* Exhibit M at 9:55-22:50).

While, as for any arrestee having his home searched, the situation was understandably undesirable from Wolfson's perspective, the Second Circuit has found non-*Mirandized* statements voluntary in more (or at least comparable) coercive environments.  *See, e.g.*, *Siddiqui*, 699 F.3d at 706 (finding statements not coerced when defendant was questioned while detained, in restraints, hospitalized and "at times in pain and medicated" because "the defendant was lucid and police conduct was not overbearing"); *Parsad*, 337 F.3d at 184-85 (finding statement not coerced when defendant was questioned, over the course of hours, in a police station and told the officers he did not want to discuss the crime); *United States v. Khalil*, 214 F.3d 111, 115, 121–22 (2d Cir. 2000) (finding a statement voluntary even though the defendant was in the hospital suffering from a gunshot wound and awaiting life-saving surgery); *Campaneria*, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding statements voluntary where the 23-year-old defendant with a "poor command of the English language" was in the intensive care unit "with tubes running in and out of his body" and suffering from a "serious knife wound," "significant pain," and dizziness); *United States v. Ceballos*, 812 F.2d 42, 51 (2d Cir. 1987) (statement of consent voluntary even though "the agents

---

[24] *See* https://www.accuweather.com/en/us/austin/78701/february-weather/351193 (noting a low temperature of 65 degrees); https://weatherspark.com/h/d/8004/2024/2/22/Historical-Weather-on-Thursday-February-22-2024-in-Austin-Texas-United-States#Figures-Temperature          (noting, around 5:53 a.m., a 6-hour low temperature of 64.9 degrees).

forcibly removed [the defendant] from his place of work in handcuffs," "warned him of the disruption to his household of execution of a court-ordered search warrant," and "promised him aid in obtaining low bail and retaining his job if he cooperated").

Other courts, including district courts in this District, have reached the same conclusion. *See, e.g.*, *United States v. Yunis*, 859 F.2d 953, 955, 963-64 (D.C. Cir. 1988) (upholding confession as voluntary despite defendant getting seasick "and either experienc[ing] dry heaves or vomit[ing] over the side of the boat"); *Fiseku*, 2015 WL 7871038, at *17 (statement of consent voluntary even when agents frisked, handcuffed, and placed the defendant in a police cruiser during questioning); *Draconis*, 2012 WL 1267838, at *2 (reasoning that a defendant "in the midst of a panic attack and suffering from chronic mental problems" and "in intense physical pain from having her hands handcuffed tightly behind her back" did not evince "the kind of significant confusion or disorientation . . . that would warrant a finding" of involuntariness); *United States v. Gonzalez*, 864 F. Supp. 375, 387-88 (S.D.N.Y. 1994) (statements were voluntary even though defendant had been "handcuffed to a plumbing pipe" at the police station); *United States v. Fox*, No. 22 Cr. 53 (JLS) (JJM), 2023 WL 9100639, at *6 (W.D.N.Y. Sept. 15, 2023) (statement voluntary even though the defendant "was shocked by the early morning intrusion into his home, and it was doubtless unpleasant to walk barefoot through the snow without any shoes, pants or shirt and remain in the BearCat for 20 to 25 minutes while the residence was cleared"), *report and recommendation adopted*, 2023 WL 8645009 (W.D.N.Y. Dec. 14, 2023).

In the face of this wall of authority showing the high bar needed to show Fifth Amendment involuntariness, Wolfson cites two cases in a single paragraph to support his assertion of constitutional involuntariness. (Device Mot. 11 (citing *Wilson*, 914 F. Supp. 2d at 562; *Kaupp v. Texas*, 538 U.S. 626, 631-32 (2003) (per curiam))). Neither supports a finding of constitutional

involuntariness here.  In *Wilson*, the district court applied the above, well-established standard and concluded that a defendant's non-*Mirandized* statements were voluntarily given, even though the defendant there had not been *Mirandized*, "was in custody, handcuffed, and sitting in the back of the police car when [the office] interrogated him about the location of his gun."  914 F. Supp. 2d at 562-63 (citing *Crespo*, 834 F.2d at 271-72 ("That Crespo was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion.  Nor . . . does the Government have an affirmative duty to advise a suspect that he may refuse his consent to an apartment search")).  The district court in *Wilson* reasoned that there was no coercion since there was "no indication that the officers took any coercive action towards the Defendant of the type that courts in this Circuit have previously found to render consent involuntary."  *Id.* at 563.  Likewise, *Kaupp* is readily distinguishable.  Unlike here—where the agents had judicially authorized arrest and search warrants and Wolfson does not move to suppress the statements on Fourth Amendment grounds—the confession in *Kaupp* was obtained by exploitation of an illegal arrest, in violation of the Fourth Amendment, where detectives tried but failed to obtain a warrant to question the defendant, which loomed large in the Supreme Court's analysis.  538 U.S. at 627-28, 630-31, 633.  Nor was the defendant in *Kaupp* a 57-year-old former chief executive officer of a bank, like Wolfson; rather, he was a minor, a 17-year-old "adolescent."  *Id.* at 627, 631.  The circumstances of Wolfson's statements were far afield from and less coercive than those in *Kaupp*.

In sum, "coercive police activity is a necessary predicate to holding a [statement] constitutionally involuntary," and the totality of the circumstances here fall short of establishing such wrongdoing.  *United States v. Haake*, 884 F.3d 400, 409 (2d Cir. 2009).  Accordingly, even though the agents concededly should have read Wolfson a *Miranda* warning before asking for his passcode, the appropriate remedy is barring the Government from using that statement in its case

in chief, not going further and suppressing data seized from the iPhone or iPad.

### 2. Data From the iPhone Should Not Be Suppressed Because the Government Would Inevitably Have Obtained the Data Even Absent Wolfson's Statements

Even assuming for the sake of argument that the Court disagrees and concludes that a Fifth Amendment violation occurred, suppression of much of the iPhone data still would not be warranted.[25]  This is so because, even if Wolfson had not provided his passcode, all of the data on the iPhone except for emails, recently visited locations, and iOS Health application data would have been inevitably discovered.  (*See* Exhibits Q (declaration of John A. Gomez), at ¶¶ 4-9; R (declaration of Enrique A. Santos), at ¶¶ 4-6).

#### a.  Applicable Law

The inevitable discovery doctrine precludes the suppression of unlawfully obtained evidence if "the information ultimately or inevitably would have been discovered by lawful means."  *Nix v. Williams*, 467 U.S. 431, 444 (1984).  "[U]nder the inevitable discovery doctrine," evidence that would otherwise be suppressed "should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation."  *United States v. Vilar*, 729 F.3d 62, 84 (2d Cir. 2013).  To prevail under this doctrine, "the government must prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered."  *Id.*  The rationale for this exception is that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced

---

[25] The Government concedes that, based on law enforcement's current technical capabilities as of December 23, 2024, the data on the iPad (unlike the data on the iPhone) would *not* inevitably have been discovered.

by putting the police in the same, not a worse, position than they would have been in" had "no police error or misconduct had occurred." *Nix*, 467 U.S. at 443.

Courts routinely deny motions to suppress cellphone evidence if they find "with high confidence that the evidence Defendant seeks to suppress would have been discovered" even had there been no *Miranda* violation. *United States v. Eldarir*, 681 F. Supp. 3d 43, 56 (E.D.N.Y. 2023); *see also, e.g.*, *United States v. Guia-Lopez*, No. 22-50234, 2023 WL 5236764, at *7 (5th Cir. Aug. 15, 2023) (per curiam) (affirming denial of motion to suppress cellphone because, among other reasons, "the Government proffered evidence that even if it had not obtained the password, it would have discovered these text messages inevitably using 'GrayKey' or 'Cellebrite'"); *United States v. Hooton*, No. 21 Cr. 105 (DAD), 2023 WL 3582029, at *4 (E.D. Cal. May 22, 2023); *United States v. Jackson*, No. 19 Cr. 6026 (CJS), 2020 WL 810747, at *12 (W.D.N.Y. Feb. 19, 2020); *United States v. Todd*, No. 416-305 CR, 2017 WL 1197849, at *13 (S.D. Ga. Feb. 10, 2017) ("regardless of whether officers violated [d]efendant's *Miranda* rights . . . the inevitable discovery doctrine prevents suppression of the evidence attained from the cell phone search"), *report and recommendation adopted*, 2017 WL 1172113 (S.D. Ga. March 29, 2017); *United States v. Will*, No. 15 Cr. 6, 2015 WL 3822599, at *16 (N.D. W. Va. 2015) (suppression not warranted under doctrine of inevitable discovery where evidence demonstrated content of phone would have been extracted even without password provided in violation of *Miranda*).

   b.   Argument

Even if this Court concludes that Wolfson's Fifth Amendment rights were violated, suppression of certain data seized from the iPhone is not warranted because that data inevitably would have been discovered, even if Wolfson had not given the agents his passcode. *See, e.g.*, *Eldarir*, 681 F. Supp. 3d at 56; *Guia-Lopez*, 2023 WL 5236764, at *7; *Hooton*, 2023 WL 3582029, at *4; *United States v. Jackson*, 2020 WL 810747, at *12; *Todd*, 2017 WL 1197849, at *13; *Will*,

2015 WL 3822599, at *16.

Here, there is no reasonable dispute that, even if Wolfson did not provide the passcode, the Government would have seized the iPhone and attempted to search it pursuant to the search warrant.[26]  The only question, then, is whether the Government would have been able to extract the data from the iPhone without Wolfson's passcode statement.  The sworn affidavits make clear—and the Government expects that, if this Court were to hold a hearing as to inevitable discovery (though it need not and Wolfson does not even request a hearing on this ground),[27] the evidence would establish, by at least a preponderance of the evidence—that the Government inevitably would have been able to extract certain data from the iPhone.  Specifically, the Government would have been able to extract, as of September 9, 2024, all of the data on the iPhone except for emails, recently visited locations, and iOS Health application data.  (*See* Exhibits Q, at ¶ 8; R, at ¶ 6).  Put another way, law enforcement did not need Wolfson's passcode in order to access this data on the iPhone.

Here, law enforcement agents seized the iPhone pursuant to a judicially authorized search

---

[26] Earlier this year, after it successfully extracted the contents of the iPhone and iPad, the Government, at Wolfson's request, returned the physical devices to Wolfson.  (*See* Exhibit Q, at ¶ 9).

