USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/17/25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                  :

UNITED STATES OF AMERICA,             :
                                  :
                                  :           1:24-cr-91-GHW
                                  :
                 -v-                :     MEMORANDUM OPINION &
                                  :               ORDER
ANDREY KOSTIN,                   :
     a/k/a "Andrei Kostin,"         :
VADIM WOLFSON,              :
     a/k/a "Vadim Belyaev," and    :
GANNON BOND,                :
                                  :
                       Defendants.  :
------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

On March 6, 2014, the President of the United States declared a national emergency in response to Russia's annexation of the Crimea region of Ukraine. Over the course of the next nine months, the President issued several executive orders (the "Executive Orders") pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* These Executive Orders, among other things, blocked select Russian officials from owning or holding property interests inside the United States. Defendant Andrey Kostin, the President and Chairman of Russia's state-owned VTB Bank, is one such official.

Mr. Kostin, along with Defendants Vadim Wolfson and Gannon Bond, have been charged with engaging in a conspiracy to violate IEEPA. The Government alleges that, while living in the United States, Mr. Wolfson purchased a luxury house in Aspen, Colorado (the "Aspen Home") from Mr. Kostin in order to funnel $12 million to Mr. Kostin through various shell companies, including an entity called CapitalInvest and its parent company, Capital Business Finance.

Mr. Wolfson presents an alternative narrative. He argues that he purchased the Aspen Home with a legitimate loan that he borrowed from Capital Business Finance, which he understood

to be an ordinary lender. To build his defense, Mr. Wolfson seeks leave to conduct a deposition

pursuant to Rule 15 of the Federal Rules of Civil Procedure. He seeks to depose a Cyprus-based

lawyer named Irina Skittides. According to Mr. Wolfson, Ms. Skittides will testify about the lending

activities of Capital Business Finance—the lender from whom Mr. Wolfson asserts he borrowed the

money to buy the Aspen Home. Mr. Wolfson also proffers that Ms. Skittides will testify about

whether Mr. Kostin indirectly owned and controlled Capital Business Finance. Because Ms.

Skittides' anticipated testimony is material, Mr. Wolfson's motion to conduct a Rule 15 deposition of

Ms. Skittides is granted.

## I.      BACKGROUND

### A.  Overview

Defendants Andrey Kostin, Vadim Wolfson, and Gannon Bond are charged with violating

the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*, by

engaging in a scheme to benefit Mr. Kostin.[1]  *See* Dkt. No. 20 (the Superseding Indictment,

hereinafter "S2") ¶¶ 1, 54–60. Mr. Kostin is the President and Chairman of Russia's state-owned

VTB Bank. *See id.* ¶ 5. Mr. Wolfson is a Russian national with legal residency in the United States.

*Id.* ¶ 6. Mr. Bond is a United States national who worked for Mr. Wolfson as his personal assistant.

*Id.* ¶ 7.

As the indictment describes, shortly after Russia invaded and annexed the Crimea region of

Ukraine in February and March 2014, the President of the United States issued a series of Executive

Orders pursuant to IEEPA that imposed sanctions on certain Russian officials. *Id.* ¶¶ 11–14, 41.

---

[1] "The IEEPA gives the President the authority to deal with unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States by declar[ing] a national emergency with respect to such threat. 50 U.S.C. § 1701(a). In exercising this power, the President may investigate, regulate, or prohibit" as proscribed by section 1702 of the act. Criminal penalties under the act are for those who willfully commit[ ], willfully attempt[ ] to commit, or willfully conspire[ ] to commit, or aids or abets the commission of a violation of the President's regulations or prohibitions issued pursuant to the IEEPA." *See United States v. Griffith*, 515 F. Supp. 3d 106, 114 (S.D.N.Y. 2021) (internal quotation marks omitted) (alterations in original).

Pursuant to the Executive Orders, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated each sanctioned individual as a Specially Designated National ("SDN"). *Id.* Once labeled an SDN, an individual is barred from owning or holding property interests inside the United States. *Id.* Individuals inside the United States are also prohibited from "dealing" in the property interests of an SDN, and from engaging in transactions that benefit any SDN living abroad, unless otherwise authorized. *Id.*

The United States announced sanctions against a Russian lender—a prominent Russian bank called Bank Rossiya—for the first time at the end of March 2014. *Id.* ¶ 41. OFAC sanctioned VTB Bank on or about July 29, 2014. *Id.* ¶ 20. In December 2017, public media reports emerged about "anticipated new U.S sanctions that were likely to be imposed . . . as a result of the ongoing Russia-Ukraine war." *Id.* ¶ 46. Mr. Kostin allegedly recognized the "high risk" that he would be added to the list of SDNs. *Id.* ¶ 46. And, indeed, on April 6, 2018, OFAC designated Mr. Kostin as an SDN given his status as "'an official of the Government of the Russian Federation' in his role as 'the President, Chairman of the Management Board, and Member of the Supervisory Council of state-owned VTB Bank.'" *Id.* ¶¶ 21. Kostin was, consequently, blocked from owning property or transacting business in the United States.[2] *Id.* ¶¶ 11–22.

As relevant here, the indictment alleges that from at least April 6, 2018—the date Mr. Kostin was sanctioned—through at least September 2019, Mr. Wolfson conspired to provide funds, goods, and services to Mr. Kostin and his businesses through the operation, maintenance, and sale of a luxury house located in Aspen, Colorado, described in the indictment as the "Aspen Home." *Id.* ¶¶ 55, 58.

---

[2] Once designated as SDN, unless otherwise exempt, "there are significant restrictions on the SDN's ability to transact in the United States or with [United States] persons." S2 ¶ 3.

### B. The Alleged Sanctions Violations

Mr. Kostin's alleged relationship with the Aspen Home began in 2010. *Id.* ¶ 34. In April, an unnamed co-conspirator ("CC-1") traveled to Aspen and "facilitated and finalized the purchase of the Aspen Home, including by attending the closing on behalf of Kostin." *Id.* ¶¶ 8, 34. Mr. Kostin allegedly purchased the Aspen Home "for approximately $13.5 million in the name of 40 North Star LLC ('40 North Star'), a Colorado limited liability company that was formed in 2010 and that nominally owned the Aspen Home until 2020."[3] *Id.* ¶ 34. Mr. Kostin visited the Aspen Home regularly after its purchase, particularly around Christmas and New Year's, and arranged visits for guests, including Mr. Wolfson.[4] *Id.* ¶¶ 36–39.

