```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  April 3, 2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

UNITED STATES OF AMERICA,

           -v-

ANDREY KOSTIN,
    a/k/a "Andrei Kostin,"
VADIM WOLFSON,
    a/k/a "Vadim Belyaev," and
GANNON BOND,

                   Defendants.

---------------------------------------------------------------- X

1:24-cr-91-GHW

<u>MEMORANDUM OPINION &
ORDER</u>

GREGORY H. WOODS, United States District Judge:

On March 6, 2014, the President of the United States declared a national emergency in response to Russia's annexation of the Crimea region of Ukraine.  Over the course of the next nine months, the President issued several executive orders pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*  These executive orders, among other things, blocked select Russian officials from owning or holding property interests inside the United States. Defendant Andrey Kostin, the President and Chairman of Russia's state-owned VTB Bank, is one such official.

Mr. Kostin, along with Defendants Vadim Wolfson and Gannon Bond, have been charged with engaging in a conspiracy to violate IEEPA.  The Government alleges that Mr. Kostin used shell companies and nominee owners to obfuscate his ownership of a luxury house in Aspen, Colorado (the "Aspen Home").  As evidence of Mr. Kostin's ownership, the Government alleges that one of Mr. Kostin's close associates, referred to as CC-2, helped maintain and fund the Aspen Home's operations.  Additionally, in 2019, Mr. Wolfson allegedly purchased the Aspen Home from Mr. Kostin in order to funnel $12 million to Mr. Kostin through various shell companies, including an

entity called CapitalInvest and its parent company, Capital Business Finance. To establish this fact, the Government alleges that another Kostin associate, CC-3, controlled Capital Business Finance on his behalf. Mr. Wolfson presents an alternative narrative. He argues that he purchased the Aspen Home from Mr. Kostin in 2014—before any sanctions—using a legitimate loan that he borrowed from Capital Business Finance, which he understood to be an ordinary lender.

To build its case, the Government seeks leave to conduct a deposition pursuant to Rule 15 of the Federal Rules of Criminal Procedure. The Government seeks to depose two witnesses who previously conducted work for Mr. Kostin. According to the Government, both witnesses will testify about the close relationship between CC-2, CC-3, and Mr. Kostin. Because both witnesses are expected to offer material testimony but are unavailable within the meaning of Rule 15, the Government's motion to conduct a Rule 15 deposition of each witness is granted.

## I.    BACKGROUND

### A.  Overview

Defendants Andrey Kostin, Vadim Wolfson, and Gannon Bond are charged with violating the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*, by engaging in a scheme to benefit Mr. Kostin.[1] *See* Dkt. No. 13 (the Superseding Indictment, hereinafter "S2") ¶¶ 1, 54–60. Mr. Kostin is the President and Chairman of Russia's state-owned VTB Bank. *See id.* ¶ 5. Mr. Wolfson is a Russian national with legal residency in the United States. *Id.* ¶ 6. Mr. Bond is a United States national who allegedly worked for Mr. Wolfson as his personal assistant. *Id.* ¶ 7.

---

[1] "The IEEPA gives the President the authority 'to deal with unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States' by 'declar[ing]' a national emergency with respect to such threat.' 50 U.S.C. § 1701(a). In exercising this power, the President may 'investigate, regulate, or prohibit' as proscribed by section 1702 of the act. Criminal penalties under the act are for those who 'willfully commit[ ], willfully attempt[ ] to commit, or willfully conspire[ ] to commit, or aids or abets the commission of' a violation of the President's regulations or prohibitions issued pursuant to the IEEPA." *See United States v. Griffith*, 515 F. Supp. 3d 106, 114 (S.D.N.Y. 2021) (alterations in original).

