

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 21, 2025

**BY ECF**
The Honorable Gregory H. Woods
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: **United States v. Vadim Wolfson, a/k/a "Vadim Belyaev," and Gannon Bond, S2 24 Cr. 91 (GHW)**

Dear Judge Woods:

The Government respectfully writes in response to defendants' letter, dated April 14, 2025, alleging that the Government obtained a warrant, dated March 27, 2025 (the "2025 Warrant"), "through serious misconduct," and seeking extraordinary and unprecedented relief, including wholesale suppression of the Government's evidence and multiple hearings. (Dkt. 162). Consistent with the Fourth Amendment, Second Circuit precedent, and the well-established plain view doctrine, the Government acted entirely appropriately in obtaining the 2025 Warrant—and the Court should reject defendants' baseless accusations.

First, pursuant to judicially authorized warrants, the Government properly seized data from certain of defendants' electronic devices. In searching that data for materials responsive to the respective warrants, the Government identified—*in plain view*—evidence of the defendants' charged offenses that was created, modified, sent, and/or received outside of the time period of the warrants. The Government then took appropriate action by applying for a supplemental search warrant (*i.e.*, the 2025 Warrant) in order to obtain authorization to search the Defendants' Data for evidence within a broader time period. Contrary to defendants' claims, the warrants in this case authorized (and authorize) the Government to seize all data from certain of the defendants' devices and to reasonably search that data for materials responsive to the warrants. That process is entirely consistent with the Fourth Amendment and Second Circuit law, and it is in place in part because, as discussed below, electronic data may not be effectively searched or sorted by date stamp, or may not even have a date stamp. Second, in obtaining the 2025 Warrant, the Government submitted an application, initially to this Court, that contained all facts relevant to the Magistrate Judge's probable cause determination. Of course, the Government is aware of defendants' pending suppression motions, and will implement the Court's forthcoming decision on those motions, including to the extent the Court's decision impacts or extends to the 2025 Warrant and/or data from defendants' devices. Third, the application submitted to the Magistrate Judge for the 2025

Warrant, upon referral from this Court, established probable cause completely independent from the evidence that defendants claim the Government improperly accessed, and the defendants' challenge to the 2025 Warrant should be denied on this basis alone.

For the reasons set forth below, the Government's search and its application for the 2025 Warrant were entirely proper, and the defendants' motion should be denied.

## BACKGROUND

A. **The Indictment**

On or about February 20, 2024, a grand jury sitting in this District returned Superseding Indictment S2 24 Cr. 91 (GHW), which charges Andrey Kostin, Wolfson, and Bond, in five counts. (Dkt. 13 (the "Indictment")). Counts One and Two of the Indictment charge Kostin with conspiring to violate the International Emergency Economic Powers Act ("IEEPA") and conspiring to commit international money laundering, in violation of 50 U.S.C. § 1705, 31 C.F.R. § 589.201, Executive Order 13661, and 18 U.S.C. § 1956(h). (*Id.* ¶¶ 49-50, 52-53). The time period for Counts One and Two is between on or about April 6, 2018, and in or about March 2022. (*Id.*). Counts Three, Four, and Five charge Kostin, Wolfson, and Bond with conspiring to violate IEEPA and two substantive counts of violating IEEPA in connection with a property located in Aspen, Colorado (the "Aspen Home"), and in violation of 50 U.S.C. § 1705, 31 C.F.R. § 589.201, 18 U.S.C. § 2, and Executive Order 13661 (the "Subject Offenses"). (*Id.* ¶¶ 55-56, 58-59, 60-61). The time period for Counts Three through Five is between on or about April 6, 2018, and in or about September 2019. (*Id.*).

As alleged in the Indictment, in February and March 2014, Russia invaded and annexed the Crimea region of Ukraine. (*Id.* ¶ 41). As a result, beginning on or about March 6, 2014, the United States imposed sanctions against Russia through Executive Order 13660. (*Id.* ¶ 12). Between in or about March 2014 through 2022, U.S. sanctions against Russia escalated and expanded from sanctions against the government to sanctions against Russian banks, entities, and individuals. (*Id.* ¶¶ 13-16, 19-22). In or about the end of March 2014, Bank Rossiya, a prominent Russian bank, was sanctioned by the United States. (*Id.* ¶ 41). On or about July 29, 2014, Russia's state-owned VTB Bank (where Kostin served as president and chairman) was sanctioned. (*Id.* ¶ 20). And on or about April 6, 2018, Kostin was also specifically sanctioned "for being an official of the Government of the Russian Federation" and in his role as president and chairman of VTB Bank. (*Id.* ¶ 21).

