Case 1:24-cr-00091-GHW    Document 219    Filed 06/17/25    Page 1 of 6



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 17, 2025

**BY ECF**
The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    **United States v. Andrey Kostin et al., No. 24 Cr. 91 (GHW)**

Dear Judge Woods:

      The Government respectfully writes in response to the Court's oral orders at the pretrial conference held on June 3, 2025, and the Orders dated June 4 and 6, 2025 (Dkt. 210, 211) requiring, by June 17, 2025, (Dkt. 211), supplemental briefing by the Government as to (1) the basis for the introduction of statements by alleged co-conspirators prior to April 2018, when sanctions were imposed on Andrey Kostin, and the introduction of statements by Kostin's agents against defendants Vadim Wolfson and Gannon Bond; and (2) additional information regarding the factual predicate upon which the Government relies to establish the alleged "common goal" of Wolfson, Kostin, and Bond prior to the date of Kostin's sanction in 2018. This letter addresses each of those topics in turn.[1]

### Statements Under Federal Rules of Evidence 801(d)(2)(E)

      Statements by alleged co-conspirators between 2014 and the date Kostin was sanctioned in 2018 are admissible under Federal Rule of Evidence 801(d)(2)(E) because they were made during and in furtherance of their joint venture, which began by at least May 2014, when Altamonte became the nominal owner of 40 North Star LLC: to conceal Kostin's ownership of the Aspen Home and allow Kostin to control, use, and benefit from the Aspen Home despite not being its nominal owner on paper.

      As background, the conspiracy between the declarant and the defendant "need not be identical to any conspiracy that is specifically charged." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999); *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-

---

[1] As the Court is aware, the parties are engaged in ongoing discussions regarding a pre-trial disposition of this matter. The Government is filing this letter in compliance with the Court's orders listed above.

conspirator need not be charged in the indictment."); *see also United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)."); *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) (same). The Second Circuit has explained that, to admit a co-conspirator statement made in a separate conspiracy, the Government must show only that the defendant and the declarant are members of some conspiracy that somehow is "factually intertwined" with the charged offenses. *See Stratton*, 779 F.2d at 829.

As relevant here and as the Second Circuit has made clear, for purposes of the co-conspirator hearsay exception, which "has its roots in the law of agency," a conspiracy's objective "need not be criminal at all" and a "joint venture" among the parties counts as a "conspiracy" for purposes of the Rule. *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002); *see also United States v. Hwa*, No. 18 Cr. 538 (MKB), 2022 WL 901796, at *1 (E.D.N.Y. Mar. 27, 2022) (approvingly citing *Russo*'s lawful-joint-venture framework). Multiple prominent treatises reaffirm this settled proposition. *See, e.g.*, 30B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6778 (2023 ed.) ("Rule 801(d)(2)(E) uses the familiar term 'conspiracy,' but it . . . addresses teamwork more generally."); 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Fed. Evid.* § 8:59 (3d ed.) ("The exception can apply if people act together by mutual understanding in pursuit of a common purpose . . . even if the proponent does not show that the venture is unlawful.").

Indeed, as the Eleventh Circuit persuasively chronicled in a recent opinion, "One need not show that a conspiracy was unlawful to introduce coconspirator statements. So long as those statements were made during and in furtherance of a joint venture that included an opposing party, the statements are admissible." *United States v. Holland*, 117 F.4th 1352, 1354 (11th Cir. 2024). As the Eleventh Circuit explained, this interpretation is supported by Supreme Court precedent, persuasive precedent from numerous circuits, leading treatises, and the Rule's text. *Id.* at 1356. Indeed, as the court observed, at least eight other circuits share this same interpretation of Federal Rule of Evidence 801(d)(2)(E), including, as noted above, the Second Circuit. *Id.* at 1357 n.2 (citing authority from the Second, Third, Fifth, Sixth, Seventh, Ninth, Tenth, and D.C. Circuits, including the Second Circuit's *Russo* decision).

As for whether statements by Kostin's agents can be introduced against Wolfson and Bond, the Government intends to introduce such statements only to the extent that they were made during and in furtherance of the above-described conspiracy, pursuant to Federal Rule of Evidence 801(d)(2)(E), as detailed above. *See, e.g.*, *Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025, 1054 (S.D.N.Y. 1992) (admitting, under FRE 801(d)(2)(E), documents written by one of the coconspirator's employees through one of his corporate entities as "statements by an agent of a co-conspirator"); *United States v. Santana*, 503 F.2d 710, 717 (2d Cir. 1974) (admitting statements of a translator interpreting a conversation between a charged coconspirator and an unindicted coconspirator, due to translator's role as "an agent for the two co-conspirators"); *Las Vegas Merchant Plumbers Ass'n v. United States*, 210 F.2d 732, 751 (9th Cir. 1954) (affirming admission of statements where declarants were "either a co-conspirator, though not indicted, or the agent of the appellant co-conspirators" and "[h]is statement . . . was in furtherance of the conspiracy"). Thus, statements of agents of coconspirators—here, Kostin's agents—are non-hearsay against other members of the conspiracy, such as Wolfson and Bond.