[27] Since Wolfson requests an evidentiary hearing only as to the voluntariness issue, no evidentiary hearing as to inevitable discovery is appropriate.  (*See* Device Mot. 12 ("In the event any factual disputes exist *regarding the voluntariness of Mr. Wolfson's statements*, Mr. Wolfson respectfully requests an evidentiary hearing.") (emphasis added)).  Additionally, Wolfson's brief and accompanying attorney declaration do not meaningfully address inevitable discovery.  In any event, courts in this District have previously resolved suppression motions involving the inevitable discovery doctrine without hearings.  *See, e.g.*, Brief for the United States of America, *United States v. Demosthene*, No. 05-1683-cr, 2005 WL 6089787, at *12-13 (2d Cir. Dec. 13, 2005) (noting that suppression motion was denied without a hearing in a case where Government argued inevitable discovery exception, among other exceptions, applied); Brief for the United States of America, *United States v. Mottley*, No. 04-4539-cr, 2005 WL 3948539, at *10-11 (2d Cir. Feb. 2, 2005) (noting that suppression motion was denied without a hearing in a case where Government argued inevitable discovery exception, among other exceptions, applied).

warrant, which had been approved based on probable cause independent of Wolfson's statements before the agents ever interviewed Wolfson or obtained his passcode. As the forensic examiner who extracted the iPhone, FBI Special Agent John A. Gomez, and USAO-SDNY Investigative Analyst Enrique Santos—an experienced mobile forensics examiner with over nine years of experience unlocking, extracting, and analyzing over 2,000 cell phones, tablet computers, and GPS devices, who has testified in over 25 trials in this District since 2019—make clear, law enforcement inevitably would have accessed certain of the contents of the iPhone pursuant to a search warrant regardless of Wolfson's passcode statement. (*See* Exhibits Q, at ¶¶ 4-8; R, at ¶¶ 4-6). This is so because, had law enforcement been unable to access the contents of the iPhone when it was recovered at the time of arrest on February 22, 2024, Special Agent Gomez is certain that he would have followed his standard practice at the time of preserving the iPhone until a technical update enabled access to the contents of the iPhone. (*See* Exhibit Q, at ¶¶ 6-7). Sure enough, by September 9, 2024, the FBI possessed the technological capability to access a cellphone like Wolfson's (an iPhone 15 Pro, 2 TB, Model A2848) without its passcode. (*See* Exhibits Q, at ¶ 8; R, at ¶ 6). As the sworn evidence shows—and would show at any hearing by a preponderance of the evidence—law enforcement could and would have preserved the iPhone pursuant to standard procedure between February 22, 2024 and September 9, 2024, and, shortly after the technical update on September 9, 2024, would have performed an extraction of Wolfson's iPhone, which would have extracted all of the data on the iPhone except for emails, recently visited locations, and iOS Health application data. (*Id.*).

In sum, as of September 9, 2024, all of the data on the iPhone except for emails, recently visited locations, and iOS Health application data "would have been obtained inevitably without the constitutional violation." *Vilar*, 729 F.3d at 84. For this reason too, Wolfson's motion should

be denied, at least as to data from the iPhone apart from emails, recently visited locations, and iOS

Health application data.

### C. Defendants' Motions to Suppress the Fruits of Searches Executed Pursuant to Search Warrants for Their Email Accounts, iCloud Accounts, and Cellphones Should Be Denied

#### 1. The Challenged Search Warrants

Over the course of the investigation prior to the Indictment, multiple federal magistrate

judges issued a series of search warrants based upon their independent findings of probable cause.

As relevant here, the defendant challenges the following search warrants:

1. **October 2022 Gmail and Yahoo Warrant:** On October 21, 2022, the Honorable Robin M. Meriweather, United States Magistrate Judge for the United States District Court for the District of Columbia, authorized a search warrant for multiple email accounts (the "Email Warrant"), including a Gmail account used by Bond (gb9150660132@gmail.com), a Gmail account used by Wolfson (vadimwolfson@gmail.com), and a Yahoo account used by Bond (gannon.bond@yahoo.com), based on a finding that there was probable cause that these accounts would contain evidence of sanctions violations and money laundering. (Bond Mot., Ex. B).

2. **December 2023 iCloud Warrant:** On December 5, 2023, the Honorable Jennifer E. Willis, United States Magistrate Judge for the Southern District of New York, authorized a search warrant for multiple iCloud accounts (the "iCloud Warrant"), including three iCloud accounts used by Bond (associated with the email addresses gb9150660132@gmail.com, gannon.bond@yahoo.com, and gbond@fovsb.com) and two iCloud accounts used by Wolfson (associated with the email addresses vadimwolfson@gmail.com and vb5717@gmail.com), based on a finding that there was probable cause that the accounts would contain evidence of the same sanctions and money laundering offenses specified in the Email Warrant. (Bond Mot., Ex. F).

3. **February 2024 Cellphone Location Warrant:** On February 20, 2024, the Honorable Sarah L. Cave, United States Magistrate Judge for the Southern District of New York, authorized a search warrant for location information for cellphones used by Wolfson and Bond (the "Cellphone Location Warrant"), based on a finding that there was probable cause that the location information would help lead to the identification of Wolfson and Bond for purposes of arrest. A grand jury sitting in this district had already returned the Indictment charging Wolfson and Bond, as described in the affidavit submitted in support of the search warrant.

4.  **February 2024 Bond Cellphone Warrant:** On February 21, 2024, the Honorable Cathy L. Waldor, United States Magistrate Judge for the District of New Jersey, authorized a search warrant for Bond's New Jersey residence to seize and subsequently search his cellphone (the "Bond Cellphone Warrant"), based on a finding that there was probable cause that the cellphone would contain evidence of the sanctions offenses charged against Bond in the Indictment, which was attached to and incorporated into the affidavit in support of the search warrant. (Bond Mot., Ex. O)

5.  **February 2024 Wolfson Premises Warrant:** On February 21, 2024, the Honorable Mark Lane, United States Magistrate Judge for the Western District of Texas, authorized a search warrant for Wolfson's Texas residence to seize and subsequently search electronic devices and to seize certain pieces of artwork (the "Wolfson Device Warrant"), based on a finding that there was probable cause that the electronic devices would contain evidence of the sanctions offenses charged against Wolfson in the Indictment, which was attached to and incorporated into the affidavit in support of the search warrant, and that the artwork would be found in the premises. (Rybicki Del., Ex. O)

## 2. Applicable Law

### a. Review of a Magistrate Judge's Probable Cause Determination

In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Such determinations must be approached in a practical way, *id.* at 231-32, because "probable cause is a flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). Probable cause "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted). It "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975). Probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Gates*, 462 U.S. at 235 (internal quotation marks omitted). Accordingly, "the fact that an innocent

explanation may be consistent with the facts alleged . . . does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985).

        b.   The *Franks* Doctrine

"A search warrant affidavit is presumed reliable." *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008) (citing *Franks*, 438 U.S. at 171). "The task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing judge] a 'substantial basis' for making the requisite probable cause determination." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 238). "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (citing Franks, 438 U.S. at 164-72). But these circumstances are limited. *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).

To invoke the *Franks* doctrine and meet the standard for obtaining an evidentiary hearing, the defendant must "make a substantial preliminary showing" that there were intentional misstatements or omissions and the warrant affidavit and that those misstatements or omissions were material. *Awadallah*, 349 F.3d at 64; *United States v. McKenzie*, 13 F.4th 223, 236 (2d Cir. 2021); *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013). The defendant must establish both components—*i.e.*, intent and materiality—by a preponderance of the evidence. *See Klump*, 536 F.3d at 119.

"The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). To secure a *Franks* hearing, a defendant must make a "'*substantial preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause."

*United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155, 170) (emphasis added).

As a result, "[t]he burden to obtain . . . a [*Franks*] hearing is a heavy one, and such hearings are exceedingly rare." *See, e.g.*, *United States v. Sandalo*, 70 F.4th 77, 86 (2d Cir. 2023) ("[T]he substantial preliminary showing standard imposes a 'high' burden on [the defendant]." (quoting *Rivera*, 928 F.2d at 604)); *United States v. Skyfield*, No. 23 Cr. 569 (LJL), 2023 WL 8879291, at *8 (S.D.N.Y. Dec. 22, 2023) (defendant's burden is "'a heavy one that requires more than a mere conclusory showing'" (quoting *Sandalo*, 70 F.4th at 86); *United States v. Melendez*, No. 16 Cr. 33 (LTS), 2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016); *United States v. Mandell*, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010) ("Hearings under *Franks* are not freely granted."); *United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden.").

### c.  Misstatements or Omissions in a Search Warrant Affidavit

To find that an affiant intentionally made misstatements or omissions in the search warrant affidavit, the "reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154 (quoting *Awadallah*, 349 F.3d at 68). A misstatement or omission is intentional only when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Canfield*, 212 F.3d at 717-18.  "To prove reckless disregard for the truth, the defendant[] must prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154; *see also Falso*, 544 F.3d at 126 ("Allegations of negligence or innocent mistake are insufficient." (quoting *Franks*, 438 U.S. at 171)).

A defendant seeking to make the required showing of an intentional or reckless

misstatement or omission must show more than inadvertent error. "[E]very statement in a warrant affidavit does not have to be true," *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005), and "the mere intent to exclude information is insufficient . . . [because] every decision not to include certain information in the affidavit is intentional insofar as it is made knowingly. . . . An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Awadallah*, 349 F.3d at 67-68.

Moreover, alleged "[o]missions are not subject to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *United States v. Vilar*, 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (internal quotation marks and citations omitted); *see also Awadallah*, 349 F.3d at 67. Thus, "as a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." *Mandell*, 710 F. Supp. 2d at 376 (internal quotation marks omitted). This is because "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.* (internal quotation marks omitted).

As a result, the law recognizes that while "an officer may not disregard plainly exculpatory evidence," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), an affiant is "not required to include all potentially exculpatory information" in seeking the search warrant, *United States v. Maisonet*, No. 12 Cr. 829 (AKH), 2013 WL 12204909, at *1 (S.D.N.Y. Mar. 22, 2013); *see also United States v. Calk*, 19 Cr. 366 (LGS), 2020 WL 3577903, at *5 (S.D.N.Y. July 1, 2020) (quoting

*id.*).  Indeed, "[a] requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process and place an extraordinary burden on law enforcement officers, and is not the law."  *United States v. Cromitie*, No. 09 Cr. 558 (CM), 2010 WL 3025670, at *6 (S.D.N.Y. July 28, 2010) (internal quotation marks omitted).  Accordingly, "[o]mitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing."  *Mandell*, 710 F. Supp. 2d at 374 (citation and internal quotation marks omitted).

To permit the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search.  *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal quotation marks omitted).  It is not sufficient for the movant to simply show that a reasonable person would have included the omitted information, *Rajaratnam*, 719 F.3d at 154.

Under *Franks*, a misstatement or omission is only material if it is "necessary to the [issuing] judge's probable cause finding."  *Canfield*, 212 F.3d at 718.  "To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause."  *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. Aug. 8, 2013).  "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate."  *Canfield*, 212 F.3d at 718.  "Courts have repeatedly been warned not to interpret the affidavit in a hypertechnical, rather than a commonsense, manner."  *Id.* at 719 (internal quotation marks omitted).  In the end, "the defense motion must be denied without a hearing if, after setting aside the allegedly misleading statements or omissions, there remains a residue of independent and lawful information sufficient to support probable cause."  *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987).