The indictment describes a series of transactions related to the Aspen Home that followed on the heels of the sanctions announced in 2014. First, the indictment alleges that approximately two months after OFAC sanctioned Bank Rossiya and two months before OFAC sanctioned VTB Bank, the "nominal ownership of 40 North Star was transferred to a new shell company" called Altamonte Holdings Limited ("Altamonte").[5] *Id.* ¶¶ 42–43. To facilitate the transaction, Altamonte borrowed $10 million from a lender called Capital Business Finance, which the Government alleges is "owned and controlled through various shell companies . . . on behalf of [Mr.] Kostin . . . ."[6] *Id.* ¶¶ 43–44.

---

[3] The indictment alleges that Mr. Kostin "owned and controlled 40 North Star through, at various times, a series of additional shell companies, nominee owners, intermediaries, and trust structures." S2 ¶ 35.

[4] According to the indictment, Mr. Kostin sent a letter to the neighbors of the Aspen house that "introduced himself, attached his resume, and stated that 'an entity' that I control [i.e., 40 North Star] purchased Lot 6 [i.e., the Aspen Home] last year." *Id.* ¶ 36 (alterations in original). Mr. Wolfson allegedly visited the Aspen Home in 2015. *Id.* ¶ 39. Mr. Kostin also allegedly purchased art worth over $1 million for the Aspen House. *Id.* ¶ 37.

[5] Altamonte was registered in the British Virgin Islands one month earlier in April 2014. *Id.* ¶ 42.

[6] The indictment alleges that Capital Business Finance "is owned and controlled, through various other shell companies and intermediaries, by CC-1 and CC-3," who are unnamed co-conspirators, "on behalf of" Mr. Kostin." *Id.* ¶ 44. In particular, "Capital Business Finance's shares are held by a nominal shareholder in trust for a shell company called Gesford Holdings, which is in turn owned by Atkien Enterprises, as a nominee for CC-1, and Ionic Nominees Limited, as a nominee for CC-3." *Id.*

According to the Government, Capital Business Finance was controlled in part by an unnamed co-conspirator, CC-3, "on behalf of Kostin."[7] *Id.* ¶ 44. The Government alleges that CC-3 was "an employee of VTB Bank and opened an office in Cyprus specifically to assist with the management" of Mr. Kostin's "shell companies and assets." *Id.* ¶ 10.

Second, the Government alleges that, from 2014 through 2017, Capital Business Finance funneled money through Altamonte to 40 North Star to support Mr. Kostin's visits to and maintenance of the Aspen Home.[8] *Id.* ¶ 45. Mr. Kostin had not yet been designated as an SDN and continued to visit the Aspen Home through 2017. *Id.* ¶ 38.

Third, the Government alleges that—after Mr. Kostin was sanctioned in April 2018—Mr. Kostin "sold the Aspen Home" to Mr. Wolfson for approximately $12 million in or about September 2019.[9] *Id.* ¶ 4. According to the Government, the sale was, in effect, a $12 million payment made from Mr. Wolfson to Mr. Kostin. *Id.* (characterizing the sale as one that "caused approximately $12 million in U.S. payments resulting from the sale to be made for the benefit of [Mr. Kostin], without an OFAC license."). To accomplish the sale, the Government alleges that Mr. Wolfson transferred $11.8 million "from a Cyprus bank account Wolfson controlled to CapitalInvest Limited ('CapitalInvest')" which is a wholly owned subsidiary of Capital Business Finance.[10] *Id.* ¶ 48. Based on this transaction, the Government charges Mr. Wolfson with "caus[ing] approximately $12 million to be transferred to a shell entity controlled by Kostin, for Kostin's benefit . . . ." *Id.* ¶ 56 (count three); ¶ 60 (count five). The Government argues that although "the nominal ownership of 40 North Star changed at certain points in the period between 2010 and

---

[7] CC-3 also allegedly worked with Mr. Wolfson's unnamed financial advisor who resided in Cyprus and "helped manage various assets and shell companies on behalf of Wolfson." S2 ¶ 48.

[8] Specifically, the indictment alleges that "Capital Business Finance regularly funded the bank account used by Altamonte in advance of Altamonte making payments to 40 North Star . . . ." *Id.* ¶ 45.

[9] The Government also alleges that, beginning around January 2018, Mr. Wolfson took over as the primary user of the Aspen Home. *Id.* ¶¶ 47–48.

[10] The indictment also alleges that Mr. Wolfson purchased the Aspen Home by "causing Altamonte to transfer $200,000 to CapitalInvest." *Id.* ¶ 48.

September 2019, Kostin remained at all relevant times, the true beneficial owner of the Aspen Home." *Id.* ¶ 35.

Mr. Wolfson presents a competing narrative. According to Mr. Wolfson, he did not buy the Aspen Home in 2019 as part of a scheme to benefit Mr. Kostin; rather, he proffers that he purchased the Aspen Home in 2014 using a "legitimate thirty-party loan" loan from a normal lender, namely, Capital Business Finance. *See* Dkt. No 66 ("Mem.") at 2, 6. Mr. Wolfson contends that he repaid the $11.8 million loan in 2019 to Capital Business Finance's subsidiary, "CapitalInvest, not Mr. Kostin, in full compliance with U.S. sanctions laws" and without any intention of transferring money to the sanctioned Mr. Kostin. *Id.* at 2. He also contends that Capital Business Finance and CapitalInvest (collectively, the "Capital Entities") were not controlled by CC-3 on behalf of Kostin, and asserts that CC-3 never did business with Mr. Kostin. Mem. at 6.

### C. Proposed Testimony by Irina Skittides

In support of his defense, Mr. Wolfson seeks to depose a Cyprus-based lawyer named Irina Skittides. Mem. at 1. She is a Director at the law firm Costas Tsirides & Co. LLP (the "Tsirides Law Firm"), in Limassol, Cyprus. Dkt. No. 67 ("Rybicki Decl."), ¶ 6. She formerly "represented CC-3 and certain of CC-3's businesses," including the Capital Entities. *Id.* Mr. Wolfson proffers that Ms. Skittides is expected to testify about the Capital Entities' lending activities, and the lack of any relationship between Mr. Kostin and CC-3.