As the indictment describes, shortly after Russia invaded and annexed the Crimea region of Ukraine in February and March 2014, the President of the United States issued a series of executive orders pursuant to IEEPA that imposed sanctions on certain Russian officials.  *Id.* ¶¶ 11–14, 41. Pursuant to those executive orders, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated each sanctioned individual as a Specially Designated National ("SDN").  *Id.*  Once labeled an SDN, an individual is barred from owning or holding property inside the United States.  *Id.*  Individuals inside the United States are also prohibited from "dealing" in the property of an SDN, and from engaging in transactions that benefit any SDN living abroad, unless otherwise authorized.  *Id.*

The United States announced sanctions against a Russian lender—a prominent Russian bank called Bank Rossiya—for the first time at the end of March 2014.  *Id.* ¶ 41.  OFAC sanctioned VTB Bank on or about July 29, 2014.  *Id.* ¶ 20.  In December 2017, public media reports emerged about "anticipated new U.S sanctions that were likely to be imposed . . . as a result of the ongoing Russia-Ukraine war."  *Id.* ¶ 46.  Mr. Kostin allegedly recognized the "high risk" that he would be added to the list of SDNs.  *Id.* ¶ 46.  And, indeed, on April 6, 2018, OFAC designated Mr. Kostin as an SDN given his status as "'an official of the Government of the Russian Federation' in his role as 'the President, Chairman of the Management Board, and Member of the Supervisory Council of state-owned VTB Bank.'"  *Id.* ¶ 21.  Kostin was, consequently, blocked from owning property or transacting business in the United States.[2]  *Id.* ¶¶ 14–22.

As relevant here, the indictment alleges that from at least April 6, 2018—the date Mr. Kostin was sanctioned—through at least September 2019, Mr. Wolfson conspired to provide funds, goods, and services to Mr. Kostin and his businesses through the operation, maintenance, and sale of a

---

[2] Once designated as SDN, unless otherwise exempt, "there are significant restrictions on the SDN's ability to transact in the United States or with [United States] persons."  S2 ¶ 3.

luxury house located in Aspen, Colorado, described in the indictment as the "Aspen Home." *Id.* ¶¶ 55–58.

### B. The Alleged Sanctions Violations

Mr. Kostin's alleged relationship with the Aspen Home began in 2010. *Id.* ¶ 34. In April, an unnamed co-conspirator ("CC-1") traveled to Aspen and "facilitated and finalized the purchase of the Aspen Home, including by attending the closing on behalf of Kostin." *Id.* ¶¶ 8, 34. Mr. Kostin allegedly purchased the Aspen Home "for approximately $13.5 million in the name of 40 North Star LLC ('40 North Star'), a Colorado limited liability company that was formed in 2010 and that nominally owned the Aspen Home until 2020."[3] *Id.* ¶ 34. Mr. Kostin visited the Aspen Home regularly after its purchase, particularly around Christmas and New Year's, and arranged visits for guests, including Mr. Wolfson.[4] *Id.* ¶¶ 36–39.

The Government alleges that a second unnamed co-conspirator ("CC-2") worked as Mr. Kostin's "proxy." *Id.* ¶ 40. In particular, CC-2 allegedly "approved the budget and financing" for Mr. Kostin's visits between 2010 and 2018. *Id.* ¶ 40. CC-2 also helped coordinate, on behalf of Mr. Kostin, a visit to the Aspen Home by Mr. Wolfson in February 2015. *Id.* ¶39. CC-2 indicated that Mr. Kostin would cover all expenses for that visit. *Id.*

The indictment describes a series of transactions related to the Aspen Home that followed on the heels of the sanctions announced in 2014. First, the indictment alleges that approximately two months after OFAC sanctioned Bank Rossiya and two months before OFAC sanctioned VTB Bank, the "nominal ownership of 40 North Star was transferred to a new shell company" called

---

[3] The indictment alleges that Mr. Kostin "owned and controlled 40 North Star through, at various times, a series of additional shell companies, nominee owners, intermediaries, and trust structures." S2 ¶ 35.
[4] According to the indictment, Mr. Kostin sent a letter to the neighbors of the Aspen house that "introduced himself, attached his resume, and stated that 'an entity' that I control [i.e., 40 North Star] purchased Lot 6 [i.e., the Aspen Home] last year." *Id.* ¶ 36 (alterations in original). Mr. Kostin also allegedly purchased art worth over $1 million for the Aspen House. *Id.* ¶ 37.