The relevant conduct began in at least in or about March 2014 when the United States began imposing sanctions against Russia. (*Id.* ¶ 12). In or about at least May 2014, approximately two months after the United States began imposing sanctions against Russia and two months before the United States sanctioned Kostin's bank, VTB Bank, Wolfson began acting as a straw owner for Kostin and purchased 40 North Star LLC (40 North Star, which owned the Aspen Home) through his shell company, Altamonte Holding Limited ("Altamonte"), which had been registered in the British Virgin Islands a month prior. (*Id.* ¶¶ 42-45). In late 2017, additional sanctions against Russia were anticipated, including as a result of the ongoing Russia-Ukraine war, and the forthcoming sanctions were expected to target Russian oligarchs, including Kostin. (*Id.* ¶ 46). As

2

a result, in or about early 2018, Wolfson and Bond began further assisting Kostin in distancing himself from his U.S.-based assets (*i.e.*, the Aspen Home) by, among other things, operating and maintaining the Aspen Home. (*Id.* ¶ 47). And on or about September 25, 2019, Wolfson purchased the Aspen Home by indirectly transmitting approximately $12 million to Kostin via CapitalInvest, an entity Kostin controlled. (*Id.* ¶ 48).

### B. The 2024 Warrants

<u>The Wolfson and Bond Warrants</u>.[1] On or about February 21, 2024, the Government obtained two judicially authorized warrants: a warrant issued by the Honorable Mark Lane, United States Magistrate Judge, Western District of Texas, to search Wolfson's residence and seize certain evidence, including electronic devices (Dkt. 78, Ex. A (filed under seal) (the "Wolfson Warrant")); and a warrant issued by the Honorable Cathy L. Waldor, United States Magistrate Judge, District of New Jersey, to search Bond's residence and seize certain evidence, including electronic devices (Dkt 87, Ex. O (filed under seal) (the "Bond Warrant")). (2025 Warrant ¶¶ 13, 15). Pursuant to the Wolfson and Bond Warrants, the Government seized two Apple iPhones (the "Wolfson Cellphone" and the "Bond Cellphone") and an Apple iPad (the "Wolfson iPad," and together with the Wolfson Cellphone and the Bond Cellphone, the "Defendants' Devices"). (*Id.*). The Wolfson and Bond Warrants authorized the Government to seize the entirety of Defendants' Devices and review their contents for certain evidence of the Subject Offenses for the time period from January 1, 2018, through March 31, 2022 (the "Initial Time Period"). (*Id.*).

On February 22, 2024—the day after the Wolfson and Bond Warrants were issued—defendants were arrested. In connection with Wolfson's arrest, law enforcement obtained his passcode to the Wolfson Cellphone and Wolfson iPad without advising him of his *Miranda* rights.

<u>Forensic Extractions of the Defendants' Devices, Filter Review, and the Renewed Wolfson Warrant</u>. In or about February 2024, data from the Bond Cellphone (the "Bond Cellphone Data") was forensically extracted and provided to the Government's filter team, which reviewed the Bond Cellphone Data for purposes of segregating potentially privileged materials. (*Id.* ¶ 16). On or about October 11, 2024, the filter team released certain non-privileged materials from the Bond Cellphone Data to the case team to begin its responsive review, which remains ongoing, including in part because the Data includes numerous records and communications in Russian that require translation (*id.*), and as the parties continue to confer about the defendants' assertions of privilege for certain materials.

In or about February or March 2024, data from the Wolfson iPad (the "Wolfson iPad Data") was forensically extracted and provided to the Government's filter team for purposes of segregating potentially privileged materials. (*Id.* ¶ 14). On or about July 22, 2024, the filter team released certain non-privileged materials from the Wolfson iPad Data to the case team to begin its responsive review, which remains ongoing for the same reasons as the review of the Bond Cellphone Data. (*Id.*).

---

[1] Many of the facts contained in this section are contained in the Government's application for a search warrant, dated March 27, 2025, which is the subject of defendants' instant motion, and referenced herein as the "2025 Warrant." (Dkt. 162, Ex. A (filed under seal)).

3

On or about May 3, 2024, following certain technical issues with the forensic extraction of data from the Wolfson Cellphone, and in an abundance of caution, the Honorable Ivan D. Davis, United States Magistrate Judge, Eastern District of Virginia, issued a warrant authorizing re-extraction of the data from the Wolfson Cellphone (the "Renewed Wolfson Warrant," and together with the Wolfson Warrant and the Bond Warrant, the "2024 Warrants"). (*Id.* ¶ 17).[2] Like the Wolfson Warrant, the Renewed Wolfson Warrant authorized the Government to review the contents of the Wolfson Cellphone for certain evidence of the Subject Offenses for the Initial Time Period. (*Id.*).

On or about June 24, 2024, data from the Wolfson Cellphone (the "Wolfson Cellphone Data") was forensically extracted and, like the Bond Cellphone Data, provided to the Government's filter team for the purposes of segregating potentially privileged materials. (*Id.* ¶ 18). On or about October 21, 2024, the filter team released certain non-privileged materials from the Wolfson Cellphone Data to the case team to begin its responsive review, which remains ongoing in part for the same reasons as the review of the Bond Cellphone Data and Wolfson iPad Data. (*Id.*).