**Factual Predicate**

An ample factual predicate supports the existence of a joint venture and common goal beginning at least as of May 2014 between Kostin, Wolfson, and Bond to conceal Kostin's ownership of the Aspen Home and continue to allow Kostin to control, use, and benefit from the Aspen Home, despite not being its owner on paper.[2]

**Applicable Law.** To admit a coconspirator statement under Federal Rule of Evidence 801(d)(2)(E), a district court must find two facts by a preponderance of the evidence: (i) the existence of a conspiracy that included the defendant and the declarant; and (ii) that the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *Gigante*, 166 F.3d at 82. "Although Rule 801(d)(2)(E) requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." *United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013).

When determining whether the predicate conspiracy has been established, the district court is not bound by the Federal Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as well as the circumstances surrounding the statement as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000); *see also Bourjaily*, 483 U.S. at 178-79 ("Congress has decided that courts may consider hearsay" in making preliminary factual determinations relevant to Rule 801(d)(2)(E)); *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). "As [the Second Circuit] has repeatedly held, once a conspiracy is established, only slight, even circumstantial evidence is needed to link another defendant with it." *United States v. Cota*, 953 F.2d 753, 758 (2d Cir. 1992). In addition, the defendant does not have to have been a member of the conspiracy at the time the statement was made. *See United States v. Farhane*, 634 F.3d 127, 161 n.35 (2d Cir. 2011). As noted above, the object of the conspiracy, which may simply be a "joint venture," need not be a criminal purpose.

Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not unduly restrictive. To be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a co-conspirator statement is admissible if it "can reasonably be interpreted as encouraging a co-

---

[2] The Government reserves its right to seek to admit other statements of co-conspirators not explicitly listed herein pursuant to Rule 801(d)(2)(E), and this letter is filed without prejudice to the Government's ability to argue that there are other valid hearsay exceptions for these statements, such as Rule 803(3), or that the statements are not hearsay because they are not statements at all or are not being admitted for the truth of the matter asserted therein, but are instead being offered for their effect on a listener, putting a listener on notice, or as commands or rules directed at a witness. *See, e.g.*, *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013); *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands . . . or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990); Fed. R. Evid. 801(c) advisory committee's note.

conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

Thus, statements are in furtherance of the conspiracy if they, for example: (i) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (ii) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958; (iii) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158; (iv) "provide reassurance," *id.*; (v) "serve to foster trust and cohesiveness," *id.*; (vi) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (vii) inform a co-conspirator of "the identity and activities of his co-conspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

Further, "so long as a coconspirator statement was in furtherance of the conspiracy, there is no requirement that it have been in furtherance of the interests of the defendant himself or of any particular coconspirator." *Gupta*, 747 F.3d at 124. Nor is it necessary that the defendant have known the co-conspirator who made the statement or the person to whom the statement was made. *See United States v. Casamento*, 887 F.2d 1141, 1157-58 (2d Cir. 1989) ("A lack of evidence connecting one defendant with others does not preclude a determination that all the defendants were co-conspirators; a single conspiracy may be found to link them all so long as each defendant knew from the scope of the operation that others were involved in the performance of functions vital to the success of the endeavor.").

**Discussion.** Among the considerable evidence of Kostin, Wolfson, and Bond's joint venture and common goal beginning as of at least May 2014—to conceal Kostin's continued ownership of the Aspen Home while he remained able to control, use, and benefit from the Aspen Home, despite not being its owner on paper—is the following:

*First*, in May 2014, just two months after the United States began imposing sanctions against Russian individuals and entities, nominal ownership of the entity that owned the Aspen Home changed from a Kostin-controlled entity, Ledridge Investments Limited ("Ledridge"), to Altamonte Holdings Limited ("Altamonte"), a Wolfson-controlled entity. Two months later, in July 2014, VTB Bank, of which Kostin was and is the President and Chairman, was sanctioned.

*Second*, on May 8, 2014, in response to a question from the Aspen Home's property manager (the "Property Manager") about the Aspen Home's "changes of ownership," CC-1, a close associate of Kostin, assured the Property Manager that "you will not be aware of any changes, as it will be business as usual." (GX 424).

*Third*, in December 2014, Ledridge (Kostin) and Altamonte (Wolfson) entered into a contract providing that Ledridge, a Kostin-controlled entity, with the assistance of a law firm in Cyprus, would collect and advise on all invoices, requests for payment, or issues relating to maintaining the Aspen Home, irrespective of the Aspen Home's nominal ownership. (*See* GX 1279).