### 3. Argument

Defendants mostly attempt to use their apparent trial defense—that Wolfson purchased the Aspen Home in May 2014—as arguments for suppression under *Franks*.[28]  This is unsuccessful for several reasons.  First, Bond ignores a critical portion of the charged offense conduct, which is sending funds to a sanctioned individual.  None of the purported false statements or omissions can overcome that the challenged warrants contained probable cause as to the September 2019 Transaction, in which approximately $12 million was transferred to a shell company Kostin controlled.  Defendants have therefore failed to make a substantial showing that any of the alleged false statements or omissions are necessary to the probable cause finding and, therefore, material.  Second, Defendants fail to make a substantial showing that the affiant intended to mislead or acted with a reckless disregard for the truth for any of the alleged false statements and omissions.  Undercutting defendants' claim of a reckless disregard for the truth is that some of the alleged false statements are not false, and that some of the allegations or purported omissions either do appear in the affidavits or that the information is inculpatory.  Defendants fail to meet the heavy burden required under *Franks* and their request for suppression or a hearing should be denied.

### a.   The Affidavit Supporting the Email Warrant Is Not Facially Defective

Defendants' first argument that the Email Warrant was facially defective can be easily rejected.  Their argument relies on the mistaken assumption that to authorize the warrant the magistrate judge needed to find probable cause of all the necessary elements to show that *Bond* had committed a violation of IEEPA (Bond Mot. 13), rather than merely finding probable cause that evidence of a violation of IEEPA—by any relevant individual—was likely to be found within

---

[28] Wolfson joined Bond's motion regarding the Email Warrant and iCloud Warrant.  (Wolfson Mot. 11).

the email accounts.[29]   The affidavit set forth evidence that Kostin, a sanctioned individual, had indirectly received a transfer of approximately $12 million from Wolfson, a U.S. person, in 2019, that Bond "handled all communications" involving Wolfson's purchase of 40 North Star LLC in connection with that transaction, that the email accounts in questions belonged to and were used by Wolfson and Bond, and were used by them to communicate for discussions regarding the Aspen Home—none of which Defendants challenge.  Bond Mot., Ex. B ¶¶ 34(c), 35, 40.

Even if—contrary to all of the evidence the Government intends to present at trial—Bond had no knowledge of the IEEPA conspiracy of which he was a member, his involvement in the Aspen Home, including representing Wolfson in U.S. dollar transactions and communicating with others about the property, provided the Magistrate Judge with sufficient probable cause that his email accounts contained evidence of IEEPA offenses that may have been committed by others. In other words, those allegations alone were sufficient to set forth probable cause that Kostin had committed an IEEPA violation and that evidence of that violation was likely to be found in Bond's email accounts.  *See Gates*, 462 U.S. at 238; *see also* Bond Mot., Ex. B ¶ 41 (stating that "in summary, there is probable cause to believe that *Kostin* and other individuals have committed violations of IEEPA" (emphasis added)).  Accordingly, Defendants' argument that the affidavit was facially deficient because it failed to set forth sufficient evidence of Bond's *mens rea* misses the mark.

---

[29] Tellingly, all three of the cases on which Defendants rely involve a court's review of arrests, and none of them apply the Supreme Court's probable cause standard from *Gates* as required here. For example, in *Dollard v. Whisenand*, 946 F.3d 342 (7th Cir. 2019), a civil action where medical providers and staff challenged a summary judgment finding, the court found that an arrest warrant, not a search warrant, lacked probable cause to arrest a parking lot attendant who was "a glorified valet."  In *United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007), the court reviewed a warrantless arrest under the Supreme Court's *Beck* standard.  And in *United States v. Christian*, 187 F.3d 663 (D.C. Cir. 1999), the court reviewed a search incident to arrest under the Supreme Court's *Chimel* standard.  None of these cases apply here.

b.  <u>The Affidavit Supporting the Email Warrant Does Not Contain Materially False Statements Nor Does It Omit Material Facts</u>

Defendants fail to identify a false statement or omission in the Email Warrant that meets the high standard required under *Franks*.  As an initial matter, they ignore that IEEPA prohibits U.S. persons from "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any sanctioned person, as charged in Count Five of the Indictment.  (Ind. ¶¶ 16, 59-60).  As discussed above, the affidavit describes evidence that Bond and Wolfson participated in the indirect transfer of approximately $12 million Kostin in September 2019.  (Bond Mot., Ex. B ¶¶ 34(c), 35).  Defendants make no argument that that the May 2014 transfer of 40 North Star LLC from Ledridge to Altamonte, or any of the purported false statements or omissions regarding that topic, would affect the magistrate judge's probable cause determination as to whether evidence regarding that September 2019 prohibited transaction would be found in their email accounts.  For that reason alone, the alleged deficiencies in the affidavit cannot satisfy *Franks*'s materiality prong.

Even if this Court examines the alleged misstatements and omissions in light of the other conduct IEEPA criminalizes—dealing in blocked property, providing funds, goods, and services to a sanctioned person other than the aforementioned $12 million, or receiving funds, goods, and services from a sanctioned person—Defendants still cannot meet the *Franks* standard.  First, Defendants allege one misstatement, which takes issue with the affiant's use of the word "representatives" in the affidavit, arguing, in effect, that only ██████, the manager of 40 North Star (referred to herein as the "LLC Manager"), could qualify as a representative of that entity. (Bond Mot. 3, 15-16).  As of October 21, 2022, the date of the affidavit, the FBI had interviewed the LLC Manager and ████████, the Aspen Home property manager (the "Property Manager") who was retained and paid by 40 North Star, to gather information about, among other

things, the Aspen Home and 40 North Star. The affidavit summarized the information that those two individuals provided and referred to them collectively as "representatives" of 40 North Star. It was entirely reasonable for the affiant to refer to them both as representatives of 40 North Star given that they both routinely interacted with third-parties, including other attorneys, banks, chefs, drivers, and other personnel on behalf of 40 North Star and more generally, carried out the operations and maintenance of the Aspen Home.

Even assuming, *arguendo*, that an employee can never accurately be referred to as a representative of her employer—a proposition in deep tension with agency law in which employees regularly act within the scope of their employment on behalf of a principal—there is no indication that the affiant used the word "representatives" in a way that was "designed to mislead" or "made in reckless disregard of whether [it] would mislead." *Rajaratnam*, 719 F.3d at 154. The word "representatives" was used to refer to the individuals closely associated with 40 North Star LLC—whose only purpose was to serve as the holding entity for the Aspen Home— and any inaccuracy in using the word is immaterial. The Property Manager could also be described as "an employee of" or "individual associated with" 40 North Star under the "corrected affidavit" approach. *Canfield*, 212 F.3d at 718. In that scenario, the substance of the affiant's summary of the interviews remains the same, and such a descriptor of the Property Manager's relationship to the LLC still supports a probable cause finding. To find materiality in the use of the word "representatives" requires that this court engage in a hypertechnical reading of the affidavit, and such a reading has been rejected by the Second Circuit. *See Martin*, 157 F.3d at 52 ("A reviewing court should not interpret supporting affidavits in a hypertechnical, rather than a commonsense manner.").

Defendants also assert that there were three alleged omissions, all of which center on the aforementioned 2014 transfer of 40 North Star from Ledridge to Altamonte. Specifically, Defendants allege that the transfer itself, the Property Manager's statement that she did not know who the ultimate beneficial owner of 40 North Star was, and that fact that the LLC Manager's understanding as to who owned the property derived from the Property Manager are all material omissions. (Bond Mot. 15-16). Defendants fail to establish a reckless disregard for the truth or materiality regarding these omissions. An affiant "cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," *Mandell*, 710 F. Supp. 2d at 373, nor is an affiant required "to include all potentially exculpatory information," *Maisonet*, 2013 WL 12204909, at *1. And as the affiant stated at the beginning of her affidavit, "[t]his affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter" (Bond Gmail and Yahoo Warrant ¶ 3).[30] Here, to show a reckless disregard for the truth, Bond would have to provide credible and probative evidence that the affiant "entertained serious doubts as to the truth of [her] allegations," *Rajaratnam*, 719 F.3d at 154, and he simply has not done that for any of the three alleged omissions.

For example, including information in the affidavit about the May 2014 nominal transfer to Altamonte would not have been "necessary to the judge's probable cause finding." *Canfield*, 212 F.3d at 718. The affidavit contained extensive information on Kostin's pattern and practice of obfuscating his ownership of assets, using the same associates in similar schemes for the Aspen

---

[30] The affiant also used qualifying language in the affidavit, presenting reflections of what the affiant believed to be true at the time based on the FBI's investigation. For example, the affiant stated that "the FBI's investigation has revealed that Kostin *likely owned* real property in the U.S. until at least 2019 (*id.* ¶ 34)," and "[i]n 2019, after Kostin was sanctioned by OFAC, Wolfson *effectively* purchased the interest in 40 North Star LLC (*id.*)."

Home, and Bond and Wolfson's communications and U.S. dollar transactions involving the Aspen Home.  Nearly all of Kostin's many assets are "owned" on paper by a shell company, and the replacement of one shell entity with another is consistent with Kostin's pattern of obfuscation for those assets.  Including information regarding the 2014 transfer to Altamonte and Wolfson's status as Altamonte's nominal officer would still result in the affidavit having "a residue of independent and lawful information sufficient to support probable cause."  *Levasseur*, 816 F.2d at 43.

Regarding the Property Manager, the affiant correctly and accurately summarized the information she provided in setting forth the salient facts establishing probable cause.  It is immaterial that she did not know the "ultimate beneficial owner" or the makeup of the shell entities that owned the Aspen Home on paper.  The Property Manager, based on her experience as the property manager for the Aspen Home, knew that Kostin and his family were the main users of the home, and that Kostin allowed her to stay there and to have a family dog at the house.  Omitting the Property Manager's lack of knowledge of shell companies or owners of shell companies does not show that the affiant "entertained serious doubts as to the truth" of Kostin's ownership.[31] Courts have repeatedly recognized that an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," *Awadallah*, 349 F.3d at 67-68, and it would be even more impossible for an affiant to include every piece of information that a witness acknowledged *not* knowing.

Regarding the LLC Manager's reliability, Defendants argue that he should have not been relied upon to conclude that Kostin owned the home because the LLC Manager told the law enforcement agents that his understanding came from the Property Manager.  (Bond Mot. 15-16).

---

[31] The fallacy of this argument is shown in other reports of interview with the Property Manager in which she repeatedly confirms that she understood Kostin to be the owner of home, regardless of who the nominal owner on paper was.  (Bond Mot., Ex. B at 9. 14, 16, 18, 19, 21).

This is beside the point, however, as the affidavit does not directly rely on the LLC Manager's understanding.  Rather, it sets forth information regarding events the LLC Manager described that led the affiant to believe that Kostin likely owned the home.  (*See* Bond Mot., Ex. B, at 14).  It is clear from the report of interview, moreover, that the LLC Manager's understanding that Kostin owned the home came not just from that initial communication with the Property Manager, but also from personal interactions that he had with Kostin.  (*See id.* at 2-3).