In particular, Ms. Skittides is expected to testify that, while practicing law in Cyprus for 16 years, her "work extended to" the Capital Entities. *Id.* Mr. Wolfson proffers that the Tsirides Law Firm "had previously provided corporate advisory services" to the Capital Entities. Dkt. No 90 ("Rybicki Supp. Decl."), ¶ 3. According to Mr. Wolfson, Ms. Skittides therefore "has personal knowledge" about "the nature of the business activities of the Capital Entities, including how the companies were engaged in investment activities and loan financing." *Id.* ¶ 4. She is expected to

testify that "CC-3 owned and operated the Capital Entities," and that "CC-3's business activities included extending loans to individuals like Mr. Wolfson."  Rybicki Decl. ¶ 8f; Rybicki Supp. Decl. ¶ 5.  Mr. Wolfson proffers that "Ms. Skittides will testify about objective facts related to CC-3's operations . . . for instance, about the appearance and staffing of the office in which the [G]overnment believes Mr. Wolfson met CC-3 to discuss the transaction at issue in the indictment," namely, the transfer of $11.8 million from Mr. Wolfson to CapitalInvest.  Dkt. No. 89 ("Reply") at 7.  Mr. Wolfson argues that this testimony bolsters his defense that he borrowed and repaid a legitimate loan from a lawful lender.

Additionally, Ms. Skittides is expected to testify that, "to her knowledge, CC-3 and CapitalInvest were not 'under the control' of Mr. Kostin[;] that CC-3 'never did business' with Mr. Kostin[;] that Mr. Kostin did not exercise 'transactional authority' over CC-3's deals[;] . . . and that CC-3 underwent vetting by and received approval from 'major' institutions."  Mem. at 6.  Mr. Wolfson proffers that "[d]uring two decades of direct experience with CC-3 between approximately 2002 and 2022, including as her lawyer, Ms. Skittides never observed or knew of any connection between CC-3 and Mr. Kostin."  Rybicki Decl. ¶ 8a; *see also* Rybicki Supp. Decl. ¶ 5 ("Ms. Skittides never observed any indication that CC-3 was operating the Capital Entities on behalf of Andrey Kostin or as his nominee.").  According to Mr. Wolfson, "CC-3's office was located in a prominent business center in downtown Limassol, Cyprus, and had a staff of approximately 10 people.  She used legitimate service providers, including the Cypriot office of [PricewaterhouseCoopers], which conducted audit work."  Rybicki Decl. ¶ 8d.  Mr. Wolfson contends that, "[b]ased on the nature of Ms. Skittides's relationship with CC-3, Ms. Skittides would expect to know if CC-3 was acting as a nominee for Mr. Kostin or anyone else."  *Id.* ¶ 8c.  Consequently, Mr. Wolfson argues that this testimony undercuts the Government's allegation that CC-3 controlled Capital Business Finance on behalf of Kostin.

### D.  Procedural History

On February 20, 2024, the Government filed a sealed indictment in this case.  Dkt. No. 4.

The same day, the Government filed two superseding indictments.  Dkt. Nos. 8, 13.  On February

22, 2024, the indictment was unsealed.  Dkt. No. 5.  Mr. Bond and Mr. Wolfson were arrested on

February 22, 2024.  As relevant here, on November 12, 2024, Mr. Wolfson filed his motion to take a

Rule 15 deposition.  *See* Mem.  Mr. Wolfson also filed a reply in support of his motion on December

2, 2024.  *See* Reply.

In this motion, Mr. Wolfson seeks leave to take a Rule 15 deposition of Ms. Skittides to

preserve her testimony and build his defense.  Mr. Wolfson's motion argues that "the

[G]overnment's theory about nefarious transactions actually has a 'legitimate' explanation . . . ."

Mem. at 6.  Mr. Wolfson argues that, as described above, Ms. Skittides's proposed testimony that

CC-3 and Capital Business Finance extended loans to individuals like Mr. Wolfson supports his

defense that he received and repaid a valid $11.8 million loan from the lender in 2014 and 2019

respectively.  Mem at 2, 6.  He also argues that Ms. Skittides's expected testimony that she never

observed any connection between CC-3 and Mr. Kostin, nor knew of any indication that CC-3 was

operating Capital Business Finance on behalf of Andrey Kostin, undercuts the Government's

allegation that the Capital Entities were shell entities used to pass money through to Mr. Kostin.  *See*

Rybicki Decl. ¶ 8a; *see also id.* ¶ 5.  Mr. Wolfson also asserts that because the Government "has no

evidence of a direct payment by Mr. Wolfson to Mr. Kostin," the Government intends to argue that

a benefit to Mr. Kostin can be *inferred* from the mere fact of CC-3's involvement in" the transfer of

$12 million from Mr. Wolfson to the Capital Entities in 2019.  Mem. at 1–2.  Consequently, Mr.

Wolfson asserts, that the Capital Entities engaged in legitimate lending and were operated by CC-3

without a relationship to Mr. Kostin undercuts the Government's allegation that Mr. Wolfson

transferred the funds for Mr. Kostin's benefit.  *Id.*

In conjunction with his motion, Mr. Wolfson's lawyer submitted declarations that proffer facts about Ms. Skittides and her expected testimony based on their conversations.  *See* Rybicki Decl.; Rybicki Supp. Decl.  According to these declarations, "Ms. Skittides, who resides in Cyprus and is not subject to the defense's subpoena power, is unavailable because she has indicated that she will not voluntarily travel to the United States to testify at trial."  Mem at 4; Rybicki Decl. ¶ 7.  On September 2, 2024, Mr. Wolfson's lawyer "met with Ms. Skittides at her law office in Limassol, Cyprus."  Rybicki Decl. ¶ 7.  During the meeting, she stated that "she would not voluntarily travel to the United States to testify in this matter."  *Id.*  She confirmed her refusal during subsequent telephone calls.  *Id.*  Mr. Wolfson's counsel "has expressed Mr. Wolfson's willingness to pay for Ms. Skittides's travel expenses, but she remains resolute in her unwillingness to appear."  Mem at 4; Rybicki Decl. ¶ 9.  Although Ms. Skittides "refus[es] to travel to the United States" to testify in this case, she has agreed to sit for a deposition in Cyprus, or "in a third country, such as Italy."  Rybicki Decl. ¶ 7; Rybicki Supp. Decl. ¶6.