Altamonte Holdings Limited ("Altamonte") in May 2014.[5]  *Id.* ¶¶ 42–43.  To facilitate the

transaction, Altamonte borrowed $10 million from a lender called Capital Business Finance, which

the Government alleges is "owned and controlled through various shell companies . . . on behalf of

[Mr.] Kostin . . . ."[6]  *Id.* ¶¶ 43–44.  According to the Government, Capital Business Finance was

controlled in part by an unnamed co-conspirator, CC-3, "on behalf of Kostin."[7]  *Id.* ¶ 44.  The

Government alleges that CC-3 was "an employee of VTB Bank and opened an office in Cyprus

specifically to assist with the management" of Mr. Kostin's "shell companies and assets."  *Id.* ¶ 10.

Second, the Government alleges that, from 2014 through 2017, Capital Business Finance

funneled money through Altamonte to 40 North Star to support Mr. Kostin's visits to and

maintenance of the Aspen Home.[8]  *Id.* ¶ 45.  Mr. Kostin had not yet been designated as an SDN and

continued to visit the Aspen Home through 2017.  *Id.* ¶ 38.

Third, the Government alleges that—after Mr. Kostin was sanctioned in April 2018—Mr.

Kostin "sold the Aspen Home" to Mr. Wolfson for approximately $12 million in or about

September 2019.[9]  *Id.* ¶ 4.  According to the Government, the sale was, in effect, a $12 million

payment made from Mr. Wolfson to Mr. Kostin.  *Id.* (characterizing the sale as one that "caused

approximately $12 million in U.S. payments resulting from the sale to be made for the benefit of

[Mr. Kostin], without an OFAC license.").  To accomplish the sale, the Government alleges that Mr.

---

[5] Altamonte was registered in the British Virgin Islands one month earlier in April 2014.  *Id.* ¶ 42.

[6] The indictment alleges that Capital Business Finance "is owned and controlled, through various other shell companies and intermediaries, by CC-1 and CC-3," who are unnamed co-conspirators, "on behalf of" Mr. Kostin.  *Id.* ¶ 44.  In particular, "Capital Business Finance's shares are held by a nominal shareholder in trust for a shell company called Gesford Holdings, which is in turn owned by Atkien Enterprises, as a nominee for CC-1, and Ionic Nominees Limited, as a nominee for CC-3."  *Id.*

[7] CC-3 also allegedly worked with Mr. Wolfson's unnamed financial advisor who resided in Cyprus and "helped manage various assets and shell companies on behalf of Wolfson."  *Id.* ¶ 48.

[8] Specifically, the indictment alleges that "Capital Business Finance regularly funded the bank account used by Altamonte in advance of Altamonte making payments to 40 North Star . . . ."  *Id.* ¶ 45.

[9] The Government also alleges that, beginning around January 2018, Mr. Wolfson took over as the primary user of the Aspen Home.  *Id.* ¶¶ 47–48.

Wolfson transferred $11.8 million "from a Cyprus bank account Wolfson controlled to CapitalInvest Limited ('CapitalInvest')" which is a wholly owned subsidiary of Capital Business Finance.[10]  *Id.* ¶ 48.  Based on this transaction, the Government charges Mr. Wolfson with "caus[ing] approximately $12 million to be transferred to a shell entity controlled by Kostin, for Kostin's benefit . . . ."  *Id.* ¶ 56 (count three); ¶ 60 (count five).  The Government argues that although "the nominal ownership of 40 North Star changed at certain points in the period between 2010 and September 2019, Kostin remained at all relevant times, the true beneficial owner of the Aspen Home."  *Id.* ¶ 35.

Mr. Wolfson presents a competing narrative.  As the Government summarized in its motion, Mr. Wolfson's asserted defense is that he did not buy the Aspen Home in 2019 as part of a scheme to benefit Mr. Kostin but that, instead, he purchased the Aspen Home in 2014 before Mr. Kostin was sanctioned.  *See* Dkt. No. 119 ("Mem") at 10.  Mr. Wolfson has also disputed that Capital Business Finance was controlled by CC-3 on behalf of Kostin.  *Id.*

### C.  Procedural History

On February 20, 2024, the Government filed a sealed indictment in this case.  Dkt. No. 4. The same day, the Government filed two superseding indictments.  Dkt. Nos. 8, 13.  On February 22, 2024, the indictments were unsealed.  Dkt. No. 5.  Mr. Bond and Mr. Wolfson were arrested on February 22, 2024.