The Ongoing Responsive Review and Identification of Evidence in Plain View Outside the Initial Time Period. Pursuant to the Renewed Wolfson Warrant, to conduct its review of the Wolfson Cellphone Data for materials responsive to the Renewed Wolfson Warrant, the Government was not (and is not) limited to reviewing materials with date and time stamps within the Initial Time Period. (*See, e.g.*, Bond Warrant, Attachment B at 2 ("Time Limitation. To the extent materials are dated, this warrant is limited to materials created, modified, sent, or received between January 1, 2018, and March 31, 2022); Bond Affidavit at 17 (same); Wolfson Affidavit ¶ 36 (same); Renewed Wolfson Affidavit ¶ 36 (same); Bond Warrant, Attachment B at 3 ("This search warrant authorizes law enforcement personnel to seize, image, or otherwise copy the cellular devices described above, and authorizes a later review of the media or information consistent with the warrant. The later review is authorized to include techniques, such as, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the medium to human inspection in order to determine whether it contains evidence as described above."); Bond Affidavit ¶ 38 (similar); Wolfson Affidavit ¶ 40 (similar); Renewed Wolfson Affidavit ¶ 40 (similar)).

Indeed, electronic warrants typically permit law enforcement to reasonably review the majority, if not all, of the data on a device to identify materials responsive to the warrants. This is in part because electronic data on electronic devices may not have a date or time stamp; the date or time stamp may reflect a creation date, modified date, deleted date, saved date, an altered date, hidden date, or other date; the date and time stamp may differ from that which is reflected in the data's metadata; the data may be encrypted, compressed, password-protected, hidden, or deleted; and/or the data may not be sortable by date stamp, among other things. For example, date stamps for a text chain that began in 2014 could only reflect the most recent message, requiring law enforcement to examine the text chain in full to determine if any communications are relevant and responsive to the warrant. For this reason, among others, electronic warrants generally permit

---

[2] Affidavits submitted in support of the warrants discussed herein are referred to as the Bond Affidavit, the Wolfson Affidavit, the Renewed Wolfson Affidavit, and the 2025 Affidavit.

broad review of electronic data seized to determine what is responsive to the warrant. Accordingly, the Government, under the 2025 Warrants, was and is authorized to review the entire contents of the Wolfson Cellphone Data for evidence of the Subject Offenses within the Initial Time Period. *See supra* at 4.

The Government utilized, among other techniques, search terms (*e.g.*, "Kostin" or "sanctions") to identify potentially responsive materials. Consistent with the above, the Government could not be confident that date metadata here accurately reflected the applicable timeframe of the data, including for electronic communications, and that applying date restrictions would enable the Government to identify all materials properly within the scope of the 2024 Warrants. During the course of its review of the Wolfson Cellphone Data for materials responsive to the Renewed Wolfson Warrant, the Wolfson iPad for materials responsive to the Wolfson Warrant, and the Bond Cellphone Data for materials responsive to the Bond Warrant, the Government identified in plain view various materials constituting evidence of the Subject Offenses that were associated with dates outside of the Initial Time Period (*i.e.*, they were sent and/or received outside of the Initial Time Period). (2025 Warrant ¶¶ 19-22). The Government seized the materials identified in plain view, and appropriately applied for a supplemental warrant (*i.e.*, the 2025 Warrant) to expand its search for responsive materials to a broader time period (the "Expanded Time Period").

### C. The Government's Productions

On January 28, 2025, the Government produced a preliminary, partial set of evidence identified from Wolfson's iPad and Bond's Cellphone, as responsive to the warrant, as well as certain materials seized in plain view. While defendants now assert that that "dozens" of those records fall outside of the Initial Time Period, prior to filing the instant motion, defendants had not identified for the Government any potential issues regarding that discovery production. Nor did defendants raise any potential issues to the Government regarding the scope of materials contained in Rule 16 productions made on September 20, 2024 (containing a preliminary set of responsive materials from Wolfson's iPad), or February 25, 2024 (containing a preliminary set of responsive materials from Bond's cellphone).

In February 2025, the Government's filter team made several productions of materials in connection with the Government's request that defendants provide a privilege log for those materials. Because those productions contained materials that had been withheld as potentially privileged, the Government's prosecution team did not have access to those records and did not review the contents of the production. On February 20, 2025, Wolfson's counsel notified the Government by email that "it appears to us that date filters were not properly applied." In response, the Government conferred with the filter team to make sure that date filters were applied and, on February 25, identified a narrowed range of records for which the Government was requesting a privilege log.

### D. The 2025 Warrant and Application

On March 27, 2025, the Government initially contacted the Court to submit the application for the 2025 Warrant, and the Court, consistent with the practices of many Judges in this District,

5

referred the application to the Magistrate Judge on duty. The Government, upon this Court's referral, submitted the application for the 2025 Warrant to the Honorable Valerie Figueredo, United States Magistrate Judge, Southern District of New York.

On March 27, 2025, Judge Figueredo, issued the supplemental warrant (*i.e.*, the 2025 Warrant) authorizing search of the Wolfson Cellphone Data, the Wolfson iPad Data, and the Bond Cellphone Data (the "Defendants' Data," or the "Subject Data") for evidence of the Subject Offenses, for the time period between May 1, 2014, and February 22, 2024 (*i.e.*, the Expanded Time Period). The application included an agent affidavit (*i.e.*, the 2025 Affidavit"), which described the following materials identified in plain view during the Government's responsive review of the Defendants' Data.