*Fourth*, on January 15, 2015, CC-2, a close associate of Kostin, instructed the Property Manager, that "[t]he boss [*i.e.*, Kostin] has invited to stay at the house in February [a] guest" and "[t]he boss has confirmed that we cover all the expenses during his family stay. . . . [The guest] may use all the rooms in the house except for the boss' master bedroom."  (GX 410).

*Fifth*, on February 18, 2015, CC-2 explained to the Property Manager that Wolfson and his family would be visiting at the end of the month and that the Property Manager would receive a "list of guests for accommodation and guest requirements."  CC-2 made clear that, with respect to Wolfson's visit that, "[a]s the boss [*i.e.*, Kostin] said we cover all the expenses . . . ."  (GX 502).  This shows that, like the prior guest that visited earlier in 2015, Wolfson and his family were visiting the Aspen Home as Kostin's guests, despite the supposed "changes of ownership" (GX 424).

*Sixth*, in February and March 2016, Bond and the Property Manager exchanged emails regarding Bond's and Wolfson's upcoming visit to the Aspen Home.  The Property Manager noted that "Mr k" told her that Bond and Wolfson might be returning to the Aspen Home, answered Bond's questions about the bedroom arrangements, and mentioned at the end that "Mr. K and family asked me to get a black lab puppy for the[] house."  (GX 482).  This again shows that Kostin in fact controlled, used, and benefited from the Aspen Home during the relevant period, despite a paper change in ownership.

*Seventh*, in February 2015, Bond wrote to CC-3, a close associate of Kostin, and asked for a meeting so he could introduce CC-3 to the lawyer who was responsible for "our collaboration."  (GX 2240).

*Eighth*, in May 2016, Bond wrote to CC-3, to inquire about "our joint project."  (GX 2242).

*Ninth*, in September 2016, CC-3 explained to Bond that for purposes of paying the Aspen Home's expenses, certain expenses from a single March 15, 2016 invoice "constitute[] your own expense[s], which you need to account for as such" but "[a]ll other expenses are covered by us."  (GX 2246-TR).  The above three messages show that, as Bond and Wolfson understood, Kostin, through his associate CC-3, controlled and funded the Aspen Home during the relevant period.

*Tenth*, on October 5, 2016, CC-2 emailed the Property Manager to get more detailed explanations for certain Aspen Home expenses at the request of "the boss" (*i.e.*, Kostin) related to repair, maintenance, landscaping, groundskeeping, and homeowners association dues, showing that Kostin truly owned and controlled the Aspen Home during the relevant period.  (GX 485).

*Eleventh*, in January 2018, just one day after Kostin's name was included on a public report to Congress listing various Russian oligarchs being considered for sanctions (the "Report"), Bond wrote to the Property Manager that it "[l]ooks like we are going forward with what we discussed" and included a link to the Report.  (GX 329 and 329-A).  This again is evidence of the existence of a joint venture regarding the treatment of the Aspen Home during the relevant timeframe.  Slightly more than two months later, Kostin was sanctioned.

*Twelfth*, both before and after the 2014 transfer to Altamonte, funding requests to maintain the Aspen Home were sent to the same employee of CC-1, undermining any suggestion that Wolfson, as opposed to Kostin, truly controlled the Aspen Home between 2014 and 2018, notwithstanding a change in paper ownership.

*Thirteenth*, under 2014 and 2016 call option agreements between Capital Business Finance Ltd ("CBF")—a Kostin-controlled entity through CC-1 and CC-3—and Wolfson-controlled entities, Bentronian Trading Limited ("Bentronian") and Altamonte, respectively, CBF was empowered to purchase Altamonte or the shares of 40 North Star LLC for $10 million at any time. (*See* GX 1209, 1212). These agreements thus prevented Wolfson from taking any significant action as to the Aspen Home, including imposing any encumbrances, selling, mortgaging, disposing, or incurring additional debt, without prior written consent of CBF, *i.e.*, Kostin. These agreements thus further evince the joint venture because they spell out the severe impediments attendant to Wolfson's nominal ownership of the Aspen Home during the relevant period.

*Fourteenth*, during the 2014 to 2017 time period, Altamonte (Wolfson) bank records show that funding for the Aspen Home came from CBF (Kostin), separate and apart from any call option agreement.

Accordingly, a more than sufficient factual predicate supports the joint venture and common goal of Kostin, Wolfson, and Bond and others beginning as of at least May 2014, that is, to conceal Kostin's ownership of the Aspen Home while he remained able to control, use, and benefit from the Aspen Home, despite not being its owner on paper.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____/s/_____
Emily Deininger / David R. Felton
Assistant United States Attorneys
(212) 637-2472 / -2299

cc:    Counsel of Record (by ECF)