Defendants also argue that the LLC Manager misquoted or misunderstood an October 14, 2019 email and conflated Altamonte with 40 North Star (Bond Mot. 16).  To the extent that the LLC Manager mistakenly recalled that Wolfson purchased Altamonte, not 40 North Star, in 2019, the affiant did not repeat that mistake in the affidavit or otherwise rely upon it.  Moreover, this minor point of confusion was not a significant issue bearing on the LLC Manager's credibility that required disclosure—particularly given that it is undisputed that, in 2019, both Altamonte and 40 North Star were involved in a transaction transferring ownership of shares related to the Aspen Home.  The LLC Manager's recollection was thus consistent, generally, with the course of events in this complex scheme.  *Cf. Andresen v. Maryland*, 427 U.S. 463, 482 n.10 (1976) ("The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession."). To find either a reckless disregard for the truth or materiality based on the affiant's failure to disclose this minor point of confusion on the part of the LLC Manager would, similar to the above argument on the word "representatives," require an improper hypertechnical reading of the affidavit.

Reviewing courts have declined to grant a *Franks* hearing or suppress evidence even where a witness *knowingly* provided false information.  *See United States v. Wapnick*, 60 F.3d 948, 956

(2d Cir. 1995) (defendant not entitled to *Franks* hearing based upon showing that informant knowingly or recklessly made false statement to affiant), *cert. denied*, 517 U.S. 1187 (1996); *United States v. Cook*, 348 F. Supp. 2d 22, 29-30 (S.D.N.Y. 2004) (denying *Franks* hearing based upon argument that informant had provided false information because defendant had not demonstrated that affiant made false statement or acted with reckless disregard for truth). Here, there is no reason to believe that the LLC Manager did anything more than conflate the first layer of shell entities with the second, or that this was a significant reason to believe that the LLC Manager was unreliable and that needed to be disclosed.[32]

    c.    <u>The Affidavit Supporting the iCloud Warrant Does Not Contain Materially False Statements Nor Does It Omit Material Facts</u>

Defendants similarly fail to identify a material false statement or omission in the iCloud Warrant that meets the high standard required under *Franks*. Their arguments, all advancing their apparent defense at trial that Wolfson purchased the Aspen Home in May 2014, are nearly identical to the ones raised above and should be rejected.[33]

As an initial matter, Defendants again ignore that IEEPA prohibits U.S. persons from "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any sanctioned person (Ind. ¶ 16, 59-60). The affidavit in support of the iCloud Warrant describes Bond and Wolfson's transfer of approximately $12 million to Kostin in September 2019, and that Bond regularly acted as Wolfson's representative on matters regarding the Aspen Home during

---

[32] The LLC Manager was not a cooperating witness when the September 9, 2022 interview was conducted, and therefore, contrary to Bond's suggestion (Bond Mot. 3 n.4), there was also nothing that should have been disclosed to the magistrate judge regarding his credibility on that point.

[33] Bond repeatedly refers to the affidavit as misleading and that it "strategically omitted critical pieces of evidence and misrepresented others" (Defendant's Memorandum 18). Similar arguments have been rejected by this court in the IEEPA context. *United States v. Nejad*, 436 F. Supp. 3d 707, 721–22 (S.D.N.Y. Jan. 28, 2020).

the relevant time period. (Bond Mot., Ex. F ¶¶ 40-43, 45). The alleged misstatements and omissions have no bearing on the evidence alleged in the affidavit that Bond and Wolfson gave a sanctioned person $12 million.  Thus, for similar reasons to those discussed above, Defendants have failed to show that any of the alleged misstatements and omissions would have been critical to the probable cause finding.

Regardless, even if this Court examines the alleged misstatements and omissions in light of the other conduct IEEPA criminalizes—dealing in blocked property, providing funds, goods, and services to a sanctioned person other than the aforementioned $12 million, or receiving funds, goods, and services from a sanctioned person—Defendants fail to make any showing, let alone a substantial preliminary showing, that "the claimed . . .  omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth," *Canfield*, 212 F.3d at 717-18, or that the alleged misstatements and omissions would have been critical to the probable cause finding.

Defendants first assert that the affidavit incorrectly referred to Wolfson as Altamonte's "nominal beneficial owner" instead of Altamonte's "ultimate beneficial owner."  The Government agrees that some of the Altamonte documents refer to Wolfson as the ultimate owner, but there is no indication that the affiant intended to mislead the Magistrate Judge or used "nominal" in reckless disregard of whether it would mislead as required under *Rajaratnam*.  The affiant did not make the statement in a vacuum, but rather provided context for the Aspen Home's ownership layers by explaining that Kostin purchased the home in 2010 through his trusted associates (Bond Mot., Ex. F ¶ 31), that the home was "owned" on paper by 40 North Star (*id*.), and that the shell companies serving as the "sole member" of the LLC changed several times as to avoid having Kostin's name as the owner, *(id*. ¶ 32).  The affiant furth explained that the sole member of the LLC was Soltrop Holdings Limited, followed by Ledridge Investments Limited, and then

Altamonte. (*Id.*). The affiant also identified Wolfson as the owner of Altamonte twice in the affidavit, which on its own significantly undercuts the argument that the affiant acted with any intent to mislead. (*Id.* ¶¶ 33, 40). The totality of the affidavit thus overwhelmingly cuts against any allegation of an intent to mislead or a reckless disregard of the truth. *See United States v. Young Buffalo*, 591 F.2d 506, 511 (9th Cir. 1979) (affiant did not intend to mislead where he was summarizing results of large investigation into an affidavit); *United States v. Austin*, 640 F. Supp. 3d 171, 181 (D. Mass. Nov. 9, 2022) (holding that affiant's conflation of technical terms in a "large and complex investigation" did not satisfy *Franks* because it did "not rise to the level of recklessness.").

Defendants also fail to show that use of the word "nominal" was material. If the affidavit referred to Wolfson as the "ultimate" owner under the corrected affidavit approach, *Canfield*, 212 F.3d at 718, it still contained probable cause. In that scenario, the affidavit still detailed Kostin's ownership and use of the Aspen Home, his use of shell companies and trusted associates to hide his ownership, and Bond and Wolfson's transfer of $12 million to Kostin post-sanctions, among other things. To find materiality in the use of the word "nominal" would, again, require an improper hypertechnical reading of the affidavit. *Martin*, 157 F.3d at 52.

Second, Defendants argue that the affiant mistakenly claimed that the LLC Manager "understood" Kostin to be the owner of the Aspen Home until at least 2018 and that the various staff members who worked at the Aspen Home believed that "Kostin owned the home until he was sanctioned" (Bond Mot. 18-19). The affiant's summary of the LLC Manager's memory of that time period is consistent with the documentation of the interview, which shows that the LLC Manager "believed" "the unnamed beneficial owner . . . to be Kostin" based on information obtained from the Property Manager, the LLC Manager's meetings with Kostin, Kostin's

associates and unindicted co-conspirators, and correspondence with those associates about the Aspen Home, and that it was in January 2018 that the LLC Manager received an email regarding a change in the authorized representative for the property. (Bond Mot., Ex. C 2-3). In short, the affiant's impression that the LLC Manager understood Kostin to be the owner until 2018 is fully consistent with the 302 and not a false statement.

The same is true for evidence summarized in the affidavit regarding the Aspen Home staff. Each of these staff members provided their recollections as to their interactions with Kostin and his family, the time period of those interactions, and their belief that Kostin owned the home, and the affiant relied on the same. Defendants' arguments as to witnesses' lack of firsthand knowledge and exact time periods may be appropriate for eventual cross-examination of those witnesses, but they fail to show a false statement under *Franks*.[34] Defendants fail to show, for many of the reasons already stated herein, that the affiant intended to mislead the Magistrate Judge or that the challenged statements were necessary to the probable cause finding. *See United States v. Baer*, 843 F. App'x 472, 477 (3d Cir. 2021) (denying defendant's motion for a *Franks* hearing where defendant argued that the affidavit misquoted witnesses because the affidavit still "accurately conveyed the information" offered by the witnesses).

Defendants also allege that the affidavit in support of the iCloud Warrant contains four omissions: (1) that CapitalInvest's parent company provided the loan to finance the 2014 purchase of North Star LLC; (2) the full email correspondence regarding a change in homeowner's insurance

---

[34] It is well known that FBI 302s are summaries of interviews and not verbatim transcripts, and courts have rejected *Franks* challenges in similar circumstances. *See, e.g.*, *United States v. Ramsey*, No. CR 19-268, 2020 WL 2220312, at n.4 (E.D. Pa. May 6, 2020) (rejecting defendant's argument that the search warrant was invalid because it contained a statement not found in the 302); *United States v. Ray*, 541 F. Supp. 3d 355, 406 (S.D.N.Y. May 26, 2021); *United States v. Stewart*, No. 319CR151TAVDCP2, 2021 WL 2408168, at *8 (E.D. Tenn. Jan. 12, 2021).

in 2014-2015; and the same alleged omissions from the Bond Gmail and Yahoo Warrant regarding (3) the Property Manager's knowledge of the shell entities that made up the ownership of the Aspen Home on paper; and (4) the LLC Manager's reliability as a witness.  (Bond Mot. 17-20).

As to these purported omissions, the defendant bears a heavy burden under *Franks* and must show that the "the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154 (quoting *Awadallah*, 349 F.3d at 68).  A misstatement or omission is intentional only when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth."  *Canfield*, 212 F.3d at 717-18.  The defendants cannot come close to making this showing with respect to the four above-referenced purported omissions in the affidavit.

As to the latter two alleged omissions—the Property Manager's knowledge of the shell entities that made up the ownership of the Aspen Home on paper and the LLC Manager's reliability as a witness—these purported omissions do not warrant suppression or a *Franks* hearing for the reasons already discussed above.  One of the other alleged omissions is that "[t]he affidavit also omitted the fact that CapitalInvest's parent company provided the loan to finance the 2014 purchase of 40 North Star LLC."  (Bond Mot. 18).  But this loan, and the parent/subsidiary relationship between CapitalInvest and Capital Business Finance, is in fact discussed in the affidavit at paragraphs 45 and 46.  Defendants argument is, in sum, that the affiant could have said *more*, which is not enough to meet their burden of making the requisite showing for a *Franks* hearing.  *See Rajaratnam*, 719 F.3d at 154.