The Government filed an opposition to Mr. Wolfson's motion on November 21, 2024.  Dkt. No. 71 ("Opp.").  The Government argues that a Rule 15 Motion is inappropriate in this case because the testimony is immaterial.  The Government contends that Mr. Wolfson does not proffer that Ms. Skittides "will provide any specific testimony regarding the transactions or entities that are central to the charged offenses . . . ."  Opp. at 2.  The proffered testimony falls short, the Government argues, because "there is no proffer of any specific testimony Skittides will provide regarding CapitalInvest, CapitalInvest's parent company, the ultimate beneficial ownership of the entities, the relevant transactions . . . or the purported 'legitimate explanations' for those transactions."  Opp. at 2, 9.  The Government contends that "there is no proffer that Wolfson was involved in, or aware of, any of the referenced due diligence, business transactions, or any other

dealings between Skittides and CC-3." Opp. at 13.  Finally, the Government raises several concerns about the deposition.  For example, the Government argues that the testimony will be unreliable because Ms. Skittides "would be unlikely to face any sanction for untruthful testimony;" that the "deposition is unlikely to result in admissible evidence that could be used at trial;" and that the deposition "would likely cause meaningful delay . . . ." *Id.* at 2–3.

## II.    LEGAL STANDARD

### A.  Standard for Leave to Take a Rule 15 Deposition

Pursuant to Federal Rule of Criminal Procedure 15, "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial.  The court may grant the motion because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1).  "A movant must show that (1) the prospective witness is unavailable for trial, (2) the witness's testimony is material, and (3) the testimony is necessary to prevent a failure of justice." *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001).

With respect to the first prong—unavailability—the Second Circuit has described that "[u]navailability is to be determined according to the practical standard of whether under the circumstances the [movant] has made a good-faith effort to produce the person to testify at trial." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984).  "[T]he overwhelming majority of courts in this Circuit—and in other circuits—have rejected arguments that the movant must produce an affidavit from the proposed deponent in order to establish his or her unavailability." *See United States v. Vilar*, 568 F. Supp. 2d 429, 438 (S.D.N.Y. 2008) (Sullivan, J.) (collecting cases).  However, "[a] movant must provide specific reasons for a witness's unavailability." *United States v. Wey*, 2017 WL 237651, at *24 (S.D.N.Y. Jan. 18, 2017) (Nathan, J.).  "Conclusory or speculative statements regarding unavailability are insufficient." *Id.*; *see also United States v. Rosenstein*, 474 F.2d 705, 715 (2d Cir. 1973) (finding that a defendant's Rule 15 motion was properly denied "since the only allegation

made to support the motion was that counsel had 'reason to believe' that [the witness] would not

attend any trial in the United States," which was "deemed insufficient to establish factually that the

witness could not be present," a "determination [that] was properly within the discretion of the

judge.").

　　　　With respect to the second prong—materiality—the "testimony is material if it is 'highly

relevant to a central issue in the case . . . .'" *United States v. Grossman*, 2005 WL 486735, at *3

(S.D.N.Y. Mar. 2, 2005) (quoting *United States v. Drogoul*, 1 F.3d 1546, 1556 (11th Cir. 1993)); *see also*

*Wey*, 2017 WL 237651, at *24 (same); *Vilar*, 568 F. Supp. 2d at 440 (same). "When, as here, the

Defendant requests Rule 15 depositions, the testimony sought should challenge central aspects of

the government's allegations." *Wey*, 2017 WL 237651, at *24 (internal quotation marks and citations

omitted); *see also id.* ("[T]estimony sought via Rule 15 motion should 'negate the crux' of the

government's case") (citing *United States v. Ismaili*, 828 F.2d 153, 161-62 (3d Cir. 1987)); *United States*

*v. Vargas*, 279 F. App'x 56, 61 (2d Cir. 2008) (summary order) (finding the district court did not

abuse its discretion in denying a defendant's Rule 15 motion because "the materiality of the

testimony sought was remote," given that the proposed testimony "did not contradict any of the

government's evidence."). There is "no requirement that the testimony being sought must surely

acquit the defendant," however. *United States v. Mashinsky*, 2024 WL 4728499, at *5 (S.D.N.Y. Nov.

8, 2024); *see United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962) (affirming the denial of a Rule

15 deposition because the defendant "was unable to demonstrate that the proposed testimony

would be material to or would help to establish [his] defense or that the proposed testimony 'would

tend to exonerate' him").

　　　　Finally, "[w]hen the first two prongs of the exceptional-circumstances test are met, the third

prong, 'neces[ity] to prevent a failure of justice,' is 'likely satisfied' if 'there are no substantial

countervailing factors militating against the taking of the deposition.'" *Wey*, 2024 WL 237651, at *24

(S.D.N.Y. Jan. 18, 2017) (alterations in the original) (quoting *Vilar*, 568 F. Supp. 2d at 442–43).

"When a substantial likelihood exists that the prospective deponents will be unavailable for trial and

their testimony is highly relevant to a central issue in the case, justice generally requires preservation

of that testimony." *Wey*, 2017 WL 237651, at \*24 (quoting *Drogoul,* 1 F.3d at 1556).  Additionally,

"[w]hile '[i]t is within the discretion of the trial court to deny [a Rule 15] motion if it is made after

'unexcused delay, it is clear that such delay must be the product of 'a serious lack of due diligence by

the moving party' in order to deny a Rule 15 motion on that basis alone." *Vilar*, 568 F. Supp. 2d at

442–43 (internal citations omitted and alternations in original).  "[P]recluding the taking of

depositions under [such] circumstances is likely to frustrate, not expedite, the administration of

criminal justice." *Id.*

  "[A] motion made under Rule 15 is addressed to the discretion of the trial court." *United

States v. Bah*, 574 F.3d 106, 118–19 (2d Cir. 2009) (quoting *Whiting*, 308 F.2d at 541); s*ee also United

States v. Sindona*, 636 F.2d 792, 803 (2d Cir. 1980) (reviewing "the District Court's decision to grant

or deny a motion to take a deposition in a criminal case for abuse of discretion").

### B.  Requirements and Guidelines for Rule 15 Depositions

  If a motion for a Rule 15 deposition is granted, the "deposition must be taken and filed in

the same manner as a deposition in a civil action except that . . . [t]he scope and manner of the

deposition examination and cross-examination must be the same as would be allowed during trial."