As relevant here, the Court previously granted a motion to take a Rule 15 deposition filed by Mr. Wolfson.  Dkt. No. 105.  On March 7, 2025, the Government filed its own motion to take a Rule 15 deposition.  *See* Mem.  In its motion, the Government seeks leave to take a Rule 15 deposition of two witnesses.  *Id.* at 1.  The Government contends that both witnesses will offer

---

[10] The indictment also alleges that Mr. Wolfson purchased the Aspen Home by "causing Altamonte to transfer $200,000 to CapitalInvest."  *Id.* ¶ 48.

"firsthand testimony regarding Kostin's ownership of assets—assets for which Kostin used shell companies and nominee owners to avoid sanctions, as well as the direct association of CC-2 and CC-3 with Kostin, including in connection with assets specifically identified in the Indictment." *Id.* at 8. The proffered testimony will therefore establish "the close association" of CC-2 and CC-3 with Mr. Kostin. *Id.* at 9. The Government asserts that both witnesses reside in London, England, and are beyond the subpoena power of this Court. *Id.* at 7.

In conjunction with its motion, the Government submitted a declaration by Assistant United States Attorney David Felton. *See* Mem. Exhibit A (the "Felton Declaration"). The Felton Declaration proffers facts about the witnesses and their expected testimony based on prior interviews and recent phone calls. *See* Felton Decl. ¶¶ 5–6. On February 12 and February 13, 2025, counsel for the two witnesses informed the Government that "they are not willing to travel to the United States to testify at trial . . . ." *Id.* ¶ 7. In response, the Government "offered to pay for travel and lodging expenses and provide a per diem for incidental expenses." *Id.* Counsel "reiterated that, notwithstanding the Government's offer to pay for travel and lodging expenses and provide a per diem, both remained unwilling to travel to the United States to testify at the trial." *Id.* The witnesses are, however, "willing to subject themselves voluntarily to a deposition in London, United Kingdom." *Id.*

Mr. Wolfson opposes the motion. Dkt. No. 127 ("Opp."); Opp. Exhibit A ("Rybicki Decl."). Mr. Bond joins in Mr. Wolfson's opposition. Opp. at 1. In the motion, Mr. Wolfson does not dispute the materiality of the proffered testimony, nor does he argue against the Government's conclusion that the deposition is necessary to prevent a failure of justice. Rather, Mr. Wolfson's sole argument is that a Rule 15 Motion is inappropriate in this case because the witnesses are not "unavailable" as required by the rule. *Id.* Mr. Wolfson proffers that the Government initially told him that the basis for its Rule 15 motion was that it "underst[ood] that [the two witnesses] have

scheduling conflicts that will not allow them to travel to the U.S. in June." Rybicki Decl. ¶ 5. Additionally, "[o]n February 20 and March 17, 2025, counsel for Mr. Wolfson spoke to the attorney" for the two witnesses, who, "in line with the [G]overnment's prior representations, indicated that . . . that they planned to travel on business during June." Opp. at 2; *id.* ¶ 6. Mr. Wolfson proffers that "counsel for [the witnesses] also stated that they had 'preexisting business commitments' and 'potential other obligations' which will prevent their attendance at trial." *Id.* ¶ 7. These excuses fall short, Mr. Wolfson argues, because such "potential" or "speculative" scheduling conflicts are insufficient to establish unavailability. Opp. at 3–5.

The Government replied on March 20, 2025. Dkt. No. 132 (Reply"). It submitted a second declaration after following up with the witnesses concerning their willingness to travel to the United States for trial. Reply Exhibit A (the "Felton Reply Declaration"). The Felton Reply Declaration asserts that counsel for both witnesses communicated on March 19, 2025 that, "[i]rrespective of any prior commitments, [both witnesses] refuse to travel to the United States to testify at trial. They reside beyond the subpoena power of the Court and they refuse to come." Felton Reply Decl. ¶ 2(a). The witnesses also clarified that they "each have preexisting, scheduled commitments that render them unavailable during the anticipated duration of trial . . . . These preexisting, scheduled commitments involve numerous other people, it is not just a matter of rearranging their individual schedules." *Id.* ¶ 2(b). In response, the Government "offered to aid in rearranging scheduled commitments by discussing the trial with third parties." *Id.* ¶ 3. However, counsel for the witnesses replied "that this offer did not change anything, as this would not enable the scheduled commitments to get rearranged and, in any event, [the witnesses] still refuse to testify at trial." *Id.* The Government again offered "to pay for [their] travel and lodging expenses and provide a per diem for incidental expenses." *Id.* ¶ 4. Even so, counsel "reiterated that, notwithstanding this offer, both refuse to travel to the United States to testify at trial." *Id.*

## II.       LEGAL STANDARD

### A.  Standard for Leave to Take a Rule 15 Deposition

Pursuant to Federal Rule of Criminal Procedure 15, "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial.  The court may grant the motion because of exceptional circumstances and in the interest of justice."  Fed. R. Crim. P. 15(a)(1).  "A movant must show that (1) the prospective witness is unavailable for trial, (2) the witness's testimony is material, and (3) the testimony is necessary to prevent a failure of justice."  *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001).