From the Wolfson Cellphone Data, the Government identified the following materials in plain view:

- On or about April 23, 2023, Wolfson sent a message to another person containing a link to a Bloomberg article titled, "US Expands Hunt for Russian Sanctions Evaders to Their Financial Advisors." (2025 Warrant ¶ 19(a)). This message is probative of Wolfson's knowledge and participation in the Subject Offenses, and his consciousness of guilt. (*Id.*).

- A Telegram chat between Wolfson and a user identified as Andrey Kostin includes a system message, sent on or about November 25, 2022, stating that "[Wolfson] disabled the self-destruct timer." (*Id.* ¶ 19(b)). This chat shows that Wolfson and Kostin were engaged in encrypted chats using Telegram before November 25, 2022, which were deleted, and is probative of their relationship, their communications, and their consciousness of guilt. (*Id.*).

From the Bond Cellphone Data, the Government identified the following materials in plain view:

- On or about March 30, 2016, an individual who served as the property manager for the Aspen Home between 2010 and 2020 (the "Property Manager") sent Bond a message informing Bond that Wolfson had left ski pants at the Aspen Home, and offered to overnight them back to him. (*Id.* ¶ 20(a)). This message shows that Wolfson was a guest of Kostin's at the Aspen Home in 2016—not the property's true owner—at a time when Wolfson claims he owned the Aspen Home. (*Id.*).

- In or about April 2016, the Property Manager sent Bond an email regarding the "tip breakdown" for the "[Wolfson] Aspen visit," stating that it was "such a pleasure hosting your group. We all had a lot of fun and are looking forward to your return next year." (*Id.* ¶ 20(b)). This message is probative of Kostin's ownership of the Aspen Home and Wolfson's status as a guest of Kostin's at the Aspen Home, including in April 2016 when Wolfson claims he owned the Aspen Home. (*Id.*).

- On or about September 17, 2022, the manager of 40 North Star ("Lawyer-1") sent Bond a message stating that "I sent you an email yesterday on a somewhat urgent matter. Please get back to me." Bond responded that "I also received the same from the same source" and "I'll

get back to you in a couple days with our plan." (*Id.* ¶ 20(c)). On or about September 16 and 17, 2022, law enforcement served grand jury subpoenas on Bond, in his capacity as an authorized representation of 40 North Star; on Lawyer-1, in his representative capacity for 40 North Star LLC; and on Wolfson, in his personal capacity. (*Id.*). In these messages, Lawyer-1 and Bond are discussing these subpoenas, and Bond's reference to "our plan" is a plan that Bond intended to form with Wolfson and Lawyer-1 to jointly respond to the subpoenas. These messages thus reflect Bond and Wolfson's knowledge, agreement, and consciousness of guilt regarding their dealings with 40 North Star LLC and the Aspen Home. (*Id.*).

- On or about October 17, 2022, Bond sent Wolfson a message containing a bank statement reflecting funds transferred as part of the $12 million September 2019 transaction and then wrote, "[s]till not sure how/why [Lawyer-1] would have this doc." (*Id.* ¶ 20(d)). On or about October 14, 2022, a few days prior to this message, this bank statement was provided to law enforcement in response to the grand jury subpoenas discussed above. In this message, Bond and Wolfson are discussing their "plan" in responding to the subpoenas, and this communication is evidence of Bond and Wolfson's knowledge, agreement, and consciousness of guilt regarding this transaction, which is a critical component of the charged scheme. (*Id.*). In particular, Bond expresses concern in this message as to why Lawyer-1 has records regarding the $12 million transaction, which shows Wolfson's and Bond's attempts to conceal the true nature of the transaction, which resulted in the purchase of the Aspen Home by Wolfson from Kostin. (*Id.*).

From the <u>Wolfson iPad Data</u>, the Government identified the following materials in plain view:

- On or about October 3, 2022, Wolfson and an individual who works for him exchanged messages in Russian regarding the 2014 transaction involving 40 North Star. (*Id.* ¶ 21(a)). Based on a draft translation, in this exchange, Wolfson's employee explained to Wolfson, in sum and substance, that everything was done in 2014 "with the help of concessions." Wolfson's employee's reference to "concessions" means an understanding between Wolfson and Kostin regarding Wolfson's straw ownership of the Aspen Home, including the fact that Kostin would reimburse Wolfson through entities Kostin controlled for Aspen Home expenses. (*Id.*).

The 2025 Affidavit also discussed, as a basis for probable cause, significant evidence that did *not* come from the Defendants' Devices. Specifically, the agent affiant explained the following, separate from the above-discussed evidence: "I believe there is independent probable cause to support issuance of [the] warrant authorizing the FBI to review [the Defendants' Data] for evidence concerning the Subject Offenses for the entirety of the time period between May 1, 2014, and February 22, 2024, when the devices were seized." (*Id.* ¶ 23). That evidence, as set forth in the 2025 Affidavit, included: (1) records obtained pursuant to grand jury subpoenas and voluntary productions showing that Altamonte, which was nominally owned by Wolfson, purchased 40 North Star in May of 2014 (*id.* ¶ 24); (2) emails obtained through a consent search of an email account used by the Property Manager that are between Bond and the Property Manager from the period between May 1, 2014 and January 2018—*i.e.*, outside of the Initial Time Period—showing that Wolfson and Bond visited the Aspen Home between in or about 2015 and