Moreover, this alleged omission does not offer "an innocuous explanation for Wolfson's $12 million payment."  (Bond Mot. 18).  The fact that the payment was sent to repay a loan is immaterial: IEEPA prohibits U.S. persons from sending sanctioned individuals any funds without

having first obtained a license from OFAC, regardless of the purpose.  Inclusion of more information regarding the transfer would have only strengthened the warrant application, as it would have also demonstrated that Altamonte obtained the financing to purchase 40 North Star from an entity controlled by Kostin, through CC-1 and CC-3.  This deeply undermines the argument that there was any recklessness or intent to mislead.  *See, e.g.*, *United States v. Thomas*, 788 F.3d 345, 351 (2d Cir. 2015) ("[W]e cannot conclude that any omission here was made deliberately or with reckless disregard for the truth when it is clear that full disclosure of the relevant information would only have strengthened the search warrant application."  (internal quotation marks and emphasis omitted)); *Rajaratnam*, 719 F.3d at 155 n.18 ("it is difficult to imagine a situation where the government would intentionally or with reckless disregard omit information that would strengthen its probable cause or necessity showing.").

Finally, Defendants argue that the affidavit's omission of emails related to a change in homeowner's insurance in 2014-2015 was material because the "email correspondence shows that . . . Kostin needed to be removed as the policy's beneficiary."  (Bond Mot. 20).  Defendants' theory is that Kostin "needed to be removed" because Wolfson purchased the home.  The Government's theory, consistent with Kostin's pattern and practice of obfuscating his ownership of assets, is stated in in the affidavit at paragraph 47:

> 47.  [B]ased on [] my involvement in this investigation and the information set forth above, I believe that, in or about May 2014, Kostin used a nominal owner, Wolfson, to obfuscate Kostin's actual ownership of the Aspen home until a sale of the property from Kostin to Wolfson was finalized in September 2019, that is, after Kostin was designated as an SDN by OFAC, and that Bond served as Wolfson's primary assistant with regard to the Aspen home throughout the relevant time period, between at least in or about 2018 and in or about 2020.

As previously stated, an affiant "cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," *Mandell*, 710 F. Supp. 2d at 373, nor is

an affiant required "to include all potentially exculpatory information," *Maisonet*, 2013 WL 12204909 at *1. Even if the additional email communications were susceptible to a reasonable exculpatory interpretation, that would still not make any of them material to probable cause. *See, e.g.*, *Fama*, 758 F.2d at 838 ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."). At base, Defendants offers only the sort of "endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," *Mandell*, 710 F. Supp. 2d at 376 (internal quotation marks omitted), that courts have uniformly held does not justify a *Franks* hearing, much less suppression.[35]

### d. There Is No Basis to Suppress Evidence Obtained from Bond's Cellphone

Bond summarily states that evidence obtained from his cellphone should also be suppressed under the fruits of the poisonous tree doctrine because the Bond Cellphone Warrant was based on evidence obtained from the two prior warrants (Bond Mot. 20-21). For all of the reasons stated above, Bond failed to meet his burden to suppress evidence obtained from the Bond Gmail and Yahoo Warrant and the Bond iCloud Warrant or to warrant a *Franks* hearing, and, thus, evidence obtained from Bond's cellphone should not be suppressed either.

### e. The Affidavit Supporting the Wolfson Device Warrant Does Not Contain Materially False Statements Nor Does It Omit Material Facts

Wolfson suggests that the affidavit supporting the Wolfson Device Warrant lacked

---

[35] Bond also alleges that the email quoted in affidavit "was among the only pieces of nontestimonial evidence supporting the claim Kostin retained ownership of the property" after 2014 (Bond Mot. 20). This is both factually incorrect and irrelevant to the *Franks* materiality standard. The affidavit references email communications related to financial transactions (Bond Mot., Ex. F ¶ 37), email communications and records related to Kostin's visits (*id*. ¶ 38), emails from 2018 sent from an unindicted co-conspirator close to Kostin (*id*. ¶ 41), and email communications and records showing a wire transfer to a shell company Kostin controlled (*id*. ¶¶ 45-46).

probable cause that Wolfson committed a crime.  (Wolfson Mot. 13).  Wolfson wholly ignores, however, that a grand jury had already returned the Indictment, which was described in and incorporated into the affidavit, and which contained extensive allegations regarding Kostin's ownership of the Aspen Home.  (Rybicki Decl., Ex. O, Affidavit ¶ 26; Ind. ¶¶ 33-48).  A grand jury's indictment creates a presumption of probable cause.  *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).

Wolfson next asserts that the affidavit both materially misleads and omits information by including a statement regarding information provided by the LLC Manager about a transfer of artwork to Wolfson in connection with the Aspen Home.[36]  (Wolfson Mot. 10-11).  As an initial matter, Wolfson does not dispute that this is an accurate summation of what the LLC Manager stated regarding the artwork, or even that he purchased the home from Kostin and that the artwork was transferred to Wolfson with the house.  Wolfson claims, however, that the statement was materially misleading because the affiant failed to include information that the witness, in a subsequent interview, changed his recollection as to *when* he believed that the sale of the Aspen Home to Wolfson occurred.  (Wolfson Mot. 10).  But neither the affidavit nor the Indictment rely on the LLC Manager—who had no firsthand knowledge regarding any person's actual use or control of the Aspen Home beyond documentation he received from various parties via email—to establish the probable cause as when the sale occurred.  As the affiant stated at the beginning of her affidavit, "[t]his affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter."  (Rybicki Decl., Ex. O, Affidavit ¶ 5), and an affiant is "not required to include all

---

[36] The purpose of this allegation was not to provide probable cause that Wolfson had committed the charged offense, but rather to establish probable cause that the artwork from the Aspen Home might be found at Wolfson's residence.

potentially exculpatory information" in seeking the search warrant. *Maisonet*, 2013 WL 12204909, at *1. While Wolfson's arguments regarding the timing of his purchase of the Aspen Home appear to be a defense he is pursuing to the underlying charges, those arguments fail to satisfy *Franks*. *See Mandell*, 710 F. Supp. 2d at 374 ("Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing.") (citation and internal quotation marks omitted).

      f.   The Affidavit Supporting the Cellphone Location Warrant Does Not Contain Materially False Statements Nor Does It Omit Material Facts

Wolfson makes a similar challenge to the Cellphone Location Warrant. (Wolfson Mot. 11). While Wolfson admits that the affidavit attached and incorporated the Indictment, he claims suppression is necessary because there was no specific foundation alleged for a paragraph in which the affiant asserts that Wolfson "did deal and cause others to deal in blocked property, specifically a home in Aspen, Colorado, purchased by Kostin in approximately 2010," and that Wolfson "did provide and cause others to provide goods, funds, or services related to the Aspen, Colorado home for Kostin's benefit." This affidavit, however, accurately summarized the investigation's findings as laid out in the Indictment. And even if the affidavit were "corrected" by entirely excluding the challenged paragraph, probable cause for the warrant sought—namely, probable cause that Wolfson had committed IEEPA violations and that the location information would identify and locate Wolfson, the person to be arrested—was still more than sufficiently alleged in the unchallenged paragraphs, which incorporated the Indictment, *see Boyd*, 336 F.3d at 76, and summarized the affiant's basis for believing that Wolfson used the relevant cellphone. (*See* Rybicki Decl., Ex. N, Affidavit ¶¶ 8, 10).

Finally, Wolfson argues the affidavit failed to include any "contrary evidence." (Wolfson Mot. 11). Wolfson does not identify any "contrary evidence" beyond the change in LLC

Manager's recollection regarding the timing of Wolfson's purchase of the Aspen Home, which fails for the reasons discussed above.  And Wolfson's position is contradicted by established law: "[a] requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process and place an extraordinary burden on law enforcement officers, and is not the law." *Cromitie*, 2010 WL 3025670 at *6 (internal quotation marks omitted).

### D.  Defendants' Motion for a Bill of Particulars Should Be Denied

Defendants seek a bill of particulars requiring the Government to "enumerate the factual basis for" and "identify the documentary and testimonial evidence it intends to introduce at trial" regarding: (a) CC-1 and CC-3's[37] nominal ownership and control of the Capital Entities on Kostin's behalf; and (b) Capital Business Finance's funding of an Altamonte bank account and proof that the funding related to the maintenance of the Aspen Home and Kostin's visits.[38] (Wolfson Mot. 6-7).  Wolfson, who does not move to dismiss the Indictment, nonetheless asserts without any authority that this bill of particulars request is "necessary" to "allow the Court to assess whether any evidence actually exists in support of the government's allegations against Mr. Wolfson." (Wolfson Mot. 7).  Defendants' request is meritless under well-established law.  The Government has provided the Defendants with more than sufficient information to understand the charges against them and to prepare a defense.  Nothing more is warranted.  And Wolfson's misguided effort to have the Court assess the weight of the Government's evidence against him is an improper effort to force a summary judgment-like motion on the Government.  But the Second Circuit has plainly held that "summary judgment does not exist in federal criminal procedure." *United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021) (citing *United States v. Sampson*, 898

---

[37] As above, CC-1 is ████████ and CC-3 is ███████████████.

[38] Bond joined in this motion for a bill of particulars, which was filed by Wolfson.  (Bond Mot. 1).

F.3d 270, 282 (2d Cir. 2018)).  The Court should thus decline to order the requested bill of particulars, which is not necessary to serve the limited purpose for which one may be sought and is simply "'an impermissible attempt to compel the Government to provide the evidentiary details of its case.'"  *United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (quoting *United States v. Biaggi*, 675 F. Supp. 790, 810 (S.D.N.Y. 1987)).[39]

### 1.  Applicable Law

The purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, [] to avoid prejudicial surprise at trial," *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (emphasis added) (internal quotation marks omitted), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010), and "to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense," *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  Accordingly, "[a] bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'"  *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Torres*, 901 F.2d at 234); *see United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014).

In determining whether the charges are so general that they require supplementation through a bill of particulars, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date.  *See Bortnovsky*, 820 F.2d at 574; *see also, e.g.*, *United States v. Block*, No. 16 Cr. 595 (JPO), 2017 WL 1608905, at *6-7

---

[39] The Government does not oppose the motion for a bill of particulars on the ground of untimeliness.  (Wolfson Mot. 1-2).

(S.D.N.Y. Apr. 28, 2017) (denying request for bill of particulars as to alleged fraud and unindicted co-conspirators where indictment sufficiently advised defendant of nature of charges against him and explained in language closely tracking statute crimes alleged); *United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013) (noting that "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense sufficient time in which to conduct the review in advance of trial); *United States v. Kazarian*, No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *25 (S.D.N.Y. May 18, 2012) (noting the "enormous amount of discovery material," including "search warrant affidavits" which "lay out the Government's investigation in detail" and "provide [the defendant] with much of the information sought in the request for a bill of particulars"); *United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *3-4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery and indictment was "sufficient to apprise the defendant of the charge" and to allow him to prepare for trial); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying request for bill of particulars where indictment and discovery materials, including search warrant affidavits, supplied sufficient information); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request where indictment was fifteen pages long and substantial discovery had been provided).