Fed. R. Crim. P. 15(e).  Because "[t]he parties and the court may not always know beforehand just

what type of examination a foreign nation may permit the attorneys to conduct[,] [t]he district court

therefore may prefer to consider these problems after the deposition has been taken, when it can

examine the transcript and the actual circumstances under which the deposition was conducted."

*United States v. Salim*, 855 F.2d 944, 952 (2d Cir. 1988).  Additionally, because United States

embassies permit "consular officers [to] administer oaths to the witnesses . . . taking sworn

testimony at a United States Embassy would mitigate the reliability problem posed when witnesses do not swear an oath before the court." *United States v. Mohamed*, 2020 WL 1545522, at *7 (E.D.N.Y. Apr. 1, 2020) (rejecting the government's argument that "the witnesses would not be sworn to an oath" because of the possibility to arrange for sworn testimony at an embassy); *see also United States v. Alexandre*, 2022 WL 9843495, at *5 (S.D.N.Y. Oct. 17, 2022) (noting that "[depositions at an American embassy or consulate" can "be conducted in a manner consistent with the American judicial system"); *United States v. Fargesen*, 2022 WL 4110303, at *5 (S.D.N.Y. Sept. 8, 2022) (directing parties to attempt to hold depositions of foreign witnesses at an American embassy or consulate "so that U.S. officials can swear the witnesses and provide assurances of formality and accuracy").

Even if a Rule 15 deposition is granted, pursuant to Rule 15(f) "[a]n order authorizing a deposition to be taken under this rule does not determine its admissibility." Fed. R. Crim. P. 15(f); *see Salim*, 855 F.2d at 952 ("[T]he purpose and language of Rule 15 . . . concentrates first on preservation of testimony and only thereafter focuses on admissibility.") "Admissibility of the deposition testimony is *not* a factor in deciding a Rule 15 motion." *Mohamed*, 2020 WL 1545522, at *2 (emphasis in original). Of course, "[t]he court need not, at the cost of time and money, engage in an act of futility by authorizing depositions that clearly will be inadmissible at trial." *Mohamed*, 2020 WL 1545522, at *2 (citing *Drogoul*, 1 F.3d at 1555). Rather, once taken, "[a] party may use all or part of a deposition as provided by the Federal Rules of Evidence." Fed. R. Crim. P. 15(f); *see also* Fed. R. Crim. P. 15, Notes of Advisory Committee on Rules (2011 Amend.) ("Subdivision (f) provides that in the case of all depositions, questions of admissibility of the evidence obtained are left to the courts to resolve on a case by case basis.");[11] Notes of Advisory Committee on Rules (2002 Amend.)

---

[11] In fact, the Advisory Committee notes that the text of subsection (f) was revised to "state more clearly the limited purpose and effect of the amendment, which is providing assistance in pretrial discovery. Compliance with the procedural requirements for the taking of the foreign testimony does not predetermine admissibility at trial, which is determined on a case-by-case basis, applying the Federal Rules of Evidence and the Constitution." *See* Notes of Advisory Committee on Rules (2011 Amend.).

(same). A party may "make the relevant objections at the deposition and object to the admissibility of such testimony at trial." *United States v. Little*, 2014 WL 1744824, at *2 (S.D.N.Y. Apr. 23, 2014).

## III.    DISCUSSION

### A.    Mr. Wolfson's Motion Establishes All Of Rule 15's Requirements For Leave To Take A Deposition

#### 1.    Ms. Skittides Is Unavailable

It is undisputed that Ms. Skittides is unavailable. The Government acknowledges that Ms. Skittides is "beyond the Subpoena power of this Court" and "does not dispute that Skittides is unavailable for trial." *See* Opp. at 7. The Government's concession is well placed because the facts proffered by Mr. Wolfson's counsel establish that Ms. Skittides is unavailable. Mr. Rybicki proffers that Ms. Skittides resides in Cyprus and refuses to travel to the United States. Rybicki Decl. ¶ 7. She reiterated on multiple occasions that she will not voluntarily travel to the United States to testify in this matter: first, during a meeting between Ms. Skittides and Mr. Wolfson's lawyer at her office in Limassol, Cyprus; on subsequent telephone calls; and even after Mr. Wolfson's counsel conveyed his client's willingness to pay for her travel. *See id.*; Mem. at 4; Rybicki Decl. ¶ 9. Mr. Wolfson therefore made "a good-faith effort" to produce Ms. Skittides to testify at trial by repeatedly requesting her voluntary participation without success. *See Johnpoll*, 739 F.2d at 709. The Court has no trouble concluding that Ms. Skittides is unavailable under Rule 15.

#### 2.    Ms. Skittides's Testimony is Material

Ms. Skittides's testimony is material because her personal knowledge is "highly relevant" to two "central issue[s] in the case," namely, whether CapitalInvest was a shell company, and whether CC-3 controlled the Capital Entities on behalf of Mr. Kostin, or instead operated them as legitimate businesses. *See Grossman*, 2005 WL 486735, at *3. According to Mr. Wolfson, Ms. Skittides's expected testimony about these central issues supports his factual defense and asserted lack of *mens rea*, namely that he did not intend to benefit Mr. Kostin when he transferred $12 million to

14

CapitalInvest.  The Court agrees.

First, Ms. Skittides's testimony regarding CC-3's and Capital Business Finance's lending activities "challenge central aspects of the government's allegations."  *See Wey*, 2017 WL 237651, at *24.  One of the Government's central allegations against Mr. Wolfson is that he caused approximately $12 million to be transferred to a "shell entity controlled by Kostin, for Kostin's benefit . . . ."  *Id.*  ¶ 56 (count three); ¶60 (count five).  The indictment specifically alleges that Mr. Wolfson transferred approximately $12 million "from a Cyprus bank account Wolfson controlled to CapitalInvest," the "wholly owned subsidiary of Capital Business Finance, which, as described above, was nominally owned by and controlled by CC-1 and CC-3 on behalf of Kostin."  *Id.* ¶ 48.  According to Mr. Wolfson, however, he believed the Capital Entities were legitimate lenders.  Mem at 2–3, 6.  He proffers that "CapitalInvest's parent company, through CC-3, extended him a legitimate third-party loan [and] he repaid that loan to CapitalInvest, not Mr. Kostin, in full compliance with U.S. sanctions laws."  Mem. at 3.  Mr. Wolfson proffers that Ms. Skittides's testimony supports his narrative because she "has personal knowledge related to the nature of the business activities of the Capital Entities, including how the companies were engaged in investment activities and loan financing."  Rybicki Supp. Decl. ¶ 4.  She is also expected to testify that "CC-3's business activities included extending loans to individuals like Mr. Wolfson."  Rybicki Decl ¶ 8f.  To the extent that Ms. Skittides's proposed testimony offers her personal observations of facts about the operations and ordinary lending of CC-3 and the Capital Entities, her testimony will challenge the Government's allegation that CapitalInvest was a shell entity.