With respect to the first prong—unavailability—the Second Circuit has described that "[u]navailability is to be determined according to the practical standard of whether under the circumstances the [movant] has made a good-faith effort to produce the person to testify at trial."  *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984).  "[T]he overwhelming majority of courts in this Circuit—and in other circuits—have rejected arguments that the movant must produce an affidavit from the proposed deponent in order to establish his or her unavailability."  *See United States v. Vilar*, 568 F. Supp. 2d 429, 438 (S.D.N.Y. 2008) (Sullivan, J.) (collecting cases).  However, "[a] movant must provide specific reasons for a witness's unavailability."  *United States v. Wey*, 2017 WL 237651, at *24 (S.D.N.Y. Jan. 18, 2017) (Nathan, J.).  "Conclusory or speculative statements regarding unavailability are insufficient."  *Id.*; *see also United States v. Rosenstein*, 474 F.2d 705, 715 (2d Cir. 1973) (finding that a defendant's Rule 15 motion was properly denied "since the only allegation made to support the motion was that counsel had 'reason to believe' that [the witness] would not attend any trial in the United States," which was "deemed insufficient to establish factually that the witness could not be present," a "determination [that] was properly within the discretion of the judge.").

With respect to the second prong—materiality—the "testimony is material if it is 'highly

relevant to a central issue in the case . . . .'" *United States v. Grossman*, 2005 WL 486735, at *3 (S.D.N.Y. Mar. 2, 2005) (quoting *United States v. Drogoul*, 1 F.3d 1546, 1556 (11th Cir. 1993)); *see also Wey*, 2017 WL 237651, at *24 (same); *Vilar*, 568 F. Supp. 2d at 440 (same).

Finally, "[w]hen the first two prongs of the exceptional-circumstances test are met, the third prong, 'neces[ity] to prevent a failure of justice,' is 'likely satisfied' if 'there are no substantial countervailing factors militating against the taking of the deposition.'" *Wey*, 2024 WL 237651, at *24 (alterations in the original) (quoting *Vilar*, 568 F. Supp. 2d at 442–43). "When a substantial likelihood exists that the prospective deponents will be unavailable for trial and their testimony is highly relevant to a central issue in the case, justice generally requires preservation of that testimony." *Wey*, 2017 WL 237651, at *24 (quoting *Drogoul*, 1 F.3d at 1556). Additionally, "[w]hile '[i]t is within the discretion of the trial court to deny [a Rule 15] motion if it is made after 'unexcused delay, it is clear that such delay must be the product of 'a serious lack of due diligence by the moving party' in order to deny a Rule 15 motion on that basis alone." *Vilar*, 568 F. Supp. 2d at 442–43 (internal citations omitted and alternations in original). "[P]recluding the taking of depositions under [such] circumstances is likely to frustrate, not expedite, the administration of criminal justice." *Id.*

"[A] motion made under Rule 15 is addressed to the discretion of the trial court." *United States v. Bah*, 574 F.3d 106, 118–19 (2d Cir. 2009) (quoting *United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962)); s*ee also United States v. Sindona*, 636 F.2d 792, 803 (2d Cir. 1980) (reviewing "the District Court's decision to grant or deny a motion to take a deposition in a criminal case for abuse of discretion").