7

in or about 2017 as guests of Kostin, not as the property's true owner, and that defendants were aware that Kostin was the owner of the Aspen Home (*id.* ¶ 25); (3) records obtained from Wolfson's iCloud accounts showing that Wolfson maintained multiple phone numbers and an email address for Kostin in his contacts, that Wolfson had a meeting in December 2017—shortly before sanctions were imposed on Kostin and also outside of the Initial Time Period—with "K," (*i.e.*, Kostin) and that Wolfson's accessed, in May and August 2019, multiple public articles, including ones with titles such as "Fancy footwork: How businesses linked to blacklisted oligarchs avoid Western sanctions," and "Hiding Russian Money was Easy. Quitting was Harder" (*id.* ¶¶ 26, 27); and (4) records obtained from Bond's iCloud account showing that, in January 2018, Bond wrote to the Property Manager that "we are going forward with what we discussed"—appearing to reference earlier discussions that would likely have occurred outside of the Initial Time Period—with regard to a report listing individuals, including Kostin, against whom sanctions were anticipated (*id.* ¶ 28). This evidence—which is completely separate from the evidence defendants claim the Government improperly accessed, and which the defendants entirely ignore and do not challenge—was more than sufficient to support Judge Figueredo's probable cause determination.

As discussed below, the 2025 Affidavit did not include discussion of defendants' pending suppression motions, which were not relevant to Judge Figueredo's probable cause determination.

E.    **Defendants' Pending Motions Regarding the 2024 Warrants**

In or about November 2024, defendants filed motions to suppress evidence obtained pursuant to the 2024 Warrants. (Dkts. 79, 83, 87 (defendants' motions); Dkt. 93 (Government's opposition to defendants' motions)).

Wolfson moved to suppress, among other things, evidence from the Wolfson Cellphone and Wolfson iPad because Wolfson provided the passcode to these devices to law enforcement prior to being advised of his *Miranda* rights. (Dkt. 79). In response, the Government agreed that Wolfson's statements providing his passcode to law enforcement prior to being advised of his rights should be suppressed, but that—consistent with the decisions of the Supreme Court and the Second Circuit—the remedy for a *Miranda* violation is suppression of the statements, *not* suppression of any fruits of those statements (*i.e.*, electronic evidence). (Dkt. 93, Discussion § B (citing, *e.g.*, *Vega v. Tekoh*, 597 U.S. 134, 145 (2022) (explaining that the Supreme Court, in *Michigan v. Tucker*, 417 U.S. 433, 450-52 n.26 (1974), held that "fruits" of "an un-*Mirandized* statement can be admitted" in evidence); *United States v. Patane*, 542 U.S. 630, 641-42 (2004) ("[F]ailure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights," and that potential constitutional "violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. Thus, . . . with respect to mere failures to warn," there is "nothing to deter" and "no reason to apply the 'fruit of the poisonous tree doctrine.'"); *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010) ) ("[F]ailure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements.")); *see also United States v. Haygood*, 157 F. App'x 448, 449 (2d Cir. 2005); *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *8 (S.D.N.Y. Aug. 13, 2019); *United States v. Fiseku*, 2015 WL 7871038, at *16 (S.D.N.Y. Dec. 3, 2015); *United States v. Wilson*, 914 F. Supp. 2d 550, 562 (S.D.N.Y. 2012); *United States v. Grant*, No. 07 Cr. 1119 (CM), 2008 WL 2971781, at *6-*7 (S.D.N.Y. Aug. 1, 2008); *United States v. Fritzinger*, 2024 WL 2868987, at *4 (E.D.N.C. June 6,

2024) ("[P]ursuant to *Patane*, . . . to the extent that unlocking a cellphone in response to an officer's request was communicative in nature, 'the fruit of that voluntary communication, even though made without a *Miranda* warning, would nonetheless be admissible into evidence.'" (quoting *United States v. Oloyede*, 933 F.3d 302, 30910 (4th Cir. 2019))).

Defendants additionally moved to suppress evidence from Bond's Cellphone and certain electronic data obtained from email and iCloud accounts used by the defendants, contending that the agent affiant made material omissions and misstatements in applying for the warrants. (Dkts. 83, 87). The Court granted defendants' request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), regarding a search warrant obtained by the Government in October 2022 for certain email accounts used by the defendants (the "Email Search Warrant").

On or about March 12, 2025, the Court held a suppression hearing on certain of the defendant's pretrial motions. During that hearing, Special Agent Roland Chattaway testified about Wolfson's arrest. His testimony and the admitted body worn camera video showed that Wolfson acted voluntarily when he provided his passcode, even though he had not yet been advised of his *Miranda* rights. Special Agent Danielle Lockridge, the affiant for the Email Search Warrant, also testified. Her testimony and the admitted exhibits showed that there had been no omission made with the intent to mislead or in reckless disregard as to whether it would mislead, in part because the Government did not obtain the evidence showing that Wolfson became the nominal owner of 40 North Star, via Altamonte, in May 2014, until *after* the Email Search Warrant was issued.