To be sure, a bill of particulars is almost always *helpful* to a defendant in any case. But "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), and therefore "[t]he ultimate test must be whether the information sought is *necessary*, not whether it is helpful," *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (emphasis added). *See also*

*Mahabub*, 2014 WL 4243657, at *2 ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant."); *Rittweger*, 259 F. Supp. 2d at 292-93 (denying bill of particulars request as "'an impermissible attempt to compel the Government to provide the evidentiary details of its case'" (quoting *Biaggi*, 675 F. Supp. at 810)).

A bill of particulars also should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." *Mitlof*, 165 F. Supp. 2d at 569; *see also Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'" (quoting *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968))). The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569 (citing *Torres*, 901 F.2d at 233-34; *Jimenez*, 824 F. Supp. at 363); *see also, e.g.*, *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'" (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001))); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense."). In short, the defense cannot use a bill of particulars as a device to compel disclosure

of the Government's evidence prior to trial.  *United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002).

Indeed, there are very good reasons why bills of particulars are warranted only where the allegations in the indictment, as supplemented by discovery and other disclosures, are so general as to render it impossible to prepare am adequate defense.  Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case."  *Henry*, 861 F. Supp. at 1197; *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *Samsonov*, 2009 WL 176721, at *3 ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").

Moreover, where the Government's provision of particulars is tantamount to an itemized preview of its proof, it creates the very real danger that a defendant will "tailor her testimony to explain away the Government's case."  *Henry*, 861 F. Supp. at 1197.  These concerns animate the rule that "if the defendant has been given adequate notice of the charges against her and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case."  *Id.*

### 2.  Argument

Defendants are not entitled to a bill of particulars.  The detailed, 21-page speaking Indictment plainly alerts Wolfson and Bond of the charges against them and provides ample information about the approximate dates and places of the charged offenses.  Nothing more is required.

Additionally, the Government has supplied Defendants with ample discovery relating to the above charges and spelled out information about the charged offenses—in detail and in a narrative format—in approximately 11 detailed search warrant affidavits, including warrants for Wolfson's home and electronic devices, iCloud account, and email account. *See Kazarian*, 2012 WL 1810214, at \*25 (noting the "enormous amount of discovery material," including "search warrant affidavits" which "lay out the Government's investigation in detail"); *Samsonov*, 2009 WL 176721, at \*4 (denying request for bill of particulars where indictment and discovery materials, including search warrant affidavits, supplied information).   Among the materials produced in discovery are corporate and financial records that show the nominee structures Kostin used to hold and manage his assets and how CC-1 and CC-3 regularly acted as Kostin's agents with respect to those entities and assets.  (*See, e.g.*, Exhibits F (identifying CC-3 as a "protector," or administrator, of a trust established for management of Kostin's assets, with Kostin, his wife, and children as identified beneficiaries); G (similar; identifying CC-1 as "protector" of the same trust)).

Additionally, even though trial is not scheduled until June 16, 2025 and, under 18 U.S.C. § 3500(a), witness statements are not subject to disclosure "until said witness has testified on direct examination in the [June 2025] trial of the case," the Government already has voluntarily, and long before it was required to, produced the witness statements in its possession.  These voluntarily produced witness statements are anything but "largely irrelevant."  (Wolfson Mot. 8).  Indeed, some of the very witness statements Wolfson submitted in connection with his motion to suppress privileged records undermine his baseless assertion that nothing produced supports a nominee relationship between Kostin, CC-1, and CC-3.  *See, e.g.*, Privilege Decl., Ex. C at 3 ("Witness also dealt with [CC-3] in regard to Kostin.  All instructions for Kostin-related matters came from [CC-

1] or [CC-3], or from people working for [CC-1] or [CC-3]."); 4 (noting that CC-1 and/or CC-3 were sometimes at meetings with Kostin and the witness); 5 (describing [CC-1] and [CC-3] as "Kostin's people" and noting that [CC-1] "was Kostin's nominee"); 6 (noting that witness "met [CC-3] in person regarding Kostin as the ultimate beneficial owner of companies and the assets held by them"); 7 (noting that with one exception "everything [CC-3] did was for Kostin"); *see id.*, Ex. E at 2 (directions that witness establish and/or manage companies for Kostin's benefit "always came from" CC-1 or CC-3; Kostin told witness that CC-3 would handle Kostin's matters; liquidation instructions for Kostin's companies came from CC-3).

Further, wholly voluntarily and as a courtesy to the Defendants, and in response to defense representations that doing so could realistically result in pre-trial guilty pleas, the Government separately met with counsel for both Wolfson and Bond in August 2024 and provided a lengthy, 47-slide reverse proffer that resembled a trial summation, walking through much of the proof and arguments it anticipates making at trial. It is thus particularly surprising that Wolfson repeatedly claims that the Government is making an attempt at "trial-by-ambush." (Wolfson Mot. 6, 8). The slide deck included two slides excerpting illustrative evidence showing that, in September and October 2016, Capital Business Finance, Kostin's entity, funded an Altamonte bank account related to the Aspen Home's maintenance and operations, which underlying documents are attached hereto as Exhibits S and T.

The foregoing materials, including this memorandum, collectively constitute the most extensive amount of detail either of the undersigned attorneys can recall ever having provided to a defendant this far in advance of trial. At a minimum, the disclosures to date are far more than sufficient to put the Defendants on notice of the nature and specifics of the crimes of which they are accused and to permit them to adequately prepare their defense. *See, e.g.*, *Bortnovsky*, 820

F.2d at 574. Given these detailed disclosures and the foregoing, the Defendants' meritless complaints about receiving insufficient information about their charges should be rejected. Indeed, the Government has already provided far more evidence than the minimal information required.

Unsurprisingly, Wolfson makes no serious argument that he has not been apprised of the nature of charges against him, *see Torres*, 901 F.2d at 234, nor could he—the Indictment explains in depth the charged offenses, and discovery provides the relevant documents, electronic communications, statements, and other materials in the Government's possession. Given the extensive detail within the Indictment's 21 pages, this plainly is not a case in which the allegations in the Indictment "are so general that they do not advise the defendant of the specific acts of which he is accused." *Walsh*, 194 F.3d at 47 (internal quotation marks and citation omitted). On the contrary, the Indictment *itself* provides a sufficient basis to deny the defendant's motion in its entirety. *See, e.g.*, *United States v. Bonventre*, 646 F. App'x 73, 79 (2d Cir. 2016) ("'[E]videntiary detail is not the function of the bill of particulars.' Particulars are necessary only where indictment charges are 'so general that they do not advise the defendant of the specific acts of which he is accused.'" (citation omitted) (quoting *Torres*, 901 F.2d at 234; *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004))); *United States v. Wedd*, No. 15 Cr. 616 (KBF), 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (denying motion for bill of particulars where "the Indictment is a 'speaking' Indictment that provides a significant amount of detail as to the Government's theory of the case and the nature of the proof that will underlie the charges at trial").

Wolfson—who does not move to dismiss the Indictment—curiously asserts, without authority, that the requested bill of particulars is "necessary" to "allow the Court to assess whether any evidence actually exists in support of the government's allegations against Mr. Wolfson." (Wolfson Mot. 7). But Wolfson's naked pronouncement does not reflect the legal standard for

*anything* at the pre-trial stage, and certainly not the bill of particulars legal standard. Notwithstanding Wolfson's strange invitation that the Court "assess whether any evidence actually exists in support of the government's allegations against Mr. Wolfson," (Wolfson Mot. 7), at the pre-trial stage, a court "do[es] not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021) (internal quotation marks omitted). Wolfson's effort to have the Court assess the weight of the Government's evidence against him has no relevance to whether a bill of particulars is appropriate, but rather is a misguided effort to force a summary judgment-like motion on the Government. This is plainly improper. The Second Circuit has long held that "summary judgment does not exist in federal criminal procedure." *Wedd*, 993 F.3d at 121 (citing *Sampson*, 898 F.3d at 282); *Sampson*, 898 F.3d at 281 ("Even more fundamentally, authorizing district court judges to resolve dispositive fact-based evidentiary disputes on Rule 12(b) motions risks invading the inviolable function of the jury in our criminal justice system." (internal quotation marks omitted)). Thus, "the district court lacks the authority 'to require the government, before trial, to make such a presentation [a full proffer of its evidence]' as this 'could effectively force a summary judgment-like motion on the government.'" *Id.*

In short, Wolfson's motion for a bill of particulars offers nothing except factual challenges to the sufficiency of the evidence. But whether the Government can establish the elements in the Indictment beyond a reasonable doubt is for a jury to decide, not for this Court to determine at this stage. Wolfson may of course argue to a jury that the Government cannot prove the elements in the Indictment beyond a reasonable doubt. But it is not for this Court to "evaluate the adequacy of the facts to satisfy the elements of the charged offense." *Dawkins*, 999 F.3d at 780. To the extent that Wolfson believes that the Government's proof will not substantiate the charges, such

issues are properly resolved at trial. *See, e.g.*, *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989) ("[A]n indictment, if valid on its face, may not be challenged on the ground that it is based on inadequate evidence."); *United States v. Butler*, S1 04 Cr. 340 (GEL), 2004 WL 2516672, at *3 (S.D.N.Y. Nov. 4, 2004) (Lynch, *J.*) ("[I]t is hornbook law that a federal defendant may not challenge a facially-valid indictment . . . on the ground that it is based on insufficient evidence."); *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence. Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary insufficiency."), *aff'd*, 17 F.3d 572 (2d Cir. 1994).

In sum, the particulars of the conduct giving rise to the charges are pled with specificity in the charging instrument itself, and amplified by the extensive discovery and voluntary disclosures produced to date. *See, e.g.*, *United States v. Ng*, No. 15 Cr. 706 (VSB) (S.D.N.Y. Apr. 26, 2017) (ECF No. 452 at 11) (denying defendant's motion for a bill of particulars that would describe, among other things, official acts and the identifies of the defendant's co-conspirators, in light of the detailed nature of the 31-page Indictment and the government's "sufficient disclosures concerning the nature of the charged offenses by other means," including discovery and agent affidavits); *United States v. Issa*, No. 17 Cr. 74 (CM), 2018 WL 461131, at *3-4 (S.D.N.Y. Jan. 9, 2018) (denying motion for bill of particulars).