Similarly, Ms. Skittides's expected testimony includes facts that support Mr. Wolfson's defense that he intended to borrow and repay a legitimate loan from a legitimate lender.  For example, according to Mr. Wolfson, "CC-3's office was located in a prominent business center in downtown Limassol, Cyprus, and had a staff of approximately 10 people.  She used legitimate

service providers . . . ." *Id.* ¶ 8d.  The Government argues that Ms. Skittides's testimony has no

bearing on Mr. Wolfson's *mens rea*—whether he intended to funnel money to Mr. Kostin—because

the proffered testimony that CC-3 ran what appeared to be legitimate business has no bearing on

whether "Wolfson was involved in, or aware of" those allegedly legitimate activities perceived by

Ms. Skittides.  Opp. at 13.  The Government is correct that facts related to CC-3 or the Capital

Entities of which Mr. Wolfson was unaware are likely not material to demonstrate his *mens rea*.  For

example, the expected testimony that that PricewaterhouseCoopers audited CC-3's work is likely not

relevant to Mr. Wolfson's *mens rea* if he was unaware of that fact.  *See* Rybicki Decl. ¶ 8d.  However,

testimony about "objective facts related to CC-3's operations . . . for instance, about the appearance

and staffing of the office in which the [G]overnment believes Mr. Wolfson met CC-3 to discuss the

transaction at issue in the indictment," may prove material to the extent that it is tethered to Mr.

Wolfson's observations of what appeared to be legitimate business operations in person.  Reply. at 7.

Such testimony would bolster Mr. Wolfson's defense that he intended to borrow and repay a

legitimate loan from a legitimate lender.

　　　　Second, Ms. Skittides's testimony regarding the lack of relationship between Mr. Kostin and

CC-3 contradicts the Government's allegation that Capital Business Finance "was nominally owned

and controlled by CC-1 and CC-3 on behalf of Kostin," and that CC-3 "opened an office in Cyprus

specifically to assist with the management" of Mr. Kostin's "shell companies and assets."  S2 ¶¶ 10,

48.  Mr. Wolfson contests these assertions.  He argues that the Capital Entities were not controlled

by CC-3 on behalf of Mr. Kostin, a fact that Ms. Skittides's expected testimony supports.  Mem. at

6.  In particular, Ms. Skittides is expected to testify that, "to her knowledge, CC-3 and CapitalInvest

were not 'under the control' of Mr. Kostin[;] that CC-3 'never did business' with Mr. Kostin[;] that

Mr. Kostin did not exercise 'transactional authority' over CC-3's deals . . . ."  Mem. at 6.  Mr.

Wolfson also proffers that "[d]uring two decades of direct experience with CC-3 between

16

approximately 2002 and 2022, including as her lawyer, Ms. Skittides never observed or knew of any connection between CC-3 and Mr. Kostin." Rybicki Decl. ¶ 8a; *see also* Rybicki Supp. Decl. ¶ 5 ("Ms. Skittides never observed any indication that CC-3 was operating the Capital Entities on behalf of Andrey Kostin or as his nominee."). The proffered testimony therefore directly challenges the Government's allegation that CC-3 controlled Capital Business Finance on behalf of Mr. Kostin.

Additionally, according to Mr. Wolfson, the Government at one point proffered to his lawyer that "the [G]overnment has no evidence of a direct payment by Mr. Wolfson to Mr. Kostin related to the 2019 repayment of the loan Mr. Wolfson received from the parent company of CapitalInvest in 2014." Rybicki Decl. ¶ 5. Ms. Skittides's expected testimony that, to her knowledge, CC-3 operated Capital Business Finance without a relationship to Mr. Kostin, if true, may help to prove that Mr. Wolfson, to the extent that he did not observe any relationship between CC-3 and Mr. Kostin, did not transfer the funds to CapitalInvest in order to pass money to Mr. Kostin for his benefit. Thus, evidence regarding the asserted lack of a relationship between Ms. Kostin and Capital Business Finance is of high importance because the Government lacks evidence of a direct payment between Mr. Wolfson and Mr. Kostin.

The Government also argues that the testimony is immaterial because Mr. Wolfson does not proffer that Ms. Skittides "will provide any specific testimony regarding the transactions or entities that are central to the charged offenses . . . ." Opp. at 2, 8–9. At this juncture, however, the proposed testimony need not "surely acquit the defendant." *Mashinsky*, 2024 WL 4728499, at *5. It is enough that Mr. Wolfson's lawyer submitted declarations detailing the categories of expected testimony based on his conversations with Ms. Skittides, and that the categories of proffered information challenge the Government's central allegations.

Finally, the Government's argument that the testimony is not material because Ms. Skittides lacks credibility is misplaced. According to the Government, Mr. Wolfson's proffer that Ms.

Skittides "will say that she 'never knew or observed of any connection between CC-3 and Kostin'

. . . is plainly false, as Skittides has already described being aware of a significant connection between

CC-3 and Kostin."[12]  Opp. at 10.  However, the argument that her testimony is inconsistent with

prior statements does not render it immaterial.  The Court does not prejudge the credibility of the

witness under the guise of a materiality assessment.  Rather, "the Court may rely solely on the

movant's representations to find the materiality requirement satisfied."  *Mashinsky*, 2024 WL

4728499, at *5 (citing *Vilar*, 568 F. Supp. 2d at 440).  Consequently, because Mr. Wolfson adequately

proffered that Ms. Skittides's expected testimony will challenge two central aspects of the

Government's allegations, the Court concludes that the anticipated testimony is material.