### B.  Requirements and Guidelines for Rule 15 Depositions

If a motion for a Rule 15 deposition is granted, the "deposition must be taken and filed in the same manner as a deposition in a civil action except that . . . [t]he scope and manner of the

deposition examination and cross-examination must be the same as would be allowed during trial." Fed. R. Crim. P. 15(e).  Because "[t]he parties and the court may not always know beforehand just what type of examination a foreign nation may permit the attorneys to conduct[,] [t]he district court therefore may prefer to consider these problems after the deposition has been taken, when it can examine the transcript and the actual circumstances under which the deposition was conducted." *United States v. Salim*, 855 F.2d 944, 952 (2d Cir. 1988).  Additionally, because United States embassies permit "consular officers [to] administer oaths to the witnesses . . . taking sworn testimony at a United States Embassy would mitigate the reliability problem posed when witnesses do not swear an oath before the court."  *United States v. Mohamed*, 2020 WL 1545522, at *7 (E.D.N.Y. Apr. 1, 2020) (rejecting the government's argument that "the witnesses would not be sworn to an oath" because of the possibility to arrange for sworn testimony at an embassy); *see also United States v. Alexandre*, 2022 WL 9843495, at *5 (S.D.N.Y. Oct. 17, 2022) (noting that "[depositions at an American embassy or consulate" can "be conducted in a manner consistent with the American judicial system"); *United States v. Fargesen*, 2022 WL 4110303, at *5 (S.D.N.Y. Sept. 8, 2022) (directing parties to attempt to hold depositions of foreign witnesses at an American embassy or consulate "so that U.S. officials can swear the witnesses and provide assurances of formality and accuracy").

Even if a Rule 15 deposition is granted, pursuant to Rule 15(f) "[a]n order authorizing a deposition to be taken under this rule does not determine its admissibility."  Fed. R. Crim. P. 15(f); *see Salim*, 855 F.2d at 952 ("[T]he purpose and language of Rule 15 . . . concentrates first on preservation of testimony and only thereafter focuses on admissibility.")  "Admissibility of the deposition testimony is *not* a factor in deciding a Rule 15 motion."  *Mohamed*, 2020 WL 1545522, at *2 (emphasis in original).  Of course, "[t]he court need not, at the cost of time and money, engage in an act of futility by authorizing depositions that clearly will be inadmissible at trial."  *Mohamed*, 2020 WL 1545522, at *2 (citing *Drogoul*, 1 F.3d at 1555).  Rather, once taken, "[a] party may use all or part

11

of a deposition as provided by the Federal Rules of Evidence." Fed. R. Crim. P. 15(f); *see also* Fed. R. Crim. P. 15, Notes of Advisory Committee on Rules (2011 Amend.) ("Subdivision (f) provides that in the case of all depositions, questions of admissibility of the evidence obtained are left to the courts to resolve on a case by case basis.");[11] Notes of Advisory Committee on Rules (2002 Amend.) (same). A party may "make the relevant objections at the deposition and object to the admissibility of such testimony at trial." *United States v. Little*, 2014 WL 1744824, at *2 (S.D.N.Y. Apr. 23, 2014).

## III.     DISCUSSION

### A.  The Government's Motion Satisfies Rule 15's Requirements

#### 1.  The Two Proposed Witnesses Are Both Unavailable

The facts proffered by the Government establish that its two proposed witnesses are unavailable because each witness refuses to attend the trial despite the Government's good faith efforts. *See Johnpoll*, 739 F.2d at 709 ("Unavailability is to be determined according to the practical standard of whether under the circumstances the [movant] has made a good-faith effort to produce the person to testify at trial."). Here, the witnesses "are unavailable based on (1) the fact that, as foreign nationals who reside in the United Kingdom, they are beyond this Court's subpoena power; (2) the government's repeated requests to the witnesses and/or their counsel that the witnesses travel, at the expense of the government, to the United States to testify at trial; and (3) the representations of the witnesses' counsel that they have," in effect, "reached a 'final' decision to decline to testify a trial." *Vilar*, 568 F. Supp. 2d at 439 (internal citations omitted).

---

[11] In fact, the Advisory Committee notes that the text of subsection (f) was revised to "state more clearly the limited purpose and effect of the amendment, which is providing assistance in pretrial discovery. Compliance with the procedural requirements for the taking of the foreign testimony does not predetermine admissibility at trial, which is determined on a case-by-case basis, applying the Federal Rules of Evidence and the Constitution." *See* Notes of Advisory Committee on Rules (2011 Amend.).