The defendants' suppression motions are pending before this Court.

### F. Defendants' March 2025 Letter Motion Regarding the 2025 Warrant

On April 14, 2025, defendants filed the instant motion, alleging that the 2025 Warrant was "procured through serious misconduct." (Dkt. 162 at 1). Defendants argue that the "misconduct" includes (1) "wholesale and systemic disregard for the date range limitations imposed on warrants throughout this case" (*id.* at 1); and (2) "material omissions" to Judge Figueredo, including the circumstances under which the Government obtained access to the Wolfson Cellphone and Wolfson iPad (*id.* at 1, 5). Defendants seek unprecedented relief, including: (1) "wholesale suppression" of all evidence from Defendants' Devices; (2) an injunction prohibiting the Government from executing the 2025 Warrant; (3) a hearing to determine whether the searches of the Defendants' Devices were conducted in "flagrant disregard" of the Initial Time Periods; (4) a "taint hearing"; and (5) a continuation of the March 2025 suppression hearing. (*Id.* at 6-13).

## ARGUMENT

### I. The Government Lawfully Seized Materials from the Defendants' Data Under the Plain View Doctrine

Defendants are incorrect in arguing that the Government violated the Fourth Amendment by seizing and relying on evidence from the Defendants' Data that was seized in plain view.

The law in this Circuit is established and clear: law enforcement officers may seize an electronic device pursuant to a warrant, forensically image the device, and reasonably examine the

entirety of the device's data to identify materials responsive to the warrant. *See, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, 100 (2d Cir. 2017), *abrogated in part on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018) ("Since a search of a computer is 'akin to [a search of] a residence,' searches of computers may sometimes need to be as broad as searches of residences pursuant to warrants."); *United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013) (discussing application of plain view doctrine if "initial intrusion" was constitutional where officers opened "all of Galpin's computer and digital storage files because opening each file was the only means of determining its content"); *United States v. Barrett*, No. 23 Cr. 623 (JLR), 2025 WL 371084, at *22 (S.D.N.Y. Feb. 3, 2025) (denying defendant's request for a hearing and holding that there was "no basis" to conclude that law enforcement's execution of certain search warrants "exceeded the scope of their authority pursuant to those warrants" where officers reviewed "the entirety of the contents" of defendant's cellphones, and "uncovered evidence of other crimes that was in plain view") (discussing cases); *United States v. Arias-Casilla*, No. 21 Cr. 218 (AT), 2022 WL 2467781, at *6 (S.D.N.Y. July 6, 2022) ("[C]ourts in this Circuit routinely uphold the validity of warrants that, as in this case, authorize searches of the entirety of a cellphone for data responsive to a warrant."); *In re a Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled by Google, Inc.*, 33 F. Supp. 3d 386, 393 (S.D.N.Y. 2014) ("[W]e view it as well established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government.").

"The 'plain view' exception to the Fourth Amendment's warrant requirement" is also "well-established." *United States v. Babilonia*, 854 F.3d 163, 179 (2d Cir. 2017) (citing *United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014)). That is, the Fourth Amendment does not prohibit the warrantless seizure of evidence of crime in plain view. *Horton v. California*, 496 U.S. 128, 130-31 (1990). Specifically, "[u]nder the plain view doctrine, a law enforcement officer may seize evidence without a warrant if (1) the officer is lawfully in a position from which the officer views an object, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object." *Id.* at 179-80 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (internal quotation marks omitted)); *see also United States v. Franzone*, No. 21 Cr. 446 (VSB), 2025 WL 993112, at 5 (S.D.N.Y. Apr. 2, 2025) (same). As the Supreme Court has explained, "[t]he rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy" under the Fourth Amendment. *Dickerson*, 508 U.S. at 375; *see also United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) ("If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." (internal quotation marks omitted)). The plain view doctrine thus "serves to supplement the prior justification" for the initial intrusion. *Babilonia*, 854 F.3d at 180 (citing *Horton*, 496 U.S. at 135-36).

The Second Circuit has recognized that the plain view doctrine applies to digital evidence, such as electronic files stored on computers or phones. *See Galpin*, 720 F.3d at 451 (discussing application of plain view doctrine to computer and digital storage files that needed to be individually opened). In explaining the application of the plain view doctrine to electronic evidence, courts have discussed the parallels between premises searches and digital searches,

including that, in the context of the latter, "[i]t has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized." *Barrett*, 2025 WL 371084, at *22 (quoting *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 2014), *aff'd*, 858 F.3d 71 (2d Cir. 2017)). "These principles apply with equal force to search for electronic data and devices." *Id.* (citing cases).