At bottom, the Defendants' request appears to be an attempt to obtain a preview of the Government's case and legal theories and unduly restrict the evidence and arguments the Government may use at trial. It should therefore be rejected. *See, e.g.*, *United States v. Brewster*, No. 19 Cr. 833 (SHS), 2021 WL 342352, at *2 (S.D.N.Y. Aug. 5, 2021) ("It is not the function of a bill of particulars to allow defendants to preview the evidence or theory of the government's

case." (internal quotation marks and citation omitted)).  Likewise, a bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'"  *D'Amico*, 734 F. Supp. 2d at 335 (quoting *Gibson*, 175 F. Supp. 2d at 537).  The Defendants' requests are the very "'wheres, whens and with whoms'" that are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569; *United States v. Bin Laden*, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have almost uniformly been denied."); *Torres*, 901 F.2d at 233-34 (affirming denial of motion for bill of particulars seeking, among other things, precise dates and locations, as "ill-disguised attempts at general pre-trial discovery" (internal quotation marks omitted)).  The Indictment, as supplemented by discovery and other disclosures, more than adequately provides what the Defendants are entitled to.  *See Bellomo*, 263 F. Supp. at 580 ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

The Defendants' request thus falls within the long line of cases where courts have denied requests for bills of particulars.  *See, e.g.*, *United States v. Reid*, No. 20 Cr. 626 (PMH), 2023 WL 155472, at *8 (S.D.N.Y. Jan. 11, 2023); *Rittweger*, 259 F. Supp. 2d at 292; *United States v. Amendolara*, No. 01 Cr. 694 (DAB), 2002 WL 31368279, at *5-6 (S.D.N.Y. Oct. 21, 2002); *Trippe*, 171 F. Supp. 2d at 240 (denying a bill of particulars in light of sufficiency of information contained in the Indictment and through discovery) (collecting cases); *United States v. Rodriguez*, No. 99 Cr. 367 (DLC), 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999); *see generally Wedd*,

2016 WL 1055737, at *4 (denying motion for bill of particulars).

Together, the ample disclosures to date and the details contained in the Indictment have "identif[ied] with sufficient particularity the nature of the charge[s] pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Bortnovsky*, 820 F.2d at 574. Accordingly, the motion for a bill of particulars should be denied.

### E. Defendants' Motion for Grand Jury Materials Should Be Denied

The Defendants next move for disclosure or *in camera* review of the grand jury minutes, testimony, and legal instructions, based on their unjustified speculation that "the grand jury may have been deceived or misled as to key legal or factual issues." (Wolfson Mot. 15). The Defendants' request should be denied.[40]

#### 1. Applicable Law

"The burden on a party seeking disclosure of grand jury materials is high," *United States v. Kirton*, No. 20 Cr. 322 (PMH), 2021 WL 1550423, at *1 (S.D.N.Y. Apr. 20, 2021), and disclosure of grand jury materials "is an extraordinary remedy," *United States v. Lesane*, No. 22 Cr. 110 (VSB), 2023 WL 155538, at *9 (S.D.N.Y. Jan. 13, 2023), *reconsideration denied*, No. 22 Cr. 110 (LJL), 2023 WL 3560549 (S.D.N.Y. May 19, 2023). "An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956); *see also United States v. Williams*, 504 U.S. 36, 54 (1992). As a general matter, there is a presumption of regularity that attaches to grand jury proceedings. *United States v. Mechanik*, 475 U.S. 66, 75 (1986); *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974) ; *United States v. Leung*, 40 F.3d 577, 581 (2d Cir.

---

[40] Bond joins in the motion for grand jury materials. (Bond Mot. 1).

1994); *Torres*, 901 F.2d at 232-33.  Thus, "[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."  *Torres*, 901 F.2d at 233; *see also Leung*, 40 F.3d at 582 ("A review of grand jury minutes should not be permitted without concrete allegations of Government misconduct.").

At the same time, "[t]here is a tradition in the United States, a tradition that is 'older than our Nation itself,' that proceedings before a grand jury shall generally remain secret."  *In re Petition of Craig*, 131 F.3d 99, 101 (2d Cir. 1997) (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959)).  As the Supreme Court has explained, grand jury secrecy is central to our criminal justice system, because "[t]he grand jury as a public institutional serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow."  *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958).  Because of the "indispensable secrecy of grand jury proceedings," *United States v. Johnson*, 319 U.S. 503, 513 (1943), disclosure is permissible only "where there is a compelling necessity."  *Procter & Gamble Co.*, 356 U.S. at 681.

This principle of grand jury secrecy is codified in Federal Rule of Criminal Procedure 6(e), which, with certain exceptions, instructs most participants in the grand jury process that they "must not disclose a matter occurring before the grand jury."  Fed. R. Crim. P. 6(e)(2)(B).  The Rule provides, however, that "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  "[T]he burden is on the party seeking disclosure to show a 'particularized need' that outweighs the need for secrecy."  *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978).

"[U]nsupported suspicions of grand jury abuse are not sufficient to justify disclosure of grand jury minutes." *United States v. Abrahms*, 539 F. Supp. 378, 389 (S.D.N.Y. 1982); *United States v. Carter*, No. 04 CR. 594 (NRB), 2005 WL 180914, at *5 (S.D.N.Y. Jan. 25, 2005).  In fact, if defendants could routinely gain access to grand jury minutes based on hollow or speculative allegations, the functioning of the criminal justice system would be severely compromised.  *See Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979) ("[I]n considering the effects of disclosure on grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries."); *Index Fund v. Hagopian*, 512 F. Supp. 1122, 1127 (S.D.N.Y. 1981) ("The encouragement of full and frank testimony, and the cooperation of persons possessing relevant documents, are important interests that should not be subordinated in the absence of a showing of particularized need."  (citation omitted)).  As such, the Supreme Court has "consistently construed [Rule 6(e)] . . . to require a strong showing of particularized need for grand jury materials before any disclosure will be permitted."  *United States v. Sells Engineering*, 463 U.S. 418, 443 (1983); *accord Moten*, 582 F.2d at 662 (a defendant seeking disclosure of grand jury minutes because of a matter that occurred before the grand jury must "show a particularized need that outweighs the government's strong interest in secrecy").  In order to obtain disclosure, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity that outweighs the Government's and the Grand Jury's substantial interest in secrecy." *United States v. Helbrans*, 547 F. Supp. 3d 409, 434 (S.D.N.Y. 2021) (citing *Gibson*, 175 F. Supp. 2d at 534 and *Sells Eng'g, Inc.*, 463 U.S. at 443).  The same showing is required where the defendant seeks *in camera* review of grand jury minutes.  *See Torres*, 901 F.2d at 233 (noting that *in camera* "review of grand jury minutes is rarely permitted without specific factual allegations of

74

government misconduct" (citation omitted)); *United States v. Ruiz*, 702 F. Supp. 1066, 1073 (S.D.N.Y. 1989) (requiring a showing of particularized need where defendant requests *in camera* review of grand jury minutes), *aff'd*, 894 F.2d 501 (2d Cir. 1990); *Carter*, 2005 WL 180914, at *5 ("This standard applies to in camera review of grand jury proceedings as well as disclosure to parties."). A district court adjudicating a motion for the disclosure of grand jury materials is "infused with substantial discretion." *Douglas Oil*, 441 U.S. at 223.

"Mere speculation that the grand jury may have heard insufficient evidence, or that the Government may have improperly instructed the grand jury on materiality, falls far short of the showing to overcome the presumption of secrecy." *United States v. Forde*, 740 F. Supp. 2d 406, 414 (S.D.N.Y. 2010); *see also United States v. Paredes-Cordova*, No. 03 Cr. 987 (DAB), 2009 WL 1585776, at *2 (S.D.N.Y. June 8, 2009); *United States v. Muse*, No. 06 Cr. 600 (DLC), 2007 WL 391563, at *10 (S.D.N.Y. Jan. 30, 2007) ("Review of a facially valid indictment is extremely circumscribed and does not include a challenge based on the contention that unreliable evidence was presented to the Grand Jury.").

Courts in this District routinely deny requests for review or disclosure of grand jury minutes on the ground that the defendants have not shown a particularized need. *See United States v. Moslem*, No. 19 Cr. 547 (CS), 2024 WL 990141, at *3 (S.D.N.Y. Mar. 7, 2024); *United States v. Rodrigues*, No. 22 Cr. 391 (PMH), 2024 WL 113744, at *5–6 (S.D.N.Y. Jan. 10, 2024); *Lesane*, 2023 WL 155538, at *9; *Greenberg*, 2022 WL 827304, at *26; *Calk*, 2020 WL 3577903, at *3; *see also*, *United States v. Brown*, 1995 WL 387698 (S.D.N.Y. June 30, 1995); *United States v. Kalevas*, 622 F. Supp. 1523, 1525 (S.D.N.Y. 1985) (Weinfeld, *J.*); *United States v. Abrams*, 539 F. Supp. 378, 389 (S.D.N.Y. 1982); *United States v. Leonelli*, 428 F. Supp. 880, 883 (S.D.N.Y. 1977) (defendant's motion for inspection of the grand jury minutes, which was supported by sworn

affidavit alleging that the grand jury had been misled and presented with lies and hearsay evidence, was denied because the "unsupported generalities" fell far short of establishing that denial would result in prejudice or an injustice).

### 2. Argument

The Defendants have not and cannot meet their heavy burden. At the outset, the Indictment is facially valid and the Defendants have provided inadequate support for their tentative speculation that "the grand jury *may* have been deceived or misled as to key legal or factual issues." (Wolfson Mot. 15 (emphasis added)). In these circumstances, courts have repeatedly refused to look behind facially valid indictments by, for example, inspecting grand jury minutes, based on claims of inadequate or insufficient evidence. *See United States v. Calandra*, 414 U.S. 338, 344-45 (1974) ("[A]n indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence[.]" (citations omitted)); *Casamento*, 887 F.2d at 1182 ("[A]n indictment, if valid on its face, may not be challenged on the ground that it is based on inadequate evidence."); *Butler*, 2004 WL 2516672, at *3 ("[I]t is hornbook law that a federal defendant may not challenge a facially-valid indictment . . . on the ground that it is based on insufficient evidence."); *Forde*, 740 F. Supp. 2d at 414 ("Mere speculation that the grand jury may have heard insufficient evidence, or that the Government may have improperly instructed the grand jury on materiality, falls far short of the showing to overcome the presumption of secrecy."). To the extent that the Defendants believe that the Government's proof will not substantiate the charges, such issues are properly resolved at trial. *See Gambino*, 809 F. Supp. at 1079; *Massino*, 605 F. Supp. at 1581. Because the Defendants have failed to show any legally cognizable basis to order the extraordinary relief of disclosure of the grand jury testimony or legal instructions provided to the grand jury, their motion should be denied.

The Defendants' arguments to the contrary are unavailing. Their inaccurate, wholly

speculative allegations that "the government's case has gaping holes," "[w]ithout a mischaracterization of fact or a misstatement of law—such as failure to instruct the grand jury that a benefit to Mr. Kostin was required—it is exceptionally difficult to imagine how the grand jury could have indicted Mr. Wolfson," and "the grand jury may have been deceived or misled as to key legal or factual issues" (Wolfson Mot. 14, 15), are belied by the detailed speaking Indictment and discovery and, in any event, fall well short of establishing any procedural irregularity or a "strong showing of particularized need" for disclosure or *in camera* review of the grand jury materials. *Sells Engineering*, 463 U.S. at 443. The Defendants' baseless speculation about what evidence and legal instructions the Government may or may not have presented to the grand jury is insufficient to meet their burden to overcome the presumption of regularity, *Calk*, 2020 WL 3577903, at *3, and their characterization of the Indictment and discovery provided is simply wrong, and collectively provide no basis for disturbing the presumption of secrecy and closure protecting grand jury testimony. Such "speculative arguments are precisely the type that courts in this district have routinely rejected as [a] basis for vitiating grand jury secrecy." *Helbrans*, 547 F. Supp. 3d at 435 (collecting cases).