### 3.  The Deposition is Necessary to Prevent a Failure of Justice

Because "the first two prongs of the exceptional-circumstances test are met," and because

the countervailing factors raised by the Government—unreliability, lack of admissibility, and delay—

are not so "substantial" that the concerns justify denying Mr. Wolfson's motion at this time, the

Court concludes that the third prong, the necessity to prevent a failure of justice, is also satisfied.  *See*

*Wey*, 2024 WL 237651, at *24.  First, the Government argues that deposing Ms. Skittides abroad will

permit her to testify "without the assurance of reliability afforded by domestic testimony of a sworn

witness subject to cross-examination" consistent with the United State's legal system.  Opp. at 7, 15–

16.  The Government's concern about a lack of sworn testimony is legitimate.  However, Mr.

Wolfson contends that he may be able to schedule the deposition at a consular office in Cyprus or

Italy where officials can administer an oath.  *See* Reply at 17.  As many courts in this Circuit have

held, United States embassies can facilitate sworn testimony, which "mitigate[s] the reliability

problem posed when witnesses do not swear an oath before the court."  *See Mohamed*, 2020 WL

---

[12] In Mr. Wolfson's Reply, he asserts that the "[G]overnment's own notes of its interview with Ms. Skittides confirm the accuracy of Mr. Wolfson's proffer."  Reply at 5 n.3.

1545522, at *7; *Alexandre*, 2022 WL 9843495, at *5 (same); *Fargesen*, 2022 WL 4110303, at *5 (same). Conducting the deposition of Ms. Skittides under oath at an embassy addresses the Government's concern about a lack of sworn testimony.

Second, the Government's concerns about the "significant level of uncertainty" with respect to "whether Ms. Skittides could be deposed, cross-examined, or compelled to answer questions" do not justify denying Mr. Wolfson's motion at this time. Opp. at 19. The Government's concerns about the manner in which the deposition will proceed, and whether the deposition will satisfy Rule 15's requirements that, for example, the "scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial," Fed. R. Crim. P. 15(e), are valid but speculative at this juncture. The Court "prefer[s] to consider these problems"—that is, whether the deposition arranged by Mr. Wolfson satisfies Rule 15—"after the deposition has been taken, when it can examine the transcript and the actual circumstances under which the deposition was conducted." *See Salim*, 855 F.2d at 952. The Government is free to raise objections regarding the methods and manner of direct and cross examination if the procedures used do not comply with Rule 15.

The Government also points out that it is unclear if Skittides "will answer questions regarding the substance of her interactions with CC-3 or will assert attorney-client privilege." Opp. at 9 n.1. In his Reply, Mr. Wolfson contends that he "does not intend to ask Ms. Skittides for privileged information" and notes that "[t]he [G]overnment already questioned Ms. Skittides extensively, and she never once invoked privilege." Reply at 10-11. To the extent that Mr. Wolfson's proffer is correct and Ms. Skittides does not intend to invoke the attorney-client privilege, the Court sees no issue. However, while the Court takes no position about the ethical obligations of a Russian national practicing law in Cyprus, the Court cautions that "the attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d

Cir. 1991).[13]  In any event, the Government's *ex-ante* objections to the impropriety of the deposition are speculative and do not justify denying Mr. Wolfson's motion at this time.

Third, the Government argues that, "[i]f permitted to testify remotely from Cyprus, Skittides would not appear before a jury and would face no meaningful consequences for false testimony," because "the Court would not have the ability to hold Skittides in contempt, if necessary, as she would not be within the territorial reach of the Court and the U.S. Marshals."  Opp. at 16.  While "[t]he [G]overnment is entitled to use the lack of a viable enforcement mechanism" against Ms. Skittides to impeach her credibility, "this is not a basis for denying defendant's motion."  *See United States v. Abu Ghayth*, 2014 WL 144653, at *1, 4 (S.D.N.Y. Jan. 15, 2014) (granting a motion to take Rule 15 deposition of a "Yemeni resident who was imprisoned at Guantanamo Bay, Cuba for several years due to his relationship with al Qaeda and [Osama] bin Laden."); *see also United States v. Gonzalez*, 488 F.2d 833, 838–39 (2d Cir. 1973) ("The testimony of a fugitive from justice is rightly suspect, but not solely because of the lack of the perjury sanction.  The jury is well able to weigh such testimony . . . ."); *Grossman*, 2005 WL 486735, at *4 ("[T]he government asserts that foreign depositions are untrustworthy because they lack a realistic perjury sanction.  However, courts routinely order the taking of foreign depositions when the witness is unavailable and his testimony is material, as is the case here.").  Indeed, it is often the very inability to bring a witness into the jurisdiction—including because the witness refuses—that justifies the Rule 15 deposition in the first place.  *See, e.g.*, *Johnpoll*, 739 F.2d 709 (concluding that a Rule 15 deposition was appropriate where the witnesses were "Swiss nationals in Switzerland" who refused to come to the United States); *Sindona*, 636 F.2d at 803 (finding that the "judge, in our view, acted well within his discretion" when "two of the prospective witnesses had specifically refused to come to the United States").

---

[13] To the extent that Ms. Skittides plans to testify about her lack of knowledge of any illegal activity by her clients, she may be opening the door to further examination about the work that she has conducted for them during the relevant time period.

Even so, the Government argues that—in this particular case—the risk of perjury "is particularly acute . . . given that Skittides apparently is unwilling to travel to the United States for trial despite having done so on multiple occasions in the past decade, and has a strong incentive to distance herself from the allegations in the Indictment, [so] there is nothing to suggest that she would offer reliable testimony . . . ." Opp. at 16. In the Government's words, granting the deposition abroad amounts to "a one-sided license to commit perjury." *Id.* However, as with a lack of enforcement, a witness's motive to lie does not justify denying a motion for a Rule 15 deposition. *See Gonzalez,* 488 F.2d at 838–39 (affirming the denial of a Rule 15 motion because "the court below probably acted within the scope of its discretion," but noting that "the wiser course would have been to grant the motion" even though the proposed deponent was "unwilling to attend [trial] because he did not want to expose himself to criminal liability" because "the defendant should not be deprived of testimony which would be available by deposition"); *Little,* 2014 WL 1744824, at *2 (finding that a Rule 15 deposition was proper when the witness "repeatedly refused to come to the United States to testify at [the defendant's] trial because the [g]overnment views him as a co-conspirator in the crime alleged."). As in *Little,* even if Ms. Skittides may be self-interested, the Government's credibility concerns do not justify denying the opportunity for Mr. Wolfson to take the deposition.