First, it is undisputed that both witnesses are "beyond this Court's subpoena power." *See Vilar*, 568 F. Supp. 2d at 439. The Government avers that both witnesses reside in London, England, and refuse to travel to the United States for the trial. Mem. at 1; Felton Reply Decl. ¶ 2(a)("[The witnesses] refuse to travel to the United States to testify at trial. They reside beyond the subpoena power of the Court and they refuse to come.").[12]

Second, the Government has made "repeated requests to the witnesses and/or their counsel that the witnesses travel, at the expense of the government, to the United States to testify at trial." *Vilar*, 568 F. Supp. 2d at 439. Indeed, "[t]he Second Circuit has held that the government's representations regarding unavailability may be sufficient to satisfy Rule 15, at least where the government established its 'good faith' efforts to obtain the witnesses' presence at trial by indicating that it had repeated contact with the witnesses and had promised 'to pay all expenses of the witnesses' in traveling to the United States.'" *Vilar*, 568 F. Supp. 2d at 438 (citing *Sindona*, 636 F.2d at 804). The Government did just that. The Government twice offered "to pay for [both witnesses'] travel and lodging expenses and provide a per diem for incidental expenses." Felton Decl. ¶ 7; Felton Reply Decl. ¶ 4. The witnesses still refused. *See* Felton Reply Decl. ¶ 4.

Finally, the declarations by the Government and Mr. Wolfson's counsel make clear that the witnesses have, in effect, "reached a 'final' decision to decline to testify a trial." *Vilar*, 568 F. Supp. 2d at 439. Counsel for the two witnesses reiterated on five separate occasions that they would not voluntarily travel to the United States to testify in this matter, including on February 12, February 13, February 20, March 17, and as recently as March 19, 2025. Felton Decl. ¶ 7; Rybicki Decl. ¶¶ 6-7; Felton Reply Decl. ¶¶ 2–5. While the witnesses initially cited work conflicts as the reason for their unwillingness to testify at the trial, the Felton Reply Declaration makes clear that the

---

[12] The Government did not include the fact that the witnesses reside in London in its affidavit. The Court accepts this fact as true because Defendants do not dispute it.

witnesses categorically refuse to attend notwithstanding preexisting work obligations. Felton Reply Decl. ¶ 2(a) ("Irrespective of any prior commitments, [both witnesses] refuse to travel to the United States to testify at trial . . . [T]hey refuse to come."). The Government therefore made "a good-faith effort" to produce both witnesses to testify at trial by repeatedly requesting their voluntary participation without success. *See Johnpoll*, 739 F.2d at 709. The Court has no trouble concluding that two proposed witnesses are unavailable within the meaning of Rule 15.

The Court is not persuaded by Mr. Wolfson's argument that the witnesses are not unavailable because the witnesses previously cited work conflicts as the basis for their unwillingness to travel. *See* Opp. at 2–5. It is true that "speculation that some theoretical future work commitments might make [a witness] unavailable is entirely insufficient to support a finding of unavailability." *United States v. Pham*, No. 12-CR-423 (AJN), 2015 WL 7871348, at *4 (S.D.N.Y. Dec. 4, 2015) (quoting *United States v. Kassar*, 572 F. Supp. 2d at 376) (denying a Rule 15 motion because the defendant "has not indicated whether any efforts have been made for [the witness] to rearrange her schedule or otherwise specify why [the witness's] work commitments prevent her from testifying . . . ."). Here, it is clear that the witnesses refuse to attend independent of prior work commitments. Felton Reply Decl. ¶ 2(a). The Court also observes that, unlike in *Pham*, the Government identified a non-speculative, preexisting work obligation and made attempts to help rearrange those conflicts. *See* Felton Reply Decl. (explaining with respect to "[the witnesses] scheduled, preexisting commitments" that the Government "offered to aid . . . in rearranging scheduled commitments by discussing the trial with third parties" but "this offer did not change anything, as this would not enable the scheduled commitments to get rearranged."). Because both witnesses refuse to travel to the United States for trial despite the Government's repeated attempts to secure their voluntary attendance, the Court concludes that both of the witnesses are unavailable under Rule 15.