Here, as authorized by the 2024 Warrants and consistent with the Fourth Amendment, the Government was permitted to review the entirety of the Defendants' Data for materials responsive to the Warrants. *See supra* at 4; *see also Ulbricht*, 858 F.3d at 100; *Galpin*, 720 F.3d at 451; *Barrett*, 2025 WL 371084, at *22; *Arias-Casilla*, 2022 WL 2467781, at *6; *In re a Warrant for All Content & Other Info.*, 33 F. Supp. 3d at 393. During the course of that search, law enforcement uncovered evidence of the Subject Offenses outside of the Initial Time Period. (2025 Warrant ¶¶ 19-21); *see also Babilonia*, 854 F.3d at 179; *Barrett*, 2025 WL 371084, at *22. Arguably, the Government need not have obtained a supplemental warrant, but in an abundance of caution, it did so (*i.e.*, the 2025 Warrant). The plain view doctrine applies because: (1) the Government was "lawfully in a position" from which it could view data (*i.e.*, the entirety of the Defendants' Data); (2) the "incriminating character" of the electronic communications were "immediately apparent"; and (3) the Government had "a lawful right of access" to the communications. *See Babilonia*, 854 F.3d at 179.

Accordingly, the Government's search and its reliance on evidence discovered in plain view as it was searching the Defendants' Data was lawful and appropriate. *See, e.g.*, *Barrett*, 2025 WL 371084, at *22. Here, just as in *Barrett*, there is "no basis [to conclude] that officers' execution of the search warrants in this matter exceeded the scope of their authority pursuant to those warrants." *Id*.

II. **The Government's Application for the 2025 Warrant Was Proper and Did Not Involve Reckless Disregard for the Truth or Any Material Omissions Impacting Judge Figueredo's Probable Cause Determination**

Defendants are incorrect in claiming that the Government engaged in "serious misconduct" by making "material omissions" in "reckless disregard for the truth" in its application for the 2025 Warrant. (Dkt. 162 at 1, 10-12). Specifically, defendants claim that omitting Wolfson's un-*Mirandized* statements about his passcode and/or the pending suppression litigation in the affidavit submitted to obtain the 2025 Warrant was "material," when it was not. These facts would have had no impact on Judge Figueredo's probable cause determination and the defendants cannot meet their heavy burden of showing that the omission was "designed to mislead"—because it was not.

To find that an affiant intentionally made misstatements or omissions in the search warrant affidavit, the "reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quoting *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)). A misstatement or omission is intentional only when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). "To prove reckless disregard for the truth, the defendant[] must prove that the

11

affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154; *see also United States v. Falso*, 544 F.3d 110, 126 (2d Cir. 2008) ("Allegations of negligence or innocent mistake are insufficient." (quoting *Franks*, 438 U.S. at 171)).

A defendant seeking to make the required showing of an intentional or reckless misstatement or omission must show more than inadvertent error. "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Awadallah*, 349 F.3d at 67-68. Moreover, alleged "[o]missions are not subject to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (internal quotation marks and citations omitted); *see also Awadallah*, 349 F.3d at 67.

Under *Franks*, a misstatement or omission is only material if it is "necessary to the [issuing] judge's probable cause finding." *Canfield*, 212 F.3d at 718. To permit the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal quotation marks omitted). It is not sufficient for the movant to simply show that a reasonable person would have included the omitted information, *Rajaratnam*, 719 F.3d at 154. "To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. Aug. 8, 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. "Courts have repeatedly been warned not to interpret the affidavit in a hypertechnical, rather than a commonsense, manner." *Id.* at 719 (internal quotation marks omitted). In the end, "the defense motion must be denied without a hearing if, after setting aside the allegedly misleading statements or omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987). "Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *United States v. Mandell*, 710 F. Supp. 2d 368, 374 (S.D.N.Y. 2010).

First and foremost, there is no evidence here whatsoever of bad faith, nefarious intent, or "reckless disregard for the truth" by the Government. Defendants have not and cannot present "credible and probative evidence" that any omissions in the 2025 Affidavit were "designed to mislead" or "made in reckless disregard of whether [it] would mislead." *Rajaratnam*, 719 F.3d at 154. As the Court and parties are well aware, the issues surrounding Wolfson's un-*Mirandized* statement and the potential consequences thereof were aired in public briefing and a public hearing before this Court. And the 2025 Affidavit includes all material information for the Court's probable cause determination, including: the fact that the 2024 Warrants were limited to the Initial Time Period, the fact that the Government uncovered evidence, discussed at length in the Affidavit, outside of the Initial Time Period, and the fact that the 2025 Warrant would authorize the Expanded Time Period. Moreover, the Government initially contacted the Court to submit the application for the 2025 Warrant, which confirms that the Government never had any intention of obtaining the 2025 Warrant by concealing the pending suppression litigation or Wolfson's un-*Mirandized*

statements about his passcode. And, as defendants acknowledge, the Government produced the 2025 Warrant and application on April 10, 2025.

The fact that Wolfson made un-*Mirandized* statements about his passcode that the Government agrees should be suppressed are not "material" because they do not change the fact that (1) there was probable cause that defendants committed the Subject Offenses, as established by the Indictment; and (2) there was probable cause that the Defendants' Data within the Expanded Time Period contained evidence of the Subject Offenses, as established by records that had been identified both on the devices and otherwise. The parties' pending suppression litigation does not alter the probable cause set forth in the 2025 Affidavit, nor would it have changed Judge Figueredo's probable cause determination. Indeed, defendants rely only on bald assertions and make no meaningful attempt to explain *how* such information would be relevant to the probable cause determination. (*See* Dkt. 162 at 5).