Of course, the Defendants' apparent disagreement with the facts as articulated by the grand jury in its Indictment is unremarkable—the Defendants are entitled to challenge the Government's evidence at trial and, if they so choose, present competent evidence and appropriate argument to contest the Government's case. But the Defendants are without a legal basis to challenge the grand jury proceedings here.

In sum, the "extraordinary remedy" of disclosure of the requested grand jury materials is unwarranted. *Lesane*, 2023 WL 155538, at *9. The Defendants' motion amounts to nothing more than "'general and unsubstantiated assertions' of government misconduct [that are] insufficient to

meet the 'stringent standard' under Rule 6(e)(3)(E)(ii) . . . ." *United States v. Martin*, 411 F. Supp. 2d 370, 376 (S.D.N.Y. 2006) (citing *United States v. Dunn*, No. 05 Crim. 127 (KMK), 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005)); *see also United States v. Bruno*, 159 F. Supp. 3d 311, 322-23 (E.D.N.Y. 2016) ("Defendant has not presented any concrete allegations of prosecutorial misconduct; rather, his allegations are speculative and are comprised of unsubstantiated 'ifs,' 'unlesses,' and 'mights' that that do not rise to the level of warranting disclosure.").  Because the Indictment is facially valid, and because the Defendants' claims are speculative and fall short of demonstrating a "particularized need" that "outweighs the need for secrecy," *Moten*, 582 F.2d at 662, the Defendants' motion should be denied.

## F. Defendants' Motion to Strike Allegations From the Indictment Should Be Denied

Defendants move to strike paragraphs 11 through 19 from the Indictment, which set forth the relevant background regarding IEEPA and the sanctions imposed on Kostin, and any paragraphs, including paragraphs 23 through 32, which set forth how Kostin, together with CC-1 and CC-2, violated IEEPA by utilizing USD transactions to maintain two superyachts that Kostin owned and controlled.[41]  According to Bond, these allegations are inflammatory and prejudicial (Bond Mot. 23, 24), irrelevant (*id.* 22), and potentially usurp the Court's role in instructing the jury regarding principles of law (*id.* 24).  The Defendants are wrong.  These portions of the Indictment are not objectionable and, in any event, Defendants' motion to strike them is premature.

### 1. Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, *see* Fed. R. Crim. P. 7(d), '[i]t has long been the policy of courts within the Southern District to refrain from tampering with indictments.'" *United States v. Bin*

---

[41] Wolfson joined in this motion, which was filed by Bond.  (Bond Mot. 21 n.11).

*Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (quoting *Jimenez*, 824 F. Supp. at 369). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory or prejudicial.'" *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (quoting *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)). "'[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'" *Id.* (quoting *United States v. DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978)) (brackets in original); *see also United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001), *cert. denied*, 535 U.S. 949 (2002). "This standard is an exacting one, and only rarely is alleged surplusage stricken from an indictment." *United States v. Murgio*, 209 F. Supp. 3d 698, 724 (S.D.N.Y. 2016) (quoting *United States v. Smith*, 985 F. Supp. 2d 547, 610 (S.D.N.Y. 2014)) (internal quotation marks omitted); *see also, e.g.*, *United States v. Coffey*, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005) ("Given th[e] exacting standard, such motions [to strike] are rarely granted.").

An indictment need not be limited only to the bare elements of a crime; rather, it can provide background to the charged criminal conduct, describe the circumstances, means, and methods of a scheme, and describe evidence that is otherwise admissible either as direct evidence or under Federal Rule of Evidence 404(b). In short, "statements providing background are relevant and need not be struck." *United States v. Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013) (citing *Mulder*, 273 F.3d at 100); *see, e.g.*, *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (affirming denial of motion to strike where "[d]efendants' cocaine-related activity was clearly relevant evidence of the organizational structure and method of operation of their heroin conspiracy, and it also tended to establish the nature of the relationship between Defendants and their supplier of heroin, [one of the defendants]").

With respect to the timing of such a motion, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *Mostafa*, 965 F. Supp. 2d at 467 (citing, *inter alia*, *Scarpa*, 913 F.2d at 1012); *see also United States v. Ahmed*, No. 10 Cr. 131 (PKC), 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011). "There is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.'" *Smith*, 985 F. Supp. 2d at 612 (quoting *United States v. Butler*, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004)).

Indeed, as Judge Lynch explained, "motions to strike purported surplusage are largely meaningless, at least in this Court." *Butler*, 351 F. Supp. 2d at 124. This is because "[i]t is not the usual practice of this Court to provide the jury with a copy of the indictment in any event, and if it should be appropriate to give a copy of the indictment to the jury in connection with their deliberations, that copy can be redacted according to the charges, allegations, and evidence that remain relevant in light of the entire trial." *Id.*

2. **Argument**

Defendants' motion to strike should be deferred until after the conclusion of the Government's case-in-chief. They suffer no current prejudice from the allegations they challenge, and, as is generally the case, "'there is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.'" *Smith*, 985 F. Supp. 2d at 612 (quoting *Butler*, 351 F. Supp. 2d at 124). Indeed, they do not really argue to the contrary. Rather, they appear to ground their request on the potential prejudice to them *at trial* if the jury were to learn of this allegation (*see* Bond Mot. 22), and acknowledge that

an "equally effective" remedy for this alleged prejudice would be for the Court to refrain from reading or providing a copy of the Indictment to the jury (Bond Mot. 26).[42]

But even if the Court were to reach the merits, the defendants' arguments are lacking in merit. Defendants' argument that the allegations regarding the conspiracy to evade sanctions in connection with Kostin's superyacht are simply "irrelevant" is demonstrably wrong. The fact that Kostin used shell entities and nominee owners to conceal his ownership of the superyachts is relevant background information as to his use of similar shell entities and nominee owners for the Aspen Home.

Indeed, given that the defendants are charged with a conspiracy to violate IEEPA, such evidence is plainly admissible, at a minimum, as background on the conspiracy. *See, e.g.*, *United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (explaining that some kinds of evidence offered "to show the background of a conspiracy" is not "other crimes" evidence subject to Rule 404(b), but rather "'direct proof of the charged conspiracy'")*; accord United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."). Accordingly, the inclusion of these allegations in the Indictment is entirely proper. Evidence regarding the background on the conspiracy will be admissible as direct evidence at trial.

---

[42] Indeed, the Government understands that it is not the usual practice of this Court to provide the jury with a copy of the Indictment. If the Government's understanding is correct, the Defendants' motion is moot.

In particular, the fact that CC-1 acted as Kostin's representative in operating and maintaining the superyachts (Ind. ¶ 32) is relevant background to demonstrate that Kostin also owned and controlled the Aspen Home and was the beneficiary of the September 2019 Transaction, given that CC-1 was involved in the 2010 purchase of the Aspen Home (*id.* ¶ 34), was involved in the approval of funding requests for the Aspen Home between 2010 and 2018 (*id.* ¶ 40), and was one of the nominal owners of Capital Business Finance, the parent company of the entity that received the September 2019 Transaction.

Nor do the allegations "impermissibly broaden the charges" against Defendants. (Bond Mot. 23). In *United States v. Greebel*, No. 15 Cr. 637 (KAM), 2017 WL 3610570 (E.D.N.Y. Aug. 4, 2017), upon which Defendants principally rely, the Court agreed that language identifying the defendant as having been a participant in four fraud schemes should be stricken when he was only charged with having participated in two fraud schemes. Here, in contrast, there is no confusing allegation suggesting that the Defendants were involved in the sanctions violations relating to the superyachts; they are not named in those paragraphs at all.

The Court accordingly need not reach Defendants' assertion that the challenged superyacht allegations are "inflammatory and prejudicial" (Bond Mot. 23, 24). *See Scarpa*, 913 F.2d at 1013 ("If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken."). But, regardless, the "description[s] of the opulent superyachts" (Bond Mot. 23) are no different in nature, and no more inflammatory than, the unchallenged allegations concerning the Aspen Home, a property worth at least $10 million and for which Kostin purchased artwork worth more than $1 million. (*See* Ind. ¶¶ 4, 34, 37, 43). *See United States v. Scarpa*, 913 F.2d at 1013 (quoting *Napolitano*, 552 F. Supp. at 480) ("Motions

to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory or prejudicial.'").

Likewise, the paragraphs of the Indictment describing IEEPA and the sanctions regime are plainly relevant background for the sanctions imposed on Kostin. The Government anticipates that it will admit evidence of the executive orders described in those paragraphs as a necessary component of proving that there was a violation of an order, regulation, or prohibition issued pursuant to IEEPA, which is an element of the charged substantive IEEPA violation. And while Defendants object to these allegations primarily because they "may . . . provide an unbalanced statement of the law" (Bond Mot 24), they do not identify a single specific aspect of those allegations that is purportedly legally or factually incorrect, unbalanced, or inflammatory.[43]

Moreover, any conceivable undue prejudice that might flow from the challenged allegations can be mitigated by an appropriate jury instruction. *See, e.g.*, *United States v. Caglar*, No. 08 Cr. 232 (CFD), 2009 WL 2169232, at *2 (D. Ct. Jul. 20, 2009) (denying motion to strike; "at trial the Court can craft a limiting instruction to shield against possible prejudice"); *United States v. Turoff*, 652 F. Supp. 707, 713-14 (E.D.NY. 1987) (denying motion to strike; "[T]he defendants will be entitled to request limiting instructions . . . [that] will guarantee that the jury understands with what the defendants are and are not charged, but the defendants are not entitled to preclude the government from pleading and proving conduct that is relevant to the defendants' alleged crimes.").

---

[43] The Indictment, moreover, does not include any references to "national security" or "terrorism," which is the language the Court in *United States v. Gross*, 616 F. Supp. 2d 777, 790 (E.D.N.Y. 2008), found to be potentially inflammatory. *Compare with United States v. Fishenko*, No. 12 Civ. 626 (SJ), 2014 WL 4804215, at *9 (E.D.N.Y. Sept. 25, 2014) (granting motion to strike in part based on Government's consent; denying motion to strike references to "national emergency" among other language, that was "descriptive but not inflammatory").

The Defendants' motion, in sum, fails in every respect.

## **CONCLUSION**

For all of the reasons set forth above, the Government respectfully submits that the Defendants' motions should be denied, except for Wolfson's motion to suppress his post-arrest statement providing his device passcode, to which the Government does not object.

Dated:      New York, New York
            December 23, 2024

                                Respectfully submitted,

                                EDWARD Y. KIM
                                Acting United States Attorney
                                Southern District of New York

By:      /s/ _____
                                Emily Deininger
                                David R. Felton
                                Assistant United States Attorneys

84