The Court is also not persuaded by the Government's speculative concerns that "a Rule 15 deposition requested through letters rogatory is likely to cause meaningful delay both in terms of the process to secure testimony . . . and in subsequent litigation regarding what, if any, of the testimony is admissible." Opp. at 7. Particularly because the first two factors are met—unavailability and materiality—"precluding the taking of depositions . . . is likely to frustrate, not expedite, the administration of criminal justice." *See Vilar,* 568 F. Supp. 2d at 442–43; *see also Alexandre,* 2022 WL 9843495, at *5 (concluding that the government's concerns that "the process of submitting letters

21

rogatory to Lithuania and Cyprus could take anywhere between six months and one year" were "speculative; there is no reason that Defendant should not be permitted to *try* to obtain the testimony before the scheduled trial date."). In his response, Mr. Wolfson also points out that Ms. Skittides "has agreed to appear for a voluntary deposition in a third country, such as Italy, if the logistics in Cyprus prove too burdensome." Reply at 1. Mr. Wolfson also concedes that he "will proceed without her testimony" if he "cannot depose Ms. Skittides in the more than five months that remain before trial in June 2025." *Id.* The Court concludes, therefore, that the Government's concerns about delay also do not warrant denial of Mr. Wolfson's motion.

Finally, the Government's argument that Mr. Wolfson's motion should be denied because the "deposition is unlikely to result in admissible evidence that could be used at trial" is misplaced. As explained above, "[a]dmissibility of the deposition testimony is *not* a factor in deciding a Rule 15 motion." *Mohamed*, 2020 WL 1545522, at *2. Even if some testimony may ultimately be inadmissible, permitting the deposition comports with "the purpose and language of Rule 15," namely the "preservation of testimony. . . ." *See Salim*, 855 F.2d at 952. Here, the Government suggests that the "Court should not, 'at the cost of time and money, engage in an act of futility' by authorizing such a deposition." Opp. at 20. For example, the Government asserts that the testimony "appears to be based almost entirely on hearsay or that would otherwise be inadmissible," and asserts that "it would object . . . to the introduction of the proposed deposition testimony under the Federal Rules of Evidence." *Id.* at 10, 20. Mr. Wolfson has proffered, however, that "as a result of [her] work at the Tsirides Law Firm, her employer, [Ms. Skittides] has *personal knowledge* related to the nature of the business activities of the Capital Entities." Rybicki Supp. Decl. ¶ 4 (emphasis added). The Court does not believe, therefore, that authorizing the deposition would be an "act of futility by authorizing depositions that clearly will be inadmissible at trial." *Mohamed*, 2020 WL 1545522, at *2 (citing *Drogoul*, 1 F.3d at 1555). To the extent that the Government has objections to

the admissibility of testimony taken at the deposition, it may "make the relevant objections at the deposition and object to the admissibility of such testimony" closer to or at trial.  *Little*, 2014 WL 3604417, at \*2.

### B.  The Court Declines to Rule on The Government's Request for 26.2 Material

The Court declines to take a position on the Government's request for any "statements" by Ms. Skittides because the issue has not been fully briefed and because it is unclear that any dispute exists that requires resolution.  Federal Rule of Criminal Procedure 26.2 provides:  "After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony."  Fed. R. Crim. P. 26.2(a); *see also United States v. Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995) (discussing Rule 26.2).[14]  A "statement" for Rule 26.2 purposes is "(1) a written statement that the witness makes and signs, or otherwise adopts or approves; (2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or (3) the witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement."  Fed. R. Crim. P. 26.2(f); *see Scotti*, 47 F.3d at 1249 (concluding that "the handwritten notes" of an FBI agent's interview with a government witness "may have been discoverable as a statement" of the witness if the witness "adopted or approved"

---

[14] The rule "applies at trial, at a suppression hearing under Rule 12, and to the extent specified in the following rules:  (1) Rule 5.1(h) (preliminary hearing); (2) Rule 32(i)(2) (sentencing); (3) Rule 32.1(e) (hearing to revoke or modify probation or supervised release); (4) Rule 46(j) (detention hearing); and (5) Rule 8 of the Rules Governing Proceedings under 28 U.S.C. §2255."  Fed. R. Crim. P. 26.2(g).  The rule "is designed to place the disclosure of prior relevant statements of a defense witness in the possession of the defense on the same legal footing as is the disclosure of prior statements of prosecution witnesses in the hands of the government under the Jencks Act, 18 U.S.C. § 3500."  *See* Fed. R. Crim. P. 26.2 Notes of Advisory Committee on Rules (1997 Amend.); *see also Scotti*, 47 F.3d at 1249 ("Rule 26.2 places in the criminal rules the substance of 18 U.S.C. § 3500 while also providing for production of statements of defense witnesses") (citing the Advisory Committee Notes)).

the agent's notes "as his own statement," or "the notes were a substantially verbatim recital of the witness's words, even if the interview was not automatically recorded") (internal quotation marks and citations omitted); *see also United States v. Dayan*, 2004 WL 2937859, at *1 (S.D.N.Y. Dec. 20, 2004) (concluding that "notes" taken by defense counsel at "witness interviews during the course of his trial preparation" were not "statements" within the contemplation of the rule because they were not "'substantially verbatim' recital of [the] witness's oral statement.").

In this case, Mr. Rybicki proffers that he "is not in possession [of] Rule 26.2 materials." Reply. at 18. He asserts that "the only records" in his possession are "notes" taken while speaking with Ms. Skittides. *Id.* He contends that these notes fall outside the scope of Rule 26.2 because they "do not constitute or even approximate a verbatim transcript . . . ." *Id.* The Government also fails to provide any binding authority in support of its request.

Because the record and briefing before the Court is scant, the Court declines to rule on the Government's request for 26.2 material at this time. The parties are directed to meet and confer about this issue. If, after conferring with defense counsel regarding the threshold issue of whether any qualifying "statements" exist, the Government wishes to renew its request for Rule 26.2 material, the Government may submit a motion accompanied by complete briefing.

## IV.    CONCLUSION

Because Mr. Wolfson has sufficiently proffered that his witness, Ms. Skittides, is unavailable for trial, her expected testimony material, and her deposition necessary to prevent a failure of justice, Mr. Wolfson's motion for leave to take a pre-trial deposition of Ms. Skittides pursuant to Federal Rule of Criminal Procedure Rule 15 is GRANTED.

SO ORDERED.

Dated: January 17, 2025
       New York, New York

_____
GREGORY H. WOODS
United States District Judge

24