14

### 2.  The Witnesses' Testimony is Material

The witnesses' testimony is material because their proposed testimony is "highly relevant" to a "central issue in the case," namely, whether CC-2 and CC-3 are close associates of Mr. Kostin. *See Grossman*, 2005 WL 486735, at *3.  Mr. Wolfson does not dispute the materiality of the proffered testimony.  This concession is well placed.  The core of the Government's case is that Mr. Kostin used shell companies and nominees to maintain ownership of the Aspen Home through 2019.  Mr. Wolfson counters that he purchased the Aspen Home in 2014.  As evidence of Mr. Kostin's continued ownership of the Aspen Home after 2014, the Government alleges that one of Mr. Kostin's close associates, CC-2, helped maintain and fund the Aspen Home's operations through 2018.  For example, the indictment alleges that CC-2, acting as Mr. Kostin's "proxy," "approved the budget and financing" for Mr. Kostin's visits between 2010 and 2018, and helped coordinate a visit by Mr. Wolfson in February 2015 on behalf of Mr. Kostin. *Id.* ¶¶ 39–40.  Consequently, whether CC-2 is, in fact, a close associate of Mr. Kostin is highly relevant to the issue of ownership because evidence that Mr. Kostin's staff supported the Aspen Home's operations supports the Government's theory that Mr. Kostin—not Mr. Wolfson—owned the house after 2014.

Similarly, to prove Mr. Kostin's relationship with Capital Business Finance, the lender from whom Mr. Wolfson asserts he borrowed the money to buy the Aspen Home, the Government alleges that a second Kostin associate, CC-3, controlled Capital Business Finance for Mr. Kostin's benefit.  As the Government points out, Mr. Wolfson has contested this fact. *See* Mem. at 10.  Whether CC-3 is closely associated with Mr. Kostin is therefore highly relevant to whether Mr. Wolfson's 2019 transfer of $12 million to Capital Business Finance's subsidiary, CapitalInvest, was in fact a payment to Mr. Kostin.  Because both witnesses will testify about the close relationship between CC-2, CC-3, and Mr. Kostin, their testimony is material.

### 3.  The Deposition is Necessary to Prevent a Failure of Justice

Because "the first two prongs of the exceptional-circumstances test are met," and because Mr. Wolfson raises no countervailing factors as to why the motion should not be granted, the Court concludes that the third prong, the necessity to prevent a failure of justice, is satisfied.  *See Wey*, 2024 WL 237651, at *24.  "When a substantial likelihood exists that the prospective deponents will be unavailable for trial and their testimony is highly relevant to a central issue in the case, justice generally requires preservation of that testimony."  *Wey*, 2017 WL 237651, at *24 (quoting *Drogoul*, 1 F.3d at 1556).  Such is the case here.

Indeed, Mr. Wolfson's only objection to the Government's motion is that the witnesses are not unavailable.  He raises no countervailing factors as to why the motion should not be granted and the Court sees none.  The parties are presently scheduled to conduct a Rule 15 deposition of Mr. Wolfson's witness on April 22, 2025, in London, England and the Government contends that it "would work diligently to try to schedule the depositions of [the witnesses] in close proximity to the [scheduled] deposition and follow similar procedures . . . ."  *See* Mem. at 10.  Mr. Wolfson does not object to this proposal.  In any case, the Government agrees that, "in the event that the depositions are unable to occur in the more than three months that remain before trial in June 2025, the Government will proceed without their testimony."  *Id.*  "Precluding the taking of depositions under [such] circumstances is likely to frustrate, not expedite, the administration of criminal justice."  *Vilar*, 568 F. Supp. 2d at 442–43.  Because the first two prongs are met, the Court concludes that the deposition of the two proffered witnesses is necessary to prevent a failure of justice.

### IV.    CONCLUSION

Because the Government has demonstrated that its two witnesses are unavailable for trial, that their expected testimony is material, and that their depositions are necessary to prevent a failure

of justice, the Government's motion for leave to take a pre-trial deposition pursuant to Federal Rule

of Criminal Procedure Rule 15 is GRANTED.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 119.

SO ORDERED.

Dated:  April 3, 2025

_____
GREGORY H. WOODS
United States District Judge