Finally, of course, the Government has every intention of implementing the Court's rulings with respect to the suppression litigation, and understands that the Court will decide what evidence from the Defendants' Data the Government will be permitted to use, if any, at trial. Specifically, to the extent the Court decides that the *Miranda* violation in this case warrants suppression of evidence from the Wolfson iPhone and/or Wolfson iPad, the Government understands that the Court's ruling will apply to these devices irrespective of the 2025 Warrant. In this heavily litigated matter that is scheduled for trial in two months, given the amount of time needed to conduct filter reviews, privilege litigation, responsive reviews, and trial preparations, the Government sought the 2025 Warrant, understanding that its ability to review and use evidence responsive to that warrant may or may not be impacted by the Court's suppression rulings.

### III. The Government's Application for the 2025 Warrant Established Probable Cause Separate from the Materials Seized in Plain View

Moreover, as discussed in detail above, the 2025 Affidavit set forth probable cause for the 2025 Warrant separate and apart from the evidence seized in plain view from Defendants' Data. *See supra* at 7-8 (discussing evidence, including electronic communications independent of evidence seized in plain view (citing 2025 Warrant ¶¶ 23-28)). Even if all of the paragraphs regarding the evidence challenged by defendants were removed from the 2025 Affidavit, "there [still] remains . . . independent and lawful information sufficient to support probable cause." *Levasseur*, 816 F.2d at 43. The 2025 Affidavit described significant evidence—outside of the Defendants' Data—showing that defendants were aware, during the relevant period, that Kostin was the true owner of the Aspen Home, that defendants had visited the Aspen Home in 2015, 2016, and 2017 only as his guests, and that they were aware of and anticipated the sanctions imposed on Kostin. *See supra* at 7-8. Indeed, the Indictment itself establishes that the relevant conduct in this case began in or about March 2014, well before the beginning of the Initial Time Period. *See supra* at 2-3 (discussing and citing Indictment). Defendants do not identify any issues with the evidence presented in the 2025 Affidavit separate from that seized in plain view, nor do they dispute that this separate evidence alone provides "independent probable cause to support issuance of [the] warrant authorizing the FBI to review [the Defendants' Data] for evidence concerning the Subject Offenses for the entirety of the time period between May 1, 2014, and February 22, 2024, when the devices were seized." (*Id.* ¶ 23.). For this reason, too, defendants motion should be denied.

## IV. The Court Should Deny Defendants' Unprecedented Request for Relief

As set forth above, defendants' motion is without merit and should be fully denied.

For purposes of the record, the Government notes that the defendants seek truly extraordinary and unprecedented relief, including "wholesale suppression" of the evidence from Defendants' Devices, an injunction prohibiting the Government from executing the 2025 Warrant, and hearings with respect to the Government's search of the Defendants' Devices and purported taint from that search, and a re-opening of the March 2025 *Franks* hearing. (Dkt. 162 at 6-13). Even if the Government had omitted material information from the application for the 2025 Warrant—*which it did not*—the extreme remedies requested by defendants are unsupported by law.

Specifically, "wholesale suppression" is not justified here, both because there was no Fourth Amendment violation, and also because suppression "has always been [the court's] last resort, not [its] first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009).[3] Nor is a hearing regarding the Government's search of the Defendants' Data necessary because, just as in *Barrett*, there is "no basis" to conclude that the Government's search has violated the Fourth Amendment or the 2024 Warrants. *See Barrett*, 2025 WL 371084, at *22 (denying evidentiary hearing) (citing *United States v. Taylor*, No. 06 Cr. 00529 (JSR), 2006 WL 2789987, at *2 (S.D.N.Y. Sept. 26, 2006) (finding that "defendant . . . failed to raise a material issue warranting an evidentiary hearing" as to whether item seized was in plain view)). Nor is there any basis for a *Franks* hearing, a "taint" hearing, or to "re-open" the March 2025 hearing. Defendants provide no legal basis for their request for a "taint" hearing, nor do they identify what aspects of this case or investigation they believe could have been "tainted." The 2025 Warrant, moreover, has no bearing on the suppression issues currently pending before the Court. And, as discussed above, information regarding defendants' suppression motions has no bearing on Judge Figueredo's probable cause determination. *See Mandell*, 710 F. Supp. 2d at 374 ("Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing."). Finally, there is no reason to pause the Government's execution of the 2025 Warrant because it was properly obtained and the Court will ultimately decide what evidence the Government may use from Defendants' Data at trial.

---

[3] Even if, assuming *arguendo*, defendants' challenge to the evidence seized in plain view were to prevail, the remedy would be limited suppression of evidence from outside of the Initial Time Period. Here, however, because the 2025 Affidavit established probable cause independent from the evidence seized in plain view, the remedy of limited suppression is neither fair nor warranted.

## **CONCLUSION**

For the foregoing reasons, defendants' motion should be denied.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

By: s/ _____
Emily Deininger
David R. Felton
Jane Kim
Assistant United States Attorney

cc: Defense Counsel (by